1    Lee M. Gordon (SBN 174168)
       lee@hbsslaw.com
2    HAGENS BERMAN SOBOL SHAPIRO LLP
     301 North Lake Avenue, Suite 203
3    Pasadena, CA 91101
     Telephone: (213) 330-7150
4    Facsimile: (213) 330-7152

5    Steve W. Berman (*pro hac vice pending*)
       steve@hbsslaw.com
6    Thomas E. Loeser (SBN 202724)
       toml@hbsslaw.com
7    HAGENS BERMAN SOBOL SHAPIRO LLP
     1918 Eighth Avenue, Suite 3300
8    Seattle, WA 98101
     Telephone: (206) 623-7292
9    Facsimile: (206) 623-0594

10   *Attorneys for Plaintiffs and the Proposed Class*

11              UNITED STATES DISTRICT COURT

12              CENTRAL DISTRICT OF CALIFORNIA

13                    EASTERN DIVISION

14

15   DERYL WALL, JUSTINE ANDOLLO,              No.  5:16-cv-01341
     DANIELLE AND JOBY HACKETT,
16   JEFFREY GUY, CASEY E. PERKINS,            **AMENDED CLASS ACTION**
     DAVID GOLDSMITH, MICHAEL                  **COMPLAINT**
17   VINCENT NATHAN JR. PASCUAL
     PIETRI, KEAN MCDONALD,
18   LINDSEY WELLS, TODD                       **JURY TRIAL DEMANDED**
     MATCHLEV, SCOTT MICHAEL
19   YOUNGSTROM JR., MELVIN SCOTT,
     ELIAM MARRERO BERNAL, CLARE
20   COLRICK, JACOB GUNNELLS, TODD
     FISHER, JOHN AND MARY
21   METZGER, CAMERON PHELPS,
     ROBERT F. HYATT IV, KAREN
22   STEDMAN, and CAMERON
     WEBSTER,on behalf of themselves and
23   persons similarly situated,

24                              Plaintiffs,

25         v.

26   FCA US LLC, a Delaware Limited
     Liability Company,
27
                                Defendant.
28

                    AMENDED CLASS ACTION COMPLAINT
010616-11  881080V1

1

**TABLE OF CONTENTS**

2

**Page**

3   I.     INTRODUCTION .................................................................. 1

4   II.    JURISDICTION .................................................................. 3

5   III.   VENUE .................................................................. 3

6   IV.    PARTIES .................................................................. 4

7          A.    California Plaintiffs .................................................. 4

8          B.    Arizona Plaintiffs .................................................. 6

9          C.    Florida Plaintiff .................................................. 7

10         D.    Illinois Plaintiffs .................................................. 8

11         E.    Massachusetts Plaintiffs .................................................. 9

12         F.    Michigan Plaintiff .................................................. 10

13         G.    Nevada Plaintiff .................................................. 11

14         H.    New Jersey Plaintiff .................................................. 11

15         I.     North Carolina Plaintiff .................................................. 12

16         J.     Ohio Plaintiffs .................................................. 13

17         K.    Oregon Plaintiff .................................................. 13

18         L.     Pennsylvania Plaintiffs .................................................. 14

19         M.    Texas Plaintiffs .................................................. 14

20         N.    Washington Plaintiffs .................................................. 15

21         O.    Defendants .................................................. 17

22  V.     FACTUAL ALLEGATIONS .................................................. 17

23         A.    The ZF Electronic Gear Shifter .................................................. 17

24         B.    The National Highway Transportation Safety
25               Administration Has Determined the ZF Shifter Is Poorly
                 Designed .................................................. 19

26         C.    Reports to NHTSA Recount Horrifying Incidents of
27               Vehicle Rollaway .................................................. 20

                       1.    Chrysler 300 .................................................. 20

28

2.   Dodge Charger ........................................................ 24

3.   Jeep Grand Cherokee ............................................. 25

D.   FCA and ZF Maintain That There Is Nothing Wrong With the Defective Shifter Vehicles ............................................. 31

E.   FCA Touts Safety and Design As Key Elements in Its Marketing ............................................................................ 31

F.   FCA's Delayed and Inadequate Response to the Defectively Designed ZF Shifter Has Led to Hundreds of Accidents, Many Involving Serious Injury, and Has Led to a Decrease in Value of the Defective Shifter Vehicles ......................... 36

VI.   TOLLING OF THE STATUTE OF LIMITATIONS ....................................... 38

A.   Discovery Rule Tolling ...................................................... 38

B.   Estoppel .................................................................................. 39

VII.   CLASS ALLEGATIONS ................................................................ 39

VIII.   VIOLATIONS ALLEGED ............................................................. 44

A.   Nationwide .......................................................................... 44

COUNT I  VIOLATION OF THE MAGNUSON-MOSS WARRANTY ACT (15 U.S.C. § 2301, *ET SEQ*.) ......................................................... 44

B.   California ................................................................................ 46

COUNT I  VIOLATION OF CALIFORNIA'S UNFAIR COMPETITION LAW (CAL. BUS. & PROF. CODE § 17200, *ET SEQ*.) ....................................................................................... 46

COUNT II  VIOLATION OF CALIFORNIA'S CONSUMERS LEGAL REMEDIES ACT (CAL. BUS. & PROF. CODE § 1750, *ET SEQ*.) ....................................................................................... 47

COUNT III  VIOLATION OF CALIFORNIA'S FALSE ADVERTISING LAW (CAL. BUS. & PROF. CODE § 17500, *ET SEQ*.) ....................................................................................... 50

COUNT IV  BREACH OF IMPLIED WARRANTY OF MERCHANTABILITY (CAL. COM. CODE § 2314) .................... 51

COUNT V  VIOLATION OF THE SONG-BEVERLY CONSUMER WARRANTY ACT FOR BREACH OF IMPLIED WARRANTY OF MERCHANTABILITY (CAL. CIV. CODE §§ 1791.1 & 1792) ................................................................ 52

COUNT VI  BREACH OF CONTRACT  (BASED ON CALIFORNIA LAW) ........................................................................................ 54

COUNT VII  EXEMPLARY DAMAGES (CAL. CIV. CODE § 3294) ...................55

    C.    Arizona .........................................................................................56

COUNT I  VIOLATION OF CONSUMER FRAUD ACT (ARIZ. REV. STAT. § 44-1521, *ET SEQ.*) ...............................................................56

COUNT II  VIOLATION OF EXPRESS WARRANTY  (ARIZ. REV. STAT. § 47-2313, *ET SEQ.*) .....................................................................59

COUNT III  VIOLATION OF IMPLIED WARRANTY OF MERCHANTABILITY (ARIZ. REV. STAT. § 47-2314) ..............................62

COUNT IV  BREACH OF CONTRACT (BASED ON ARIZONA LAW)..............................................................................................................63

COUNT V UNJUST ENRICHMENT ........................................................................64

    D.    Florida ..........................................................................................64

COUNT I  VIOLATION OF FLORIDA'S UNFAIR &  DECEPTIVE TRADE PRACTICES ACT (FLA. STAT. § 501.201, *ET SEQ.*)...................64

COUNT II  BREACH OF EXPRESS WARRANTY (FLA. STAT. § 672.313)..........................................................................................................68

COUNT III  BREACH OF IMPLIED WARRANTY OF MERCHANTABILITY (FLA. STAT. § 672.314) .........................................70

COUNT IV  BREACH OF CONTRACT (BASED ON FLORIDA LAW)..............................................................................................................71

COUNT V  UNJUST ENRICHMENT ......................................................................72

    E.    Illinois ..........................................................................................72

COUNT I  VIOLATIONS OF ILLINOIS CONSUMER FRAUD AND DECEPTIVE BUSINESS PRACTICES ACT (815 ILCS 505/1, *ET SEQ.* AND 720 ILCS 295/1A) ........................................................72

COUNT II  BREACH OF EXPRESS WARRANTY (810 ILL. COMP. STAT. 5/2-313) ..........................................................................................76

COUNT III  VIOLATION OF IMPLIED WARRANTY OF MERCHANTABILITY (800 ILL. COMP STAT. 5/2-314 AND 5/2A-212) ...................................................................................................78

COUNT IV  BREACH OF CONTRACT (BASED ON ILLINOIS LAW)..............................................................................................................79

COUNT V  UNJUST ENRICHMENT ......................................................................80

    F.    Massachusetts...............................................................................81

010616-11  881080V1

COUNT I  DECEPTIVE ACTS OR PRACTICES PROHIBITED BY MASSACHUSETTS LAW (MASS. GEN. LAWS CH. 93A, §1, *ET SEQ.*) .................................................................................... 81

COUNT II  BREACH OF EXPRESS WARRANTY (MASS. GEN. LAWS CH. 106, § 2-313) ....................................................... 81

COUNT III  BREACH OF IMPLIED WARRANTY OF MERCHANTABILITY (MASS. GEN. LAWS CH. 106, § 2-314) ........................................................................................ 84

COUNT IV  BREACH OF CONTRACT (BASED ON MASSACHUSETTS LAW) ...................................................... 85

COUNT V  UNJUST ENRICHMENT ............................................... 86

      G.     Michigan .................................................................. 86

COUNT I  VIOLATIONS OF THE MICHIGAN CONSUMER PROTECTION ACT (MICH. COMP. LAWS § 445.903, *ET SEQ.*) ..................................................................................... 86

COUNT II  BREACH OF EXPRESS WARRANTY (MICH. COMP. LAWS ANN.440.2313 AND 440.2860) .............................. 91

COUNT III  BREACH OF IMPLIED WARRANTY OF MERCHANTABILITY (MICH. COMP. LAWS § 440.314) ........................ 93

COUNT IV  BREACH OF CONTRACT (BASED ON MICHIGAN LAW) ............................................................................ 94

COUNT V  UNJUST ENRICHMENT ............................................... 95

      H.     Nevada .................................................................... 96

COUNT I  VIOLATIONS OF THE NEVADA DECEPTIVE TRADE PRACTICES ACT (NEV. REV. STAT. § 598.0903, *ET SEQ.*) .................... 96

COUNT II  BREACH OF EXPRESS WARRANTY (NEV. REV. STAT. § 104.2313 AND 104A.2210) ............................. 100

COUNT III  BREACH OF IMPLIED WARRANTY OF MERCHANTABILITY (NEV. REV. STAT. § 104.2314) .......................... 103

COUNT IV  BREACH OF CONTRACT  (BASED ON NEVADA LAW) ............................................................................ 103

COUNT V  UNJUST ENRICHMENT ............................................. 105

      I.     New Jersey ............................................................ 105

COUNT I  VIOLATIONS OF THE NEW JERSEY CONSUMER FRAUD ACT (N.J. STAT. ANN. §§ 56:8-1, *ET SEQ.*) ............................... 105

010616-11  881080V1

COUNT II  BREACH OF EXPRESS WARRANTY (N.J. STAT. ANN. § 12A:2-313 AND 12A:2A-210) ............................................. 107

COUNT III  BREACH OF IMPLIED WARRANTY OF MERCHANTABILITY (N.J. STAT. ANN. § 12-A:2-314) .......................... 109

COUNT IV  BREACH OF CONTRACT  (BASED ON NEW JERSEY LAW) ......................................................................................... 110

COUNT V  UNJUST ENRICHMENT ............................................ 111

    J.     North Carolina ...................................................... 112

COUNT I  VIOLATIONS OF THE NORTH CAROLINA UNFAIR AND DECEPTIVE TRADE PRACTICES ACT (N.C. GEN. STAT. §§ 75-1.1, *ET SEQ.*) ................................................ 112

COUNT II  BREACH OF EXPRESS WARRANTY (N.C. GEN. STAT. § 25-2-313 AND § 25-2A-210) ................................... 113

COUNT III  BREACH OF IMPLIED WARRANTY OF MERCHANTABILITY (N.C. GEN. STAT.  § 25-2-314) ............. 116

COUNT IV  BREACH OF CONTRACT (BASED ON NORTH CAROLINA LAW) ......................................................... 117

COUNT V  UNJUST ENRICHMENT ............................................ 118

    K.     Ohio ............................................................................ 119

COUNT I  VIOLATIONS OF THE CONSUMER SALES PRACTICES ACT (OHIO REV. CODE § 1345.01, *ET SEQ.*) ..................... 119

COUNT II  BREACH OF EXPRESS WARRANTY (OHIO REV. CODE § 1302.26, *ET SEQ.*) (U.C.C. § 2-313) ................................. 122

COUNT III  BREACH OF IMPLIED WARRANTY OF MERCHANTABILITY (OHIO REV. CODE § 1302.27)(U.C.C. § 2-314)) ..................................................................... 125

COUNT IV  BREACH OF CONTRACT (BASED ON OHIO LAW) ................ 125

COUNT V  UNJUST ENRICHMENT ............................................ 126

    L.     Oregon ...................................................................... 127

COUNT I  VIOLATIONS OF THE OREGON UNLAWFUL TRADE PRACTICES ACT  (OR. REV. STAT. §§ 646.605, *ET SEQ.*) .................... 127

COUNT II  BREACH OF EXPRESS WARRANTY (OR. REV. STAT. §§ 72.3130 AND § 72A.2100) ........................................ 131

COUNT III  BREACH OF IMPLIED WARRANTY OF MERCHANTABILITY (OR. REV. STAT. § 72.3140) ............................... 133

COUNT IV  BREACH OF CONTRACT  (BASED ON OREGON LAW) ........................................................................................ 134

COUNT V  UNJUST ENRICHMENT ........................................................... 135

    M.    Pennsylvania ...................................................................... 136

COUNT I  VIOLATIONS OF THE PENNSYLVANIA UNFAIR TRADE PRACTICES AND CONSUMER PROTECTION LAW (73 PA. CONS. STAT. § 201-1, *ET SEQ.*) ..................................... 136

COUNT II  BREACH OF EXPRESS WARRANTY (13 PA. CONS. STAT. ANN. § 2313) .................................................................. 140

COUNT III  BREACH OF IMPLIED WARRANTY OF MERCHANTABILITY (13 PA. CONS. STAT. ANN. § 2314) ................... 142

COUNT IV  BREACH OF CONTRACT  (BASED ON PENNSYLVANIA LAW) ................................................................. 143

COUNT V  UNJUST ENRICHMENT ........................................................... 144

    N.    Texas .................................................................................. 145

COUNT I  VIOLATIONS OF THE DECEPTIVE TRADE PRACTICES ACT  (TEX. BUS. & COM. CODE §§ 17.41, *ET SEQ.*) ........................................................................................... 145

COUNT II  BREACH OF EXPRESS WARRANTY (TEX. BUS. & COM. CODE § 2.313) .................................................................. 145

COUNT III  BREACH OF IMPLIED WARRANTY OF MERCHANTABILITY (TEX. BUS. & COM. CODE § 2.314) ................... 148

COUNT IV  BREACH OF CONTRACT  (BASED ON TEXAS LAW) .............. 148

COUNT V  UNJUST ENRICHMENT ........................................................... 150

    O.    Washington ....................................................................... 150

COUNT I  VIOLATIONS OF THE WASHINGTON CONSUMER PROTECTION ACT  (WASH. REV. CODE ANN. § 19.86.010, *ET SEQ.*) ........................................................................................... 150

COUNT II  BREACH OF EXPRESS WARRANTY (WASH. REV. CODE § 62A.2-313) ................................................................. 154

COUNT III  BREACH OF IMPLIED WARRANTY OF MERCHANTABILITY  (WASH. REV. CODE § 62A.2-314) ..................... 156

COUNT IV  BREACH OF CONTRACT  (BASED ON WASHINGTON LAW) ..................................................................... 157

COUNT V  UNJUST ENRICHMENT ........................................................... 158

010616-11  881080V1

REQUEST FOR RELIEF ........................................................................... 159

DEMAND FOR JURY TRIAL ................................................................. 160

010616-11  881080V1

Plaintiffs Deryl Wall, David Goldsmith, Michael Vincent Nathan Jr., Pascual Pietri, Jeffrey Guy, Casey E. Perkins, Justine Andollo, Kean McDonald, Lindsey Wells, Todd Matchley, Scott Michael Youngstrom Jr., Melvin Scott, Eliam Marrero Bernal, Clare Colrick, Jacob Gunnells, Danielle and Joby Hackett, Todd Fisher, John and Mary Metzger, Cameron Phelps, Robert F. Hyatt IV, Karen Stedman, and Cameron Webster, individually and on behalf of all others similarly situated (the "Class"), allege the following:

## I.     INTRODUCTION

1.     One of the most basic safety features in every car is the gear shifter that causes a stationary car to remain stationary, *unless and until* an operator wants the car to move. The design of a gear shifter must be such that operators know when a car is safe to exit because it is in the "park" mode, or it must include a safety override that automatically puts the car in park when the drivers' door is opened and pressure is taken off the foot brake.

2.     FCA US LLC ("FCA") broke this basic rule.  In its 2012-14 Dodge Chargers and Chrysler 300s, and 2014-15 Jeep Grand Cherokees ("Defective Shifter Vehicles"), FCA installed gear shifters, designed and manufactured by ZF Friedrichshaffen AG ("ZF"), that departed from the long established "PRND" gear selector in favor of an electronic mechanism that never actually "shifts" into any gear, but rather always moves back to a central location after being engaged (the "ZF Shifter"). The ZF Shifter design is dangerously defective because there is no tactile or position feedback to the operator as to whether the car has actually been placed into the safe-to-exit "park" gear and there is no safety override that automatically puts the car in "park" if the driver's door is open and pressure is taken off the foot brake.

3.     The safety issue is real.  Well over 300 accidents have already been reported, causing dozens of serious injuries, and potentially the death of Anton Yelchin, a young Hollywood actor who was crushed to death when his own 2015 Jeep Grand Cherokee rolled down his drive and pinned him against his brick mailbox.

010616-11 881080V1

4.     The design defect was avoidable.  FCA competitors, including BMW, have for several years used similar electronic shift levers that return to center after being engaged.  But on the BMW, if the car is not in "park," and the driver's door is opened and the foot brake released, the car automatically shifts into "park," thus making impossible the roll-away incidents and accidents at issue in this case.

5.     Though complaints and accident reports have been ongoing since at least early 2015, FCA has only recently initiated a voluntary recall of the over 811,000 Defective Shifter Vehicles in the United States; but initially, FCA only sent a letter to owners describing the design defect of the ZF Shifter, even though it knew exactly how to fix the problem by looking at what its competitors have done.  Only after years of blaming rollaway accidents on their customers and telling them the cars were not defective, the widely publicized death of Mr. Yelchin, and the filing of the original complaint in this action, FCA finally changed its tune and issued a recall to purportedly add an "autopark" feature to the defective shifter mechanism.

6.     FCA's unreasonable delay in fixing the defect and its warning letter was obviously too little, too late for Mr. Yelchin, and nearly a million Defective Shifter Vehicles remain in unsuspecting owners' driveways and garages. As a result of this dangerous defect, the Defective Shifter Vehicles are "unsafe in any driveway," and the value of each Defective Shifter Vehicle has diminished and will remain depressed even if an effective fix is eventually applied.

7.     While no one can bring back young Mr. Yelchin, or stem the pain and suffering of the dozens of other owners of the Defective Shifter Vehicles who have been involved in accidents or injured because of the defective ZF Shifter, through this lawsuit, Plaintiffs seek to force FCA to promptly fix the Defective Shifter Vehicles by replacing the defectively designed ZF Shifter and/or installing a safety override system like in the BMW, and to compensate owners of Defective Shifter Vehicles for the loss of value resulting from the dangerous design defect.

8.      Plaintiffs bring this action individually and on behalf of all other owners or lessees of 2012-14 Dodge Chargers and Chrysler 300s, and 2014-15 Jeep Grand Cherokees.  Until the defectively designed ZF Shifters in the Defective Shifter Vehicles are replaced with gear selectors that cannot be unintentionally left in drive or neutral when a driver gets out of the car, every owner of a Defective Shifter Vehicle is at risk of accident, injury, or even death.  Plaintiffs seek damages, injunctive relief, and equitable relief for the conduct of FCA related to the defectively designed gear selector as alleged in this Complaint.  Specifically, Plaintiffs seek: immediate installation of a safety override system or replacement of the defective ZF Shifter, provision of a temporary replacement vehicle while replacement is pending, and/or buyback of the Defective Shifter Vehicles, compensation for any additional sums spent on maintenance as a result of any "fix," restitution for increased auto insurance premiums caused by accidents resulting from the defectively designed ZF Shifter, restitution for purchase of extended warranties that will go unused, and punitive damages for FCA's knowing fraud that put drivers in California and nationwide at risk.

## II.      JURISDICTION

9.      This Court has jurisdiction pursuant to the Class Action Fairness Act of 2005, 28 U.S.C. § 1332(d), because the proposed Class consists of 100 or more members; the amount in controversy exceeds $5,000,000, exclusive of costs and interest; and minimal diversity exists.  This Court also has supplemental jurisdiction over the state law claims pursuant to 28 U.S.C. § 1367.

## III.      VENUE

10.      Venue is proper in this District under 28 U.S.C. § 1391 because a substantial part of the events or omissions giving rise to Plaintiffs' claims occurred in this District.  Plaintiff Deryl Wall resides in this District and purchased his Defective Shifter Vehicle in this District.  FCA has marketed, advertised, sold, and leased the Defective Shifter Vehicles within this District.

# IV.    PARTIES

## A.    California Plaintiffs

11.    Plaintiff Deryl Wall is a resident of California domiciled in Temecula, California. Deryl bought a Jeep Grand Cherokee in California in 2015.  He purchased the car because of its reputation for safety and utility, consistent with his review of Jeep's advertising messaging regarding safety and reliability.  Deryl believed his Grand Cherokee would be a good value because of its utility and reputation for safety. Plaintiff still owns his Jeep Grand Cherokee.  Unknown to Plaintiff at the time the vehicle was purchased, the vehicle was equipped with a ZF Shifter that is defectively designed.  The design defect allows the driver to get out of the car while the car is not in "park," which can allow the car to roll away from its parked position. The defect in the Jeep Grand Cherokee has caused Plaintiff out-of-pocket losses, future attempted repairs, loss of warranty value, and diminished value of his vehicle.  FCA knew that the ZF Shifter could lead to vehicle roll-away incidents, but did not disclose this defect to Plaintiff, so Plaintiff purchased the vehicle on the reasonable, but mistaken, belief that the Jeep Grand Cherokee was utile and safe to operate as designed.

12.    Plaintiff David Goldsmith is a resident of California domiciled in Hanford, California. On August 15, 2015, Plaintiff bought a new 2015 Jeep Grand Cherokee at Clovis Chrysler Dodge Jeep RAM in Clovis, California.  He purchased the car because of its reputation for safety and utility, consistent with his review of Jeep's advertising messaging regarding safety and reliability.  Plaintiff believed his Grand Cherokee would be a good value because of its utility and reputation for safety. Plaintiff still owns his Jeep Grand Cherokee.  Unknown to Plaintiff at the time the vehicle was purchased, the vehicle was equipped with a ZF Shifter that is defectively designed.  The design defect allows the driver to get out of the car while the car is not in "park," which can allow the car to roll away from its parked position. This happened to Plaintiff on August 24, 2015, when his car rolled into a post, causing damage to the car and, eventually, increased insurance premiums.  The defect in the

Jeep Grand Cherokee has also caused Plaintiff out-of-pocket losses, future attempted repairs, loss of warranty value, and diminished value of his vehicle. FCA knew that the ZF Shifter could lead to vehicle roll-away incidents, but did not disclose this defect to Plaintiff, so Plaintiff purchased the vehicle on the reasonable, but mistaken, belief that the Jeep Grand Cherokee was utile and safe to operate as designed.

13.     Plaintiff Michael Vincent Nathan, Jr. is a resident of California domiciled in Acton, California. On or about September 10, 2013, Plaintiff bought a new 2014 Jeep Grand Cherokee at AutoNation Chrysler Dodge Jeep Ram at 23820 Creekside Road, Valencia, CA 91355. He purchased the car because of its reputation for safety and utility, consistent with his review of Jeep's advertising messaging regarding safety and reliability. Plaintiff believed his Grand Cherokee would be a good value because of its utility and reputation for safety. Plaintiff still owns his Jeep Grand Cherokee. Unknown to Plaintiff at the time the vehicle was purchased, the vehicle was equipped with a ZF Shifter that is defectively designed. The design defect allows the driver to get out of the car while the car is not in "park," which can allow the car to roll away from its parked position. The defect in the Jeep Grand Cherokee has caused Plaintiff out-of-pocket losses, future attempted repairs, loss of warranty value, and diminished value of his vehicle. FCA knew that the ZF Shifter could lead to vehicle roll-away incidents, but did not disclose this defect to Plaintiff, so Plaintiff purchased the vehicle on the reasonable, but mistaken, belief that the Jeep Grand Cherokee was utile and safe to operate as designed.

14.     Plaintiff Pascual Pietri is a resident of California domiciled in Los Angeles, California. On or about May 1, 2016, Plaintiff bought a new 2015 Jeep Grand Cherokee at AutoNation Chrysler Dodge Jeep Ram Valencia at 23820 Creekside Road, Valencia, CA 91355. He purchased the car because of its reputation for safety and utility, consistent with his review of Jeep's advertising messaging regarding safety and reliability. Plaintiff believed his Grand Cherokee would be a good value because of its utility and reputation for safety. Plaintiff still owns his Jeep

010616-11 881080V1

Grand Cherokee.  Unknown to Plaintiff at the time the vehicle was purchased, the vehicle was equipped with a ZF Shifter that is defectively designed.  The design defect allows the driver to get out of the car while the car is not in "park," which can allow the car to roll away from its parked position. The defect in the Jeep Grand Cherokee has caused Plaintiff out-of-pocket losses, future attempted repairs, loss of warranty value, and diminished value of his vehicle.  FCA knew that the ZF Shifter could lead to vehicle roll-away incidents, but did not disclose this defect to Plaintiff, so Plaintiff purchased the vehicle on the reasonable, but mistaken, belief that the Jeep Grand Cherokee was utile and safe to operate as designed.

**B.    Arizona Plaintiffs**

15.    Plaintiff Jeffrey Guy is a resident of Arizona domiciled in Mesa, Arizona. On January 31, 2015, Plaintiff bought a new 2015 Jeep Grand Cherokee at Larry Miller Jeep Chrysler in Avondale, Arizona.  He purchased the car because of its reputation for safety and utility, consistent with his review of Jeep's advertising messaging regarding safety and reliability.  Plaintiff believed his Grand Cherokee would be a good value because of its utility and reputation for safety.  Plaintiff still owns his Jeep Grand Cherokee.  Unknown to Plaintiff at the time the vehicle was purchased, the vehicle was equipped with a ZF Shifter that is defectively designed. The design defect allows the driver to get out of the car while the car is not in "park," which can allow the car to roll away from its parked position. The defect in the Jeep Grand Cherokee has caused Plaintiff future attempted repairs, loss of warranty value, and diminished value of his vehicle.  FCA knew that the ZF Shifter could lead to vehicle roll-away incidents, but did not disclose this defect to Plaintiff, so Plaintiff purchased the vehicle on the reasonable, but mistaken, belief that the Jeep Grand Cherokee was utile and safe to operate as designed.

16.    Plaintiff Casey E. Perkins is a resident of Arizona domiciled in Fort Mojave, Arizona. On October 8, 2014, Plaintiff bought a new 2014 Chrysler 300 at Swanty's Chrysler Dodge Jeep Ram in Bullhead City, Arizona.  He purchased the car

because of its reputation for safety and utility, consistent with his review of Chrysler's advertising messaging regarding safety and reliability.  Plaintiff believed his Chrysler 300 would be a good value because of its utility and reputation for safety.  Plaintiff still owns his Chrysler 300.  Unknown to Plaintiff at the time the vehicle was purchased, the vehicle was equipped with a ZF Shifter that is defectively designed. The design defect allows the driver to get out of the car while the car is not in "park," which can allow the car to roll away from its parked position. The defect in the Chrysler 300 has caused Plaintiff future attempted repairs, loss of warranty value, and diminished value of his vehicle.  FCA knew that the ZF Shifter could lead to vehicle roll-away incidents, but did not disclose this defect to Plaintiff, so Plaintiff purchased the vehicle on the reasonable, but mistaken, belief that the Chrysler 300 was utile and safe to operate as designed.

**C.    Florida Plaintiff**

17.    Plaintiff Justine Andollo is a resident of Florida domiciled in Naples, Florida. Justine bought a 2015 Jeep Grand Cherokee at Naples Dodge Chrysler Jeep in Naples, Florida, in 2015.  She purchased the car because of its reputation for safety and utility, consistent with her exposure to Jeep's advertising messaging.  Justine believed her Grand Cherokee would be a good value because of its utility and reputation for safety.  Plaintiff still owns her Jeep Grand Cherokee.  Unknown to Plaintiff at the time the vehicle was purchased, the vehicle was equipped with a ZF Shifter that is defectively designed.  The design defect allows the driver to get out of the car while the car is not in "park," which can allow the car to roll away from its parked position. The defect in the Grand Cherokee has caused Plaintiff out-of-pocket losses, future attempted repairs, loss of warranty value, and diminished value of her vehicle.  FCA knew that the ZF Shifter could lead to vehicle roll-away incidents, but did not disclose this defect to Plaintiff, so Plaintiff purchased the vehicle on the reasonable, but mistaken, belief that the Jeep Grand Cherokee was utile and safe to operate as designed.

-7-

18.    Plaintiff Andollo has had four separate incidents where her vehicle has rolled away because of the defectively designed ZF Shifter and FCA's failure to include a safety override.  Plaintiff Andollo no longer feels safe operating her Defective Shifter Vehicle but, because of the defective ZF Shifter, she is not able to trade or sell her car absent a substantial financial loss as the value of her car has substantially declined.

**D.    Illinois Plaintiffs**

19.    Plaintiff Kean McDonald is a resident of Illinois domiciled in Western Springs, Illinois.  On July 8, 2013, he bought a new 2014 Jeep Grand Cherokee at Zeigler Chrysler Dodge Jeep RAM in Downers Grove, Illinois.  He purchased the car because of its reputation for safety and utility, consistent with his review of Jeep's advertising messaging regarding safety and reliability.  Plaintiff believed his Grand Cherokee would be a good value because of its utility and reputation for safety.  Plaintiff still owns his Jeep Grand Cherokee.  Unknown to Plaintiff at the time the vehicle was purchased, the vehicle was equipped with a ZF Shifter that is defectively designed.  The design defect allows the driver to get out of the car while the car is not in "park," which can allow the car to roll away from its parked position. The defect in the Jeep Grand Cherokee has caused Plaintiff future attempted repairs, loss of warranty value, and diminished value of his vehicle.  FCA knew that the ZF Shifter could lead to vehicle roll-away incidents, but did not disclose this defect to Plaintiff, so Plaintiff purchased the vehicle on the reasonable, but mistaken, belief that the Jeep Grand Cherokee was utile and safe to operate as designed.

20.    Plaintiff Lindsey Wells is a resident of Illinois domiciled in Highland Park, Illinois. On April 30, 2015, Plaintiff bought a new 2015 Jeep Grand Cherokee at Fields Jeep in Glenview, Illinois. She purchased the car because of its reputation for safety and utility, consistent with his review of Jeep's advertising messaging regarding safety and reliability.  Plaintiff believed that her Grand Cherokee would be a good value because of its utility and reputation for safety.  Plaintiff still owns her Jeep

Grand Cherokee.  Unknown to Plaintiff at the time the vehicle was purchased, the vehicle was equipped with a ZF Shifter that is defectively designed.  The design defect allows the driver to get out of the car while the car is not in "park," which can allow the car to roll away from its parked position. The defect in the Jeep Grand Cherokee has caused Plaintiff out-of-pocket losses, future attempted repairs, loss of warranty value, and diminished value of her vehicle.  FCA knew that the ZF Shifter could lead to vehicle roll-away incidents, but did not disclose this defect to Plaintiff, so Plaintiff purchased the vehicle on the reasonable, but mistaken, belief that the Jeep Grand Cherokee was utile and safe to operate as designed.

E.    **Massachusetts Plaintiffs**

21.    Plaintiff Scott Michael Youngstrom Jr. is a resident of Massachusetts domiciled in Quincy, Massachusetts.  On December 10, 2011, Plaintiff bought a new 2012 Dodge Charger at Planet Jeep Chrysler Dodge in Franklin, Massachusetts.  He purchased the car because of its reputation for safety and utility, consistent with his review of Fiat Chrysler's advertising messaging regarding safety and reliability. Plaintiff believed his Dodge Charger would be a good value because of its utility and reputation for safety.  Plaintiff still owns his Dodge Charger.  Unknown to Plaintiff at the time the vehicle was purchased, the vehicle was equipped with a ZF Shifter that is defectively designed.  The design defect allows the driver to get out of the car while the car is not in "park," which can allow the car to roll away from its parked position. The defect in the Dodge Charger has caused Plaintiff out-of-pocket losses, future attempted repairs, loss of warranty value, and diminished value of his vehicle.  FCA knew that the ZF Shifter could lead to vehicle roll-away incidents, but did not disclose this defect to Plaintiff, so Plaintiff purchased the vehicle on the reasonable, but mistaken, belief that the Dodge Charger was utile and safe to operate as designed.

22.    Plaintiff Todd Machtley is a resident of Massachusetts domiciled in Middleboro, Massachusetts.  On or about December 20, 2014, Plaintiff bought a new 2015 Jeep Grand Cherokee Altitude 4x4 at Somerset Chrysler Jeep Dodge in

Somerset, Massachusetts.  He purchased the car because of its reputation for safety and utility, consistent with his review of Jeep's advertising messaging regarding safety and reliability.  Plaintiff believed his Grand Cherokee would be a good value because of its utility and reputation for safety.  Plaintiff still owns his Jeep Grand Cherokee. Unknown to Plaintiff at the time the vehicle was purchased, the vehicle was equipped with a ZF Shifter that is defectively designed.  The design defect allows the driver to get out of the car while the car is not in "park," which can allow the car to roll away from its parked position. The defect in the Jeep Grand Cherokee has caused Plaintiff out-of-pocket losses, future attempted repairs, loss of warranty value, and diminished value of his vehicle.  FCA knew that the ZF Shifter could lead to vehicle roll-away incidents, but did not disclose this defect to Plaintiff, so Plaintiff purchased the vehicle on the reasonable, but mistaken, belief that the Jeep Grand Cherokee was utile and safe to operate as designed.

**F.    Michigan Plaintiff**

23.    Plaintiff Melvin Scott is a resident of Michigan domiciled in Grand Rapids, Michigan. On April 30, 2013, Plaintiff bought a new 2014 Jeep Grand Cherokee at Courtesy Jeep Chrysler Dodge in Grand Rapids, Michigan.  He purchased the car because of its reputation for safety and utility, consistent with his review of Fiat Chrysler's advertising messaging regarding safety and reliability.  Plaintiff believed his Jeep Grand Cherokee would be a good value because of its utility and reputation for safety.  Plaintiff still owns his Jeep Grand Cherokee.  Unknown to Plaintiff at the time the vehicle was purchased, the vehicle was equipped with a ZF Shifter that is defectively designed.  The design defect allows the driver to get out of the car while the car is not in "park," which can allow the car to roll away from its parked position. The defect in the Jeep Grand Cherokee has caused Plaintiff out-of-pocket losses, future attempted repairs, loss of warranty value, and diminished value of his vehicle.  FCA knew that the ZF Shifter could lead to vehicle roll-away incidents, but did not disclose this defect to Plaintiff, so Plaintiff purchased the vehicle

010616-11 881080V1

1    on the reasonable, but mistaken, belief that the Jeep Grand Cherokee was utile and

2    safe to operate as designed.

3    **G.    Nevada Plaintiff**

4        24.    Plaintiff Eliam M. Marrero Bernal is a resident of Nevada domiciled in

5    Las Vegas, Nevada.  On or about May 20, 2015, Plaintiff bought a new 2015 Jeep

6    Grand Cherokee at Prestige Chrysler Jeep Dodge in Las Vegas, Nevada.  He

7    purchased the car because of its reputation for safety and utility, consistent with his

8    review of Jeep's advertising messaging regarding safety and reliability.  Plaintiff

9    believed his Grand Cherokee would be a good value because of its utility and

10   reputation for safety.  Plaintiff still owns his Jeep Grand Cherokee.  Unknown to

11   Plaintiff at the time the vehicle was purchased, the vehicle was equipped with a ZF

12   Shifter that is defectively designed.  The design defect allows the driver to get out of

13   the car while the car is not in "park," which can allow the car to roll-away from its

14   parked position. The defect in the Jeep Grand Cherokee has caused Plaintiff out-of-

15   pocket losses, future attempted repairs, loss of warranty value, and diminished value

16   of his vehicle.  FCA knew that the ZF Shifter could lead to vehicle roll-away

17   incidents, but did not disclose this defect to Plaintiff, so Plaintiff purchased the vehicle

18   on the reasonable, but mistaken, belief that the Jeep Grand Cherokee was utile and

19   safe to operate as designed.

20   **H.    New Jersey Plaintiff**

21       25.    Plaintiff Clare Colrick is a resident of New Jersey domiciled in Short

22   Hills, New Jersey.  On August 27, 2013, Plaintiff bought a new 2014 Jeep Grand

23   Cherokee at Salerno Duane in Summit, New Jersey.  She purchased the car because of

24   its reputation for safety and utility, consistent with her review of Jeep's advertising

25   messaging regarding safety and reliability.  Plaintiff believed her Grand Cherokee

26   would be a good value because of its utility and reputation for safety.  Plaintiff still

27   owns her Jeep Grand Cherokee.  Unknown to Plaintiff at the time the vehicle was

28   purchased, the vehicle was equipped with a ZF Shifter that is defectively designed.

The design defect allows the driver to get out of the car while the car is not in "park," which can allow the car to roll away from its parked position. The defect in the Jeep Grand Cherokee has caused Plaintiff out-of-pocket losses, future attempted repairs, loss of warranty value, and diminished value of her vehicle.  FCA knew that the ZF Shifter could lead to vehicle roll-away incidents, but did not disclose this defect to Plaintiff, so Plaintiff purchased the vehicle on the reasonable, but mistaken, belief that the Jeep Grand Cherokee was utile and safe to operate as designed.

## I.    North Carolina Plaintiff

26.    Plaintiff Jacob Gunnells is a resident of North Carolina domiciled in Raleigh, North Carolina.  In July 2015, he bought a used 2014 Jeep Grand Cherokee at Mark Jacobson Toyota in Durham, North Carolina.  Before purchasing the car, he took it for a used-car inspection at Westgate Chrysler Jeep Dodge Ram in Raleigh, North Carolina.  He purchased the car because of its reputation for safety and utility, consistent with his review of Jeep's advertising messaging regarding safety and reliability.  He also purchased a lifetime service contract on this vehicle from Jeep. Plaintiff believed his Grand Cherokee would be a good value because of its utility and reputation for safety.  Plaintiff still owns his Jeep Grand Cherokee.  Unknown to Plaintiff at the time the vehicle was purchased, the vehicle was equipped with a ZF Shifter that is defectively designed.  The design defect allows the driver to get out of the car while the car is not in "park," which can allow the car to roll away from its parked position. The defect in the Jeep Grand Cherokee has caused Plaintiff future attempted repairs, loss of warranty value, and diminished value of his vehicle.  FCA knew that the ZF Shifter could lead to vehicle roll-away incidents, but did not disclose this defect to Plaintiff, so Plaintiff purchased the vehicle on the reasonable, but mistaken, belief that the Jeep Grand Cherokee was utile and safe to operate as designed.

**J.    Ohio Plaintiffs**

27.    Plaintiffs Danielle and Joby Hackett are residents of Ohio domiciled in Masury, Ohio. The Hacketts bought a 2015 Jeep Grand Cherokee at Eddy Chrysler Dodge Jeep in Youngstown, Ohio.  They purchased the car because of its reputation for safety and utility, consistent with their exposure to Jeep's advertising messaging. The Hacketts believed their Grand Cherokee would be a good value because of its utility and reputation for safety.  Plaintiffs still own their Jeep Grand Cherokee. Unknown to Plaintiffs at the time the vehicle was purchased, the vehicle was equipped with a ZF Shifter that is defectively designed.  The design defect allows the driver to get out of the car while the car is not in "park," which can allow the car to roll away from its parked position. The defect in the Grand Cherokee has caused Plaintiffs out-of-pocket losses, future attempted repairs, loss of warranty value, and diminished value of their vehicle.  FCA knew that the ZF Shifter could lead to vehicle roll-away incidents, but did not disclose this defect to Plaintiffs, so Plaintiffs purchased the vehicle on the reasonable, but mistaken, belief that the Jeep Grand Cherokee was utile and safe to operate as designed.

**K.    Oregon Plaintiff**

28.    Plaintiff Todd Fisher is a resident of Oregon domiciled in Gresham, Oregon. On December 9, 2014, Plaintiff bought a new 2015 Jeep Grand Cherokee at Gresham Dodge Jeep in Gresham, Oregon. He purchased the car because of its reputation for safety and utility, consistent with his review of Jeep's advertising messaging regarding safety and reliability.  Plaintiff believed his Grand Cherokee would be a good value because of its utility and reputation for safety.  Plaintiff still owns his Jeep Grand Cherokee.  Unknown to Plaintiff at the time the vehicle was purchased, the vehicle was equipped with a ZF Shifter that is defectively designed. The design defect allows the driver to get out of the car while the car is not in "park," which can allow the car to roll away from its parked position. The defect in the Jeep Grand Cherokee has caused Plaintiff out-of-pocket losses, future attempted repairs,

-13-

loss of warranty value, and diminished value of his vehicle.  FCA knew that the ZF Shifter could lead to vehicle roll-away incidents, but did not disclose this defect to Plaintiff, so Plaintiff purchased the vehicle on the reasonable, but mistaken, belief that the Jeep Grand Cherokee was utile and safe to operate as designed.

**L.      Pennsylvania Plaintiffs**

29.     Plaintiffs John and Mary Metzger are residents of Pennsylvania domiciled in Lancaster, Penssylvania.  On April 7, 2014, John and Mary Metzger bought a used 2014 Jeep Grand Cherokee at Keller Bros. Dodge Inc. at 395 North Broad Street, Litiz, PA 17543.  They purchased the car because of its reputation for safety and utility, consistent with his review of Jeep's advertising messaging regarding safety and reliability.  Plaintiffs believed his Grand Cherokee would be a good value because of its utility and reputation for safety.  Plaintiffs still own their Jeep Grand Cherokee.  Unknown to Plaintiffs at the time the vehicle was purchased, the vehicle was equipped with a ZF Shifter that is defectively designed.  The design defect allows the driver to get out of the car while the car is not in "park," which can allow the car to roll away from its parked position. The defect in the Jeep Grand Cherokee has caused Plaintiffs future attempted repairs, loss of warranty value, and diminished value of their vehicle.  FCA knew that the ZF Shifter could lead to vehicle roll-away incidents, but did not disclose this defect to Plaintiffs, so Plaintiffs purchased the vehicle on the reasonable, but mistaken, belief that the Jeep Grand Cherokee was utile and safe to operate as designed.

**M.      Texas Plaintiffs**

30.     Plaintiff Robert F. Hyatt IV is a resident of Texas domiciled in Houston, Texas.  In December 2014, he bought a new 2014 Jeep Grand Cherokee at Helfman Dodge Chrysler Jeep RAM in Houston, Texas.  He purchased the car because of its reputation for safety and utility, consistent with his review of Jeep's advertising messaging regarding safety and reliability.  Plaintiff believed his Grand Cherokee would be a good value because of its utility and reputation for safety.  Plaintiff still

-14-

owns his Jeep Grand Cherokee.  Unknown to Plaintiff at the time the vehicle was purchased, the vehicle was equipped with a ZF Shifter that is defectively designed. The design defect allows the driver to get out of the car while the car is not in "park," which can allow the car to roll away from its parked position. The defect in the Jeep Grand Cherokee has caused Plaintiff future attempted repairs, loss of warranty value, and diminished value of his vehicle.  FCA knew that the ZF Shifter could lead to vehicle roll-away incidents, but did not disclose this defect to Plaintiff, so Plaintiff purchased the vehicle on the reasonable, but mistaken, belief that the Jeep Grand Cherokee was utile and safe to operate as designed.

31.     Plaintiff Cameron Phelps is a resident of Texas domiciled in Austin, Texas. On April 26, 2016, Plaintiff bought a used 2014 Jeep Grand Cherokee at Austin Subaru in Austin, Texas.  He purchased the car because of its reputation for safety and utility, consistent with his review of Jeep's advertising messaging regarding safety and reliability.  Plaintiff believed his Grand Cherokee would be a good value because of its utility and reputation for safety.  Plaintiff still owns his Jeep Grand Cherokee. Unknown to Plaintiff at the time the vehicle was purchased, the vehicle was equipped with a ZF Shifter that is defectively designed.  The design defect allows the driver to get out of the car while the car is not in "park," which can allow the car to roll away from its parked position. The defect in the Jeep Grand Cherokee has caused Plaintiff out-of-pocket losses, future attempted repairs, loss of warranty value, and diminished value of his vehicle.  FCA knew that the ZF Shifter could lead to vehicle roll-away incidents, but did not disclose this defect to Plaintiff, so Plaintiff purchased the vehicle on the reasonable, but mistaken, belief that the Jeep Grand Cherokee was utile and safe to operate as designed.

**N.     Washington Plaintiffs**

32.     Plaintiff Karen Stedman is a resident of Washington domiciled in Mill Creek, Washington.  On March 8, 2015, Plaintiff bought a new 2015 Jeep Grand Cherokee at Dwayne Lane's Chrysler Dodge Jeep and Ram in Everett, Washington.

She purchased the car because of its reputation for safety and utility, consistent with his review of Jeep's advertising messaging regarding safety and reliability. Plaintiff believed her Grand Cherokee would be a good value because of its utility and reputation for safety. Plaintiff still owns her Jeep Grand Cherokee. Unknown to Plaintiff at the time the vehicle was purchased, the vehicle was equipped with a ZF Shifter that is defectively designed. The design defect allows the driver to get out of the car while the car is not in "park," which can allow the car to roll away from its parked position. The defect in the Jeep Grand Cherokee has caused Plaintiff future attempted repairs, loss of warranty value, and diminished value of his vehicle. FCA knew that the ZF Shifter could lead to vehicle roll-away incidents, but did not disclose this defect to Plaintiff, so Plaintiff purchased the vehicle on the reasonable, but mistaken, belief that the Jeep Grand Cherokee was utile and safe to operate as designed.

33.    Plaintiff Cameron Webster is a resident of Washington domiciled in North Bend, Washington. In April 2014, he bought a new 2014 Jeep Grand Cherokee at Rairdon Chrysler Dodge Jeep in Kirkland, Washington. He purchased the car because of its reputation for safety and utility, consistent with his review of Jeep's advertising messaging regarding safety and reliability. Plaintiff believed his Grand Cherokee would be a good value because of its utility and reputation for safety. Plaintiff still owns his Jeep Grand Cherokee. Unknown to Plaintiff at the time the vehicle was purchased, the vehicle was equipped with a ZF Shifter that is defectively designed. The design defect allows the driver to get out of the car while the car is not in "park," which can allow the car to roll away from its parked position. The defect in the Jeep Grand Cherokee has caused Plaintiff future attempted repairs, loss of warranty value, and diminished value of his vehicle. FCA knew that the ZF Shifter could lead to vehicle roll-away incidents, but did not disclose this defect to Plaintiff, so Plaintiff purchased the vehicle on the reasonable, but mistaken, belief that the Jeep Grand Cherokee was utile and safe to operate as designed.

**O.    Defendants**

34.    Defendant FCA US LLC ("FCA") is a limited liability company organized and existing under the laws of the State of Delaware, and is wholly owned by holding company Fiat Chrysler Automobiles N.V., a Dutch corporation headquartered in London, United Kingdom. FCA is doing business in the Central District of California and elsewhere. FCA's principal place of business and headquarters is in Auburn Hills, Michigan.

35.    FCA (commonly referred to as Chrysler) is a motor vehicle "Manufacturer" and a licensed "Distributor" of new, previously untitled Chrysler, Dodge, Jeep, and Ram brand motor vehicles (hereinafter referred to as "vehicles") as defined in Florida Statute § 320.60. FCA's Chrysler brand is one of the "Big Three" American automobile brands. FCA engages in commerce by distributing and selling new and unused passenger cars and motor vehicles under its Chrysler, Dodge, Jeep, and Ram brands. Other major divisions of FCA include Mopar, its automotive parts and accessories division, and SRT, its performance automobile division. As of 2015, FCA is the seventh largest automaker in the world by unit production.

36.    FCA's business operations in the United States include the manufacture, distribution, and sale of motor vehicles and parts through its network of independent, franchised motor vehicle dealers. FCA is engaged in interstate commerce in that it sells vehicles through this network located in every state of the United States.

37.    FCA and/or its affiliates and agents developed and disseminated the owner's manuals and warranty booklets, advertisements, and other promotional materials relating to the Defective Shifter Vehicles.

**V.    FACTUAL ALLEGATIONS**

**A.    The ZF Electronic Gear Shifter**

38.    FCA sold its 2012-14 Dodge Charger, 2012-14 Chrysler 300, and 2014-15 Jeep Grand Cherokee vehicles with an 8-speed transmission with electronic gear selector that was made for FCA by ZF (the "ZF Shifter").

-17-

39.    On its website announcing a "voluntary recall" of these vehicles, FCA describes the ZF Shifter as follows:

> The vehicles affected by this recall are equipped with electronic shift levers that return to the same position after each manipulation. Gear selection is conveyed to the driver by multiple sets of indicator lights, not gear-selector position, and unless due care is taken, drivers may draw erroneous conclusions about the status of their vehicles.[1]

40.    The ZF Shifter does not have positions for each gear setting, i.e., Park, Reverse, Neutral, Drive ("PRND").  Rather, it always rests in the same position after having been pushed up or down from that position.  The following is a picture of the ZF Shifter in a Jeep Grand Cherokee:



41.    Importantly, the ZF Shifter does not include a safety override that prevents the driver from getting out of the car when it is not in "park."  Other manufacturers, including BMW, use monostable electronic gear shifters like the ZF Shifter, but *the BMW gear shifter has a safety override*. If the BMW is not in "park" and the driver's door is opened, releasing the foot brake causes the car to

---

[1] *See* http://media.fcanorthamerica.com/newsrelease.do?id=17455&amp;mid=1 (last viewed on July 6, 2016).

-18-

*automatically shift into "park."* This safety override eliminates the possibility of the roll-away incidents that plague the Defective Shifter Vehicles.

42. FCA has already recognized that the ZF Shifter has a problem. As noted on its website, "To address customer satisfaction issues, the Company began equipping the Charger and 300 with a new shift-lever design in model-year 2015. The Grand Cherokee's shift-lever was updated in model year 2016."[2]

43. In FCA's own recall chronology it states that as of April 12, 2016, "FCA has identified approximately 700 field reports potentially related to this issue which includes 212 crashes, 308 claims of property damage and 41 injuries."

**B.    The National Highway Transportation Safety Administration Has Determined the ZF Shifter Is Poorly Designed**

44. The National Highway Transportation Safety Administration ("NHTSA") Office of Defects Investigation ("ODI") opened Preliminary Evaluation PE15-030 on August 20, 2015, to investigate 14 reports of rollaway 2014-15 Jeep Grand Cherokee vehicles.[3]

45. As described by NHTSA:

> The MY 2014-2015 Grand Cherokee vehicles are equipped with Monostable electronic ("E-shift") gearshift assemblies supplied by ZF Group (ZF). The E-shift system operates electronically and the gear requested by the driver is transmitted from the shifter via the CAN Bus to the Transmission Control Module which makes the requested shift. The Monostable gearshift does not move into a detent but springs back to a centered/neutral position after the driver selects a gear and releases the shifter. A button on the shift knob must be depressed to shift out of Park, shift out of Neutral, and to shift from Drive to Reverse or Park. The gear selected is shown on a display in the dash and illuminated letters on the shifter. If the driver's door is opened when the gearshift is not in Park, a chime sounds and a message is displayed on the EVIC to warn the driver. In addition, the

---

[2] *See id.*

[3] *See* http://www-odi.nhtsa.dot.gov/owners/SearchResultsByUrlCode.action?referenceSearch.requestId=48801&referenceSearch.urlCode=RGRCHIUC3ZXFGZZ (last accessed June 20, 2016).

engine Start/Stop push-button control logic does not permit normal engine shut-off when the transmission is not in Park. This logic may provide feedback to drivers who attempt to turn the engine off when the transmission is not in Park. ***However, this function does not protect drivers who intentionally leave the engine running or drivers who do not recognize that the engine continues to run after an attempted shut-off.*** NHTSA testing during PE15-030 indicates that ***operation of the Monostable shifter is not intuitive and provides poor tactile and visual feedback to the driver, increasing the potential for unintended gear selection***. ODI's analysis of the PE15-030 complaint and field report data identified ***306 incidents of vehicle rollaway following intended shifts to Park in the 2014-2015 Grand Cherokee. These resulted in 117 alleged crashes. Twenty-eight of the crashes reportedly caused injuries, including 3 with a fractured pelvis and 4 others requiring some degree of hospitalization*** (a ruptured bladder, fractured kneecap, broken ribs, damaged to right leg). Other injuries include reports of a broken nose, facial lacerations requiring stitches, sprained knees, severe bruising, and trauma to legs. MY 2012-2014 Chrysler 300 and Dodge Charger vehicles (L-cars) equipped with 3.6L engines use the same ZF Monostable shifter. ODI has received 8 complaints, including 4 crashes and 2 injuries on the subject L-cars. FCA changed the shifter design in the L-cars in MY 2015 and in the Grand Cherokee vehicles in MY 2016. An Engineering Analysis has been opened to assess the scope, frequency, and safety-related consequences of the alleged defect.[4]

46.    In early February, 2016, amid continuing reports of roll-away vehicles, NHTSA upgraded its investigation to an engineering analysis, after determining the issue is one of design rather than defect.[5]

## C.    Reports to NHTSA Recount Horrifying Incidents of Vehicle Rollaway

47.    NHTSA has received hundreds of reports of rollaway incidents involving the Defective Shifter Vehicles, including the reports copied verbatim below:

### 1.    Chrysler 300

ON FEBRUARY 7, 2016, MY HUSBAND PARKED HIS 2014 CHRYSLER 300 IN A PARKING SPOT IN A

---

[4] *See id* (emphasis added).

[5] *See id.*

PARKING LOT AND EXITED THE VEHICLE WITH THE ENGINE RUNNING. I WAS SEATED IN THE FRONT PASSENGER SEAT WITH OUR 11 YEAR OLD CHILD BEHIND ME AND 9 YEAR OLD CHILD SEATED BEHIND THE DRIVER'S SEAT. ALL 3 OF US WERE WEARING SEAT BELTS. MY HUSBAND WALKED ACROSS THE PARKING LOT AND DOWN THE BLOCK. I WAS TEXTING SOMEONE ON MY CELLPHONE WHEN MY 11 YEAR OLD EXCLAIMED THAT THE CAR WAS MOVING. WITHOUT LOOKING UP FROM MY PHONE, I EXPLAINED TO HER THAT IT WAS PROBABLY THE ILLUSION OF A CAR PULLING INTO OR OUT OF THE PARKING SPOT BESIDE US. SHE SCREAMED, "NO THE CAR IS DEFINITELY MOVING!" THE CAR WAS ACCELERATING BACKWARDS. I MADE EVERY EFFORT TO MOVE THE GEARSHIFT, GRAB THE STEERING WHEEL AND HIT THE BRAKES BUT DUE TO THE SIZE OF THE LARGE CONSOLE I COULD NOT SWING MY LEG OVER TO REACH THE BRAKE. THE CAR MOVED IN REVERSE ACROSS THE PARKING LOT AND STRUCK AN UNOCCUPIED VEHICLE THAT WAS PARKED ON THE OPPOSITE SIDE OF THE LOT. THANKFULLY, THE CAR DID NOT STRIKE ANY PEDESTRIANS OR OCCUPIED VEHICLES, AS THIS WAS A BUSY PARKING LOT. OUR CHRYSLER ENDURED SIGNIFICANT DAMAGE WHILE THE DAMAGE TO THE OTHER VEHICLE WAS MINOR. MY CHILDREN AND I WERE EXTREMELY UPSET. WE ARE VERY GRATEFUL THAT NO ONE WAS PHYSICALLY INJURED BUT WE WERE ALL QUITE SHAKEN BY THE OUT OF CONTROL CAR. THE IMPACT WAS SUCH THAT IT MAKE A LOUD "THUD" SOUND WHEN IT COLLIDED WITH THE OTHER VEHICLE AND JOLTED US A BIT. WE WERE COMPLETELY SHOCKED THAT THE CAR SEEMINGLY ON IT'S OWN WENT FROM "PARK" INTO "REVERSE". MY HUSBAND HAD TIME TO WALK ACROSS THE PARKING LOT AND DOWN THE BLOCK BEFORE THE VEHICLE STARTED TO MOVE. THE VEHICLE WAS LONG OUT OF HIS SIGHT BEFORE IT STARTED TO MOVE. THIS CAR IS DANGEROUSLY DEFECTIVE. WE REPORTED THIS INCIDENT TO OUR INSURANCE CARRIER THE NEXT DAY.

THE CONTACT OWNS A 2014 CHRYSLER 300. WHILE THE VEHICLE WAS ON AND PARKED, THE DOOR WAS OPENED TO EXIT THE VEHICLE. AFTER RETURNING TO THE VEHICLE, IT INDEPENDENTLY SHIFTED INTO REVERSE AND ROLLED AWAY. THE CONTACT WAS STRUCK BY THE PASSENGER SIDE DOOR AND FELL TO THE GROUND. THE VEHICLE ROLLED OVER THE CONTACT'S ANKLE AND CRASHED INTO A FENCE. THE CONTACT SUSTAINED INJURIES THAT REQUIRED MEDICAL

010616-11 881080V1

1    ATTENTION, WHICH INCLUDED FRACTURED RIBS.
     A POLICE REPORT WAS FILED. THE
2    MANUFACTURER WAS MADE AWARE OF THE
     FAILURE. THE APPROXIMATE FAILURE MILEAGE
3    WAS 37,000.

4    THE CAR WAS PUT INTO PARK AND ROLLED DOWN
     THE DRIVEWAY, ACROSS THE STREET, INTO A
5    RAVINE AND HIT A TREE.

6    ON NUMEROUS TIMES I HAVE NO IDEA WHAT
     GEAR THE TRANSMISSION IS IN. I PARK THE CAR
7    AND THINK IT IS IN PARK ONLY TO FIND OUT IT IS
     IN REVERSE.AS I AM STEPPING OUT OF THE CAR IT
8    STARTS TO BACK UP. THIS IS A DANGEROUS
     DESIGN FLAW BY CHRYSLER CORP.THERE NEEDS
9    TO BE SOME SORT OF SAFETY MECHANISM
     INSTALLED TO MAKE SURE THE ENGINE IS OFF
10   UPON EXIT.

11   I FEEL THE GEAR SELECTOR ON MY 2014
     CHRYSLER 300 IS VAGUE, CONFUSING, AND
12   DANGEROUS. IT IS ELECTRONIC AND PIVOTS
     INSTEAD OF MOVING ONE SPOT FOR EACH GEAR
13   SELECTION. IF YOU PARK AND ATTEMPT TO SHIFT
     FROM DRIVE TO PARK SOMETIMES IT MAKES IT
14   AND SOMETIMES IT ENDS UP IN REVERSE. WHEN
     THIS HAPPENS THE ENGINE DOES NOT TURN OFF
15   WHEN YOU PUSH THE STOP BUTTON AND AS YOU
     STEP OUT THE CAR TAKES OFF BACKWARDS. ALSO
16   WHEN SHIFTING FROM PARK TO DRIVE
     SOMETIMES IT GOES PAST DRIVE AND INTO LOW,
17   SO I ENDED UP DRIVING FOR A TIME STUCK IN
     LOW GEAR AND NOT KNOWING UNTIL YOU GO TO
18   SLOW OR STOP AND IT FEELS LIKE THE BRAKES
     ARE STUCK ON SO YOU START LOOKING FOR THE
19   REASON. I HAVE HATED THIS CAR ALMOST SINCE I
     LEASED IT IN DECEMBER OF 2014. I FEEL WITH THE
20   LACK OF A SWITCH KEY TO TURN THE ENGINE ON
     AND OFF, AND THIS VAGUE GEAR SELECTOR THIS
21   GROUP OF VEHICLES IS AN ACCIDENT WAITING TO
     HAPPEN. I HAVE TRIED TO TRADE IT IN BUT I STILL
22   HAVE 13 MONTHS LEFT AND CAN DO NOTHING.
     PLEASE LOOK INTO THIS...THANK YOU
23
     THE GEAR SHIFTER ON THIS CAR CONTINUALLY
24   CAUSES THE CAR TO NOT SHIFT TO THE DESIRED
     GEAR, ESPECIALLY WHEN SHIFTING FROM DRIVE
25   INTO REVERSE OR PARK. THANKFULLY, I HAVE
     NOT HAD ANY MAJOR ACCIDENTS BECAUSE OF
26   THIS DEFECT, HOWEVER, I HAVE DAMAGED MY
     DAUGHTER'S BICYCLE AND MY GARAGE DOOR
27   BECAUSE THE CAR WAS NOT IN PARK. THIS IS A
     SERIOUS ACCIDENT WAITING TO HAPPEN.
28

010616-11  881080V1

THE CONTACT OWNS A 2012 CHRYSLER 300. WHILE THE VEHICLE WAS PARKED, IT ROLLED BACK IN REVERSE AND KNOCKED THE CONTACT TO THE GROUND. THE VEHICLE CRASHED INTO A DUMPSTER ACROSS THE STREET. THE BUMPER OF THE VEHICLE WAS DAMAGED. THE CONTACT SUSTAINED INJURIES TO THE HEAD FROM THE IMPACT OF THE BOTTOM OF THE VEHICLE DOOR. MEDICAL ATTENTION WAS NOT REQUIRED AND A POLICE REPORT WAS NOT FILED. THE MANUFACTURER WAS NOT MADE AWARE OF THE ISSUE. THE FAILURE MILEAGE WAS UNKNOWN.

THE GEAR SHIFTER SOMETIMES DOES NOT GO INTO PARK AND ON ONE OCCASION I GOT OUT OF THE CAR WITHOUT REALIZING AND IMMEDIATELY JUMPED BACK IN, REENGAGING THE PARK POSITION. SINCE THAT TIME, I DOUBLE CHECK EACH TIME BEFORE GETTING OUT. HAVE NOT LIKED THIS SHIFTER SINCE I BOUGHT THE CAR IN 2012, SINCE OBTAINING THE CORRECT GEAR TAKES SOMETIMES SEVERAL ATTEMPTS. MY WIFE ALSO HAS THIS DIFFICULTY.

THE CONTACT OWNS A 2013 CHRYSLER 300. THE CONTACT STATED THAT THE VEHICLE DID NOT REGISTER THE SHIFTER IN THE PARK POSITION AND THE VEHICLE ROLLED AWAY. THE CONTACT WAS ABLE TO REGAIN CONTROL OF THE VEHICLE. THE FAILURE RECURRED WITHOUT WARNING. THE CONTACT RECEIVED NOTIFICATION OF NHTSA CAMPAIGN NUMBER: 16V240000 (POWER TRAIN); HOWEVER, THE PARTS TO DO THE REPAIR WERE NOT AVAILABLE. THE CONTACT STATED THAT THE MANUFACTURER EXCEEDED A REASONABLE AMOUNT OF TIME FOR THE RECALL REPAIR. THE MANUFACTURER WAS NOT NOTIFIED OF THE FAILURE. THE FAILURE MILEAGE WAS 52,000. VIN TOOL CONFIRMS PARTS NOT AVAILABLE.

THE CONTACT OWNS A 2013 CHRYSLER 300. WHILE THE CONTACT WAS EXITING THE VEHICLE, THE GEAR SHIFTED FROM PARK TO REVERSE WITHOUT WARNING. AS A RESULT, THE CONTACT WAS DRAGGED ON THE GROUND. THE PASSENGER IN THE VEHICLE HAD TO MOVE OVER AND DEPRESS THE BRAKE PEDAL IN ORDER TO STOP THE VEHICLE. THE CONTACT RECEIVED LEG AND FACE INJURIES THAT REQUIRED MEDICAL ATTENTION. A POLICE REPORT WAS NOT FILED. THE CONTACT HAD NOT TAKEN THE VEHICLE TO THE DEALER FOR DIAGNOSTIC TESTING. SHORTLY AFTER THE INCIDENT, THE CONTACT RECEIVED A RECALL NOTIFICATION FOR NHTSA CAMPAIGN NUMBER: 16V240000 (POWER TRAIN), WHICH WAS DIRECTLY

RELATED TO THE FAILURE. THE VEHICLE WAS NOT REPAIRED. THE MANUFACTURER WAS MADE AWARE OF THE FAILURE AND INFORMED THE CONTACT THAT A SECOND NOTICE REGARDING THE REMEDY WOULD BE ISSUED. THE APPROXIMATE FAILURE MILEAGE WAS 85,000. VIN TOOL CONFIRMS PARTS NOT AVAILABLE.

THE CONTACT OWNS A 2013 CHRYSLER 300. WHILE THE VEHICLE WAS PARKED, IT ROLLED AWAY AND CRASHED INTO A VAN WITHOUT WARNING. BOTH VEHICLES WERE DENTED, BUT DRIVABLE. NEITHER THE DEALER NOR THE MANUFACTURER WERE MADE AWARE OF THE FAILURE. THERE WERE NO INJURIES AND A POLICE REPORT WAS NOT FILED. THE CONTACT RECEIVED NOTIFICATION OF NHTSA CAMPAIGN NUMBER: 16V240000 (POWER TRAIN); HOWEVER, THE PART TO DO THE REPAIR WAS UNAVAILABLE. THE FAILURE MAILLEAGE WAS 57,000. VIN TOOL CONFIRMS PARTS NOT AVAILABLE.

VEHICLE SHIFTER WILL NOT OPERATE PROPERLY, THERE ARE TIMES I THOUGHT CAR WAS IN PARK AND IT WAS IN REVERSE. I MOVE SHIFTER FROM PARK TO DRIVE AND IT IS STILL IN PARK. GO TO PUT IT IN REVERSE AND IT BYPASSES THE GEAR. TIMES I PUT IT IN DRIVE AND IT IS IN NEUTRAL. TAKEN CAR BACK TO DEALER FOR PROBLEM AND WAS TOLD TO LIVE WITH IT, NOTHING CAN BE DONE. ONE TIME I GOT OUT THINKING CAR WAS IN PARK AND IT WAS IN REVERSE AND STARTED TO MOVE, LUCKILY I WAS IN A FLAT PARKING AREA AT THE TIME.

MY CAR WAS PARKED IN A PARKING LOT IDLING IN PARK WHILE I WAS AT AN ATM MACHINE AND JUMPED OUT OF PARK AFTER I HAD JUST GOT TO THE ATM AND HIT ANOTHER CAR THAT WAS PARKED. I HAD TO REPLACE THE ENTIRE FRONT OF MY CAR AND HAVE IT PAINTED AT A HIGH COST TO ME.I DIDN'T TAKE ANY PHOTOS. I BOUGHT THE PARTS FROM EBAY AND HAD THE BUMPER AND COVER PAINTED AT A LOCAL CHRYSLER DEALER

## 2. Dodge Charger

VEHICLE ROLLAWAY, ENGINE ON. RE: ODI PE1530 AND EA 16002. I EXITED MY VEHICLE WITH THE ENGINE RUNNING AND THE TRANSMISSION WAS NOT IN PARK. THE VEHICLE HILL START ASSIST GAVE ME ENOUGH TIME TO EXIT THE VEHICLE AND THEN IT BEGAN TO ROLL BACKWARD. THE OPEN DRIVER'S SIDE DOOR KNOCKED ME DOWN

AND DRAGGED ME 50 FEET. MY RIGHT LEG AND FOOT WENT UNDER THE LEFT FRONT WHEEL WHICH PULLED ME OUT FROM UNDER THE OPEN DOOR. THE VEHICLE CONTINUED ROLLING BACKWARD OVER AN EMBANKMENT AND CRASHED ON THE ROAD BELOW. THE VEHICLE WAS A TOTAL LOSS AND I SUSTAINED A SEVERE SPRAIN TO MY RIGHT FOOT. I HAVE PICTURES AND AN INSURANCE CLAIM REPORT TO PROVIDE PROOF OF THIS INCIDENT

TWICE I PULLED IN MY DRIVEWAY AND THOUGHT I PUT THE CAR IN PARK AND WENT TO GATHER MY THINGS BEFORE SHUTTING THE CAR OFF AND INSTEAD OF BEING IN PARK THE CAR CONTINUED FORWARD. THE FIRST TIME IT SCRAPED MY SIDE FENCE AND THE SECOND UNTIL IT HIT MY CHAIN LINK GATE BENDING THE POSTS AND TAKING THE FENCE GATE OFF THE POSTS. THE FENCE GATE THEM PROCEEDED TO FALL ON TOP OF THE HOOD OF THE CAR. BECAUSE I WAS GATHERING MY ITEMS OFF THE SEAT I DIDN'T NOTICE THE CAR MOVING UNTIL I HEARD THE CRUNCHING SOUND

THE CONTACT OWNS A 2014 DODGE CHARGER. WHILE THE VEHICLE WAS PARKED, IT INDEPENDENTLY ROLLED BACK AND CRASHED INTO ANOTHER PARKED VEHICLE. THE AIR BAGS FAILED TO DEPLOY. A POLICE REPORT WAS NOT FILED. THERE WERE NO INJURIES. THE FAILURE WAS EXPERIENCED PRIOR TO RECEIVING THE NOTICE FOR NHTSA CAMPAIGN NUMBER: 16V240000 (POWER TRAIN). THE MANUFACTURER WAS NOT NOTIFIED. THE FAILURE MILEAGE WAS 36,923

**3.    Jeep Grand Cherokee**

MY WIFE PULLED THE CAR INTO A COMMUNITY PARK AND PUT THE JEEP IN PARK AND OPENED THE DOOR TO GRAB HER SONS LOST DOG. NEXT THING SHE KNOWS THE JEEP IS ROLLING, AND PROCEEDS TO RUN HER OVER AND CONTINUES DOWN A SMALL HILL INTO SOME TREES. SHE WAS TAKEN TO THE HOSPITAL VIA A 911 CALL AND WE ARE NOW WAITING FOR RESULTS FROM AN MRI. THIS PROBLEM COULD HAVE KILLED HER IF SHE DIDN'T GET HER HEAD OUT OF THE WAY.

ON AUGUST 19, 2014, I STEPPED OUT OF MY STATIONARY 2014 JEEP GRAND CHEROKEE OVERLAND BELIEVING I HAD PUT THE VEHICLE IN PARK ON A GENTLE CITYSTREET SLOPE WHEN IT SUDDENLY MOVED BACKWARD, ROLLING OVER MY LEFT LEG AND SEVERELY DAMAGING MY

010616-11  881080V1

KNEE, SKIN, ARTERY, AND QUAD MUSCLES. MY WIFE IMMEDIATELY CALLED AN AMBULANCE, WHICH TRANSPORTED ME TO A LOCAL HOSPITAL, WHERE DOCTORS SURGICALLY ATTACHED AN "EXTERNAL FIXATOR" IN THREE PLACES, STABILIZING AND COMPLETELY IMMOBILIZING MY LEG (FOR THE NEXT FIVE WEEKS). AFTER A SECOND SURGERY AND OVER A YEAR OF PAINFUL AND ARDUOUS THERAPY LATER, I CAN NOW WALK WITH A KNEEBRACE, HALTINGLY AND WITH A NOTICEABLE LIMP. . . ALL DUE TO THE JEEP GRAND CHEROKEE'S TRANSMISSION THAT DOES NOT ACCURATELY INDICATE WHAT GEAR IT IS IN! UNLESS ONE IS CONCENTRATING 100+% OF THE TIME ON THE CONSOLE SHIFTERAND CONSTANTLY GLANCING AT THE INDICATOR LIGHTS ON THE VEHICLE DASHBOARD THE DRIVER NEVER KNOWS WHAT POSITION THE JEEP'S TRANSMISSION IS IN! THE SHIFTER ON THE CONSOLE ALWAYS LOOKS EXACTLY THE SAME, NO MATTER WHAT GEAR HAS SUPPOSEDLY BEEN SELECTED. WE HAD NO ABSOLUTELY FOREWARNING OF THE POTENTIAL LIFETHREATENING PROBLEM INHERENT IN THIS VEHICLE'S DESIGN, AND I CAN ONLY THANK GOD THAT I'M STILL ALIVE TODAY. LAST WEEK WE WERE SURPRISED TO RECEIVE WRITTEN NOTIFICATION FROM FIAT CHRYSLER AUTOMOBILES THAT THE COMPANY AND NHTSA HAD RECALLED 2014 JEEP GRAND CHEROKEES FOR THE SPECIFIC DEFECT DESCRIBED IN MY INCIDENT ABOVE!. (FINALLY! VINDICATION!) THE RECALL NUMBER IS SHOW BELOW, I BELIEVE. FCA VEHICLE RECALL NUMBER: S27 / NHTSA 16V240

ON FEBRUARY 25TH, I SHIFTED MY CAR INTO PARK AND WAS GETTING OUT TO LOOK AT BACK WIPER WHICH SEEMED TO BE STUCK. I HAD LEFT THE CAR RUNNING. THE CAR TOOK OFF IN GEAR AND CAUSED ME TO FALL AND BREAK MY ANKLE IN AN OPEN COMPOUND FRACTURE THAT REQUIRED HOSPITALIZATION AND SURGERY. MY JEEP ENDED UP HITTING A PARKED GARBAGE TRUCK AND SUSTAINED ABOUT $5000 DAMAGE. WHO KNOWS WHAT MY MEDICAL BILLS WILL END UP BEING. PLUS MY ANKLE MAY NEVER BE RIGHT. I WILL INCLUDE A PHOTO OF MY CAR AND XRAY. IT HAPPENED ON PRIVATE PROPERTY (TACO BELL PARKING LOT). A POLICE OFFICER CAME AND PARKED MY CAR AND CALLED AN AMBULANCE BUT DID NOT MAKE A REPORT SINCE ON PRIVATE PROPERTY. WE HAVE NOT HEARD FROM GARBAGE TRUCK AND DOUBT IT DID ANYTHING TO IT. THE CAR WAS IN PARK AND NOT SURE HOW FAST WAS GOING WHEN HIT THE GARBAGE TRUCK

010616-11  881080V1

THE CONTACT OWNS A 2014 JEEP GRAND CHEROKEE. AFTER SHIFTING INTO PARK AND REFUELING THE VEHICLE, IT FAILED TO ENGAGE INTO PARK AND STARTED TO ROLL AWAY. AS A RESULT, THE VEHICLE ROLLED OVER THE DRIVER AND FRACTURED 22 RIBS, THE CLAVICLE, AND AN ANKLE. MEDICAL ATTENTION WAS REQUIRED. A POLICE REPORT WAS FILED. THE VEHICLE WAS NOT TAKEN TO THE DEALER. THE MANUFACTURER WAS MADE AWARE OF THE FAILURE. THE VEHICLE WAS NOT REPAIRED. THE VIN AND FAILURE MILEAGE WERE UNKNOWN.

THE CONTACT OWNS A 2014 JEEP GRAND CHEROKEE. AFTER PLACING THE VEHICLE INTO THE PARK POSITION AND ATTEMPTING TO EXIT, THE VEHICLE INDEPENDENTLY ROLLED BACK AND CRASHED INTO A TELEPHONE POLE. THE AIR BAGS DID NOT DEPLOY. A POLICE REPORT WAS NOT FILED AND NO INJURIES WERE SUSTAINED. THE VEHICLE WAS TAKEN TO THE DEALER WHERE IT WAS DIAGNOSED THAT THE TRANSMISSION SHIFTER MECHANISM FAILED. THE VEHICLE WAS NOT REPAIRED. THE CONTACT MENTIONED THAT THE FRONT DRIVER SIDE DOOR WAS DESTROYED. THE MANUFACTURER WAS MADE AWARE OF THE FAILURE. THE FAILURE MILEAGE WAS 8,944.

THE JEEP'S ELECTRONIC TRANSMISSION DID NOT FULLY SHIFT IN TO THE "PARK" POSITION WHILE STILL RUNNING. MY WIFE EXITED THE VEHICLE TO TAKE OUR 3 YEAR OLD FROM THE BACK SEAT AND THE JEEP BEGAN TO ROLL AWAY. SHE RAN AND JUMPED IN TO THE DRIVER'S SEAT TO STOP IT AND IN THE PROCESS HER FOOT SLIPPED FROM THE BRAKE TO THE GAS PEDAL DRIVING THE CAR INTO/THROUGH A HOUSE. SIGNIFICANT DAMAGE WAS DONE TO THE VEHICLE AND THE HOME BUT NO ONE WAS INJURED.

VEHICLE WAS PUT IN PARK. I EXITED THE CAR. WIFE WAS SITTING IN CAR IN PASSENGER SEAT. CAR WAS NOT MOVING. WIFE EXITED CAR TO RETRIEVE ITEM FROM HOUSE. RETURNED TO FIND VEHICLE DOWN THE HILL AND IN THE WOODS

REGARDING RECALL 16V240. I AM WRITING TO ENCOURAGE NHTSA TO REQUIRE FCA TO REPLACE THE ELECTRONIC SHIFT SELECTOR WITH ONE THAT STAYS IN THE POSITION CORRESPONDING TO THE TRANSMISSION GEAR SELECTION. MORE DISPLAY WARNINGS AND PRINTED CARDS WILL NOT SOLVE THE USER INTERFACE PROBLEM CREATED BY THE SHIFTER MOVING BACK TO CENTER REGARDLESS OF THE TRANSMISSION

010616-11  881080V1

GEAR SELECTION. ON NUMEROUS OCCASIONS, I HAVE MOVED THE SHIFT SELECTOR FORWARD FROM DRIVE TOWARD PARK, THINKING THAT I HAD HEARD/FELT 3 CLICKS AND THAT I WAS IN PARK, ONLY TO FIND THAT THE VEHICLE IS IN REVERSE.

THE CONTACT OWNS A 2014 JEEP GRAND CHEROKEE. THE CONTACT STATED THAT AFTER SHIFTING THE VEHICLE INTO THE PARK POSITION AND EXITING, THE VEHICLE INDEPENDENTLY SHIFTED INTO THE DRIVE POSITION. AS A RESULT, THE VEHICLE ROLLED FORWARD AND CRASHED INTO THE CONTACTS GARAGE. A POLICE REPORT WAS NOT FILED AND NO INJURIES WERE REPORTED. THE VEHICLE WAS INSPECTED BY THE MANUFACTURERS ENGINEER BUT THE FAILURE WAS UNDETERMINED. THE MANUFACTURER WAS NOTIFIED OF THE FAILURE AND THE VIN WAS INCLUDED IN NHTSA CAMPAIGN NUMBER: 16V240000 (POWER TRAIN). THE FAILURE MILEAGE WAS UNKNOWN.

ELECTRONIC SHIFTER DOES NOT ENGAGE IN TO PARK. ON NUMEROUS OCCASIONS THE CAR HAS STARTED TO ROLL WHEN I THOUGHT IT WAS IN PARK. THE SHIFTER IS TERRIBLY DANGERS AND CUMBERSOME TO USE CORRECTLY TO FIND GEARS. THIS IS ALWAYS WHEN PARKING OR WHEN STARTING UP. DANGEROUS.

THE CONTACT OWNS A 2014 JEEP GRAND CHEROKEE. THE CONTACT STATED THAT WHILE THE DRIVER LEFT THE VEHICLE RUNNING WITH THE GEAR SHIFTIER IN PARK, THE VEHICLE ROLLED AWAY AND CRASHED INTO A PARKING GARAGE. THE VEHICLE WAS TAKEN TO A DEALER WHERE THE FAILURE WAS UNABLE TO BE DETERMINED. THE VIN WAS NOT INCLUDED IN NHTSA CAMPAIGN NUMBER: 16V240000 (POWER TRAIN). THE MANUFACTURER WAS NOTIFIED OF THE FAILURE. THE FAILURE MILEAGE WAS 5,514.

INSD PUT CAR IN PARK, WHEN EXITED VEHICLE, VEHICLE ROLLED DOWN A HILL AND HIT A TREE.

I PARKED MY VEHICLE IN MY DRIVEWAY AND EXITED THE VEHICLE TO ENTER MY HOME. I WAS IN THE HOUSE FOR 5 MINUTES AND HEARD A LOUD CRASH, UPON LOOKING OUT THE WINDOW MY VEHICLE HAD COME OUT OF GEAR AND DROVE ITSELF THROUGH MY GARAGE DOOR DAMAGING THE DOOR, THE FRONT END OF MY JEEP AND MY HARLEY INSIDE THE GARAGE.

010616-11  881080V1

1    MY INITIAL COMPLAINT WAS THE VEHICLE NOT
     SHIFTING INTO PARK CORRECTLY WHICH I NOW
2    SEE FIAT CHRYSLER IS PREPARED TO ISSUE A
     RECALL. HOWEVER, THE SOLUTION OFFERED IS IN
3    MY OPINION INSUFFICIENT. WARNINGS AS
     OPPOSED TO A REAL FIX IS TOTALLY
4    UNACCEPTABLE AND I BELIEVE NHTSA MUST
     DEMAND A REPLACEMENT OF THE ENTIRE SHIFT
5    MODULE.

6    I HAVE A 2015 JEEP GRAND CHEROKEE WITH A
     MONOSTABLE GEAR SHIFTER. NUMEROUS TIMES I
7    HAVE HAD THE CAR GO INTO AN UNDESIRED
     GEAR. ON OCTOBER 20, 2015, I DROVE THE CAR
8    INTO THE GARAGE TO PARK IT; I PLACED IT IN
     WHAT I THOUGHT TO BE PARK, EXITED THE
9    VEHICLE, AND THEN THE VEHICLE (IN REVERSE)
     STARTED TO DRIVE OUT OF THE GARAGE. I WAS
10   CAUGHT BETWEEN THE DOOR AND CAR AND
     UNABLE TO GET BACK IN DUE TO THE SPEED OF
11   MOVEMENT. AS THE CAR BACKED OUT, THE DOOR
     CAUGHT ON THE MAIN SUPPORT COLUMN TO THE
12   HOUSE AND BENT BACKWARDS; EVENTUALLY
     THE DOOR HINGE GAVE OUT AND THE CAR
13   CLEARED THE GARAGE. ONCE IN THE DRIVEWAY
     AND WITH THE DOOR OUT OF THE WAY, I WAS
14   ABLE TO RUN FAST ENOUGH TO GET INTO THE
     CAR AND STOP IT BEFORE IT DROVE INTO THE
15   HOUSE ACROSS THE STREET. THE CAR HAD
     ENOUGH SPEED TO SCREECH WHEN THE BRAKES
16   WERE APPLIED. MY SHOULDER AND ARM WERE
     BADLY BRUISED BUT I DID NOT SEEK MEDICAL
17   ATTENTION. THE HOUSE DAMAGE WAS MOSTLY
     MINOR; WE ARE AWAITING AN INSPECTION TO
18   VERIFY THE COLUMN'S INTEGRITY. THE CAR
     DAMAGE WAS SUBSTANTIAL, REQUIRING A NEW
19   DOOR AND TWO NEW PANELS. MY INSURANCE
     COMPANY, USAA, COVERED THE DAMAGE (MINUS
20   DEDUCTIBLE). MY BROTHER HAD A SIMILAR
     EXPERIENCE IN A CHRYSLER 300 WITH THE SAME
21   SHIFTER, HE BACKED INTO ANOTHER CAR WHEN
     HE THOUGHT THE VEHICLE WAS IN PARK. MY
22   WIFE HAS MADE THE MISTAKE ON OUR JEEP A
     NUMBER OF TIMES AS WELL, BUT SHE HAD NOT
23   GOTTEN OUT OF THE VEHICLE COMPLETELY
     BEFORE NOTICING THE ERROR.
24
     ON 11/3/2015, I PUT MY CAR IN PARK, ENGINE WAS
25   STILL RUNNING, AND I EXITED VEHICLE.
     HOWEVER, CAR DID NOT GO INTO PARK, ROLLED
26   FORWARD, KNOCKED ME DOWN AND ROLLED
     OVER MY LEFT FOOT WITH BACK REAR TIRE. THE
27   PARKING GEAR DID NOT ENGAGE AND I WAS NOT
     ALERTED THAT IT WAS STILL IN DRIVE. THIS
28   OCCURRED IN A PARKING LOT. SOMEHOW I GOT

UP, WAS ABLE TO RUN AFTER CAR AND DIVE IN CAR AND HIT GEARSHIFT INTO NEUTRAL TO STOP IT. I ENDURED A CRUSHED FOOT AND FOUR MONTHS OF THERAPY. THERE WAS NOT DAMAGE TO THE CAR NOR DID I REPORT TO POLICE.

3/7/16 CAR WAS PARKED AT WALMART PARKING LOT, ENGINE WAS LEFT RUNNING WITH MY WIFE IN PASSINGER SEAT. AFTER APPROX. 20 MIN. THE CAR BEGAN TO REVERSE. CAR WENT APPOX. 60 FT AND HIT ANOTHER PARKED CAR, MOVING IT APPROX. 1 1/2 FT SIDEWAYS. THE OTHER CAR WAS HIT ON DRIVER SIDE BETWEEN THE DOORS. MY WIFE ATTEMPTED TO STOP THE JEEP AFTER IT HIT THE OTHER CAR WHILE SHE WAS STILL IN THE PASSINGER SEAT, AND THE CAR WENT FORWARD TO THE SAME PARKING SPOT, JUMPED 12 IN CURB,WENT UP A THREE BERM AND STOPPED WHEN IT HIT A CONCRETE BASE FOR A LIGHT POLE. I'M 81 YEARS OLD AND I'VE OWNED MANY CARS AND THIS IS THE WORST SHIFTING SYSTEM I'VE EVER HAD. I HAVE ALSO RENTED MANY CARS IN MANY COUNTRIES AND NEVER HAD A SHIFTER AS BAD AS THIS JEEP. THIS JEEP IS NOT SAFE!!! FOR PICTURES AND INCIDENT REPORT #1614797, CALL POLICE OFFICER JENNIFER HINES #134 CITY OF LOVELAND,CO, PHONE:9709622502 EXT. 1134

I AM PUTTING IN A COMPLAINT FOR MY 2015 JEEP GRAND CHEROKEE AND THE ELECTRONIC SHIFTER. ON MULTIPLE OCCASIONS, I HAVE BEEN IN A SITUATION WHERE QUICKLY SELECTING GEARS OR SWITCHING GEARS WAS NECESSARY IN ORDER TO AVOID A HAZARDOUS SITUATION. I HAVE ALSO EXPERIENCED INSTANCES WHERE I THOUGHT I HAD PUT THE CAR IN PARK WHEN I HAD ACTUALLY SELECTED REVERSE, BECAUSE THE TACTICAL FEEDBACK OF THE SHIFTER VARIES FROM TIME TO TIME, AND IS NOT CONSISTENT AT ALL. I AM EXTREMELY DISAPPOINTED IN THE CHOICE OF SHIFTER FOR THIS VEHICLE. I HAVE HAD ABOUT 15 CARS IN MY LIFE, BOTH MANUAL AND AUTOMATIC, AND THIS IS BY FAR THE WORST DESIGN I'VE EVER SEEN/USED. THIS IS A DANGEROUS SHIFTER AND SHOULD BE COMPLETELY SWITCHED OUT FOR ONE OF A DIFFERENT DESIGN. CARS SHOULD NEVER BE ALLOWED TO USE THE MONOSTABLE SHIFTER DESIGN. THEY ARE TERRIBLE. PLEASE HELP FIX THIS PROBLEM BEFORE SOMEONE ELSE GETS HURT!

010616-11  881080V1

**D.    FCA and ZF Maintain That There Is Nothing Wrong With the Defective Shifter Vehicles**

48.    While FCA has acknowledged it knows of 41 injuries that may be related to what it describes as a "confusing" shifter, it has stated: "the vehicles involved in these events were inspected and no evidence of equipment failure was found."[6]

49.    ZF issued a press release stating:

> ZF supplies gearshift systems to automotive manufacturers according to their technical and design specifications. The manufacturer designs the integration of the gearshift system into the vehicle operating concept and develops the respective safeguard mechanisms. ZF delivered a fully functional state-of-the-art product, which was integrated into the vehicle architecture by the manufacturer. As such, ZF is unaware of any indications that claims could be made against ZF in the context of the current NHTSA investigations of the FCA vehicle models "2014-15 Grand Cherokee; 2012-14 Charger & 300 w/3.6 l engine".[7]

50.    The Defective Shifter Vehicles have been under investigation by NHTSA since August 20, 2015, yet FCA concealed detailed information on the defect by marking as confidential all but two pages from its owner's manual in the presentation it provided to NHTSA in response to its investigation.  FCA has purposefully kept consumers and its customers in the dark about the ZF Shifter defect.

**E.    FCA Touts Safety and Design As Key Elements in Its Marketing**

51.    As its "Mission," FCA touts its commitment to "safety and connected vehicles: with a specific focus on all aspects of safety (active, passive and preventative) and on the development of efficient info-mobility systems".

52.    Following extensive press in 2014 and 2015 that FCA was neglecting its obligations regarding safety, FCA claimed to have put safety first:[8]

> At FCA, our dedication to vehicle safety is consistent with our commitment to being a good corporate citizen, one that judges itself not only on its ability to grow as a global

---

[6] *See* http://jalopnik.com/fiat-chrysler-is-recalling-1-1-million-cars-because-peo-1772561060 (last accessed on July 6, 2016).

[7] *See id.*

[8] http://reports.fcagroup.com/sustainability/2015/products-and-processes/product-innovation-and-responsible-mobility/vehicle-safety#start (accessed on July 6, 2016).

enterprise but also by its ability to make a positive, lasting impact on our communities and on society as a whole. In 2015, FCA US continued to focus efforts on refining recall processes and procedures and entered into a consent order with the National Highway Traffic Safety Administration (NHTSA) to undertake specific actions to improve its recall execution. The Company also engaged an independent third-party consultant to conduct a comprehensive review and evaluation of existing processes and procedures for compliance with the Safety Act and regulations thereunder and to assist in the development of best practices. In addition, as a public safety advocate, we committed our efforts to support industry and consumer outreach and education.

In early 2016, FCA US further reaffirmed its commitment to vehicle safety by signing an agreement, the Proactive Safety Principles, along with 18 other automakers, to leverage their knowledge and collaborate to enhance safety of the traveling public. The Principles include Enhance and Facilitate Proactive Safety; Enhance Analysis and Examination of Early Warning Reporting Data; Maximize Safety Recall Participation Rates; and Enhance Automotive Cybersecurity.

The FCA US Vehicle Safety and Regulatory Compliance organization made important moves in 2015 to amplify our commitment to safety, more than doubling the number of assigned professionals. Among the organization's primary activities is a substantial investment in the use of predictive analytics as a tool to more quickly identify potential vehicle safety issues. The organization is led by a vice president who reports directly to the CEO of FCA US, ensuring a high level of information flow and accountability. This structure establishes a focal point for working with consumers, regulatory agencies and other partners to enhance real-world vehicle safety. Another important move in 2015 was the announcement of the newly established position of Safety Advocate. The Safety Advocate role is responsible for promoting greater awareness of vehicle safety - both internally with FCA US employees, and externally with regulators, industry observers and trade associations. In addition to highlighting the Company's vehicle safety engineering achievements, the Safety Advocate will share insights about proposed legislation and the evolution of the vehicle safety landscape.

From a global perspective, the safety organizations in the four FCA regions continuously share information and best practices in order to harmonize design guidelines and processes where possible, given the regulatory environment. Safety design concepts are implemented from the early phases of every new model through the release of detailed design specifications to all the providers of subsystems for the vehicle. Our approach recognizes that safer highways, improved traffic management and driver education all have a

role to play in enhancing safety on the road. That is why we strive to connect our safety efforts to a collective goal we share with our employees, customers, dealers, suppliers, law enforcement, regulators, researchers, educators and others who have a stake in driver, passenger and pedestrian safety. All share a collective responsibility to make our roads safer.

FCA's commitment to transportation safety includes engineering active and passive features for diverse drivers and vehicle segments. In some cases, such as restraint systems, global regulations are very similar and we have developed a worldwide restraint system standardization plan. In other instances, government regulations and third-party ratings standards vary from region to region. Even with this variance, our safety centers continuously collaborate with suppliers to meet internal safety standards designed to address quality and reliability goals.

Within FCA, responsibility for safety is not limited to the designated safety organizations, but cuts across many departments. Numerous individuals at FCA, as well as at our dealerships and within our supply chain, are engaged in tracking and understanding how vehicles perform on a day-to-day basis on the road. This work includes examining accident data in order to understand factors that may need closer investigation and understanding. Within our organization, many centers of expertise contribute to the technological advancement on safety issues by cooperating with public institutions, suppliers, universities and other organizations on research and development into innovative solutions.

53.    With respect to the Jeep Grand Cherokee, FCA advertisements include the following, touting "over 70 available safety and security features":

010616-11 881080V1



54.    Likewise for the Dodge Charger, FCA advertises "always on guard" and "safety and security are built in":



010616-11 881080V1



55.    For the Chrysler 300, the message is much the same, touting "Safety you can sense":



56.    On its website, FCA states the following about the brands of the Defective Shifter Vehicles:



Since the company was founded in 1925, the Chrysler brand has continued to delight customers with its distinctive designs, craftsmanship and intuitively innovative technology – all at an extraordinary value.



Dodge, America's mainstream performance brand, offers a full range of muscle cars, compacts, minivans, crossovers and SUVs. Built for top performance – from power off the

-35-

line to handling on corners – every Dodge delivers unmatched versatility and excellent fuel efficiency.

**Jeep**

Since 1941, the Jeep brand has continued to deliver an open invitation to live life to the fullest, providing customers unique, versatile and capable vehicles that provide owners a sense of safety and security to handle any adventure with confidence.

57.    But despite its claim to put safety first and the plethora of marketing and advertising by FCA touting its commitment to safety, the facts of this case speak for themselves.  When it placed in commerce the Defective Shifter Vehicles with monostable electronic shifters and no override device, it put style and profits first, and as a result there have been hundreds of accidents, dozens of injuries, and likely the death of a young, talented actor.

**F.    FCA's Delayed and Inadequate Response to the Defectively Designed ZF Shifter Has Led to Hundreds of Accidents, Many Involving Serious Injury, and Has Led to a Decrease in Value of the Defective Shifter Vehicles**

58.    FCA's foot-dragging with respect to notifying its customers of the dangerous ZF Shifter defect, and taking steps to correct it, is unfortunately business as usual for FCA.  As reported in the New York Times on June 21, 2016, Center for Auto Safety Executive Director Clarence Ditlow said, "There was no sense of urgency on Chrysler's part or NHTSA's part given the potential for death or injury." The Times points out that NHTSA "had publicly chastised the company, which acknowledged delaying recalls in almost two dozen cases going back to 2013 and affecting millions of vehicles." NHTSA Head Mark Rosekind had said at the time, "[t]his represents a significant failure to meet a manufacturer's safety responsibilities."

010616-11 881080V1

59.     Chrysler promised to speed up its recalls and agreed to pay close to $105 million in penalties. But this case evidences the fact that little has changed. FCA is still putting profits ahead of safety.

60.     Class members paid premiums to purchase the Defective Shifter Vehicles.  They paid these premiums as a result of the brand, value, and safety representations made by FCA.  Class members were harmed from the day they drove their Defective Shifter Vehicle off the lot because they did not get what they paid for—a car that was well-designed and safe to operate.

61.     In addition, following the death of actor Anton Yelchin who was crushed by his roll-away 2015 Jeep Grand Cherokee, there has been widespread disclosure of the design defect of the ZF Shifter in the Defective Shifter Vehicles.  This press has caused a sharp decrease in the value of the Defective Shifter Vehicles and may have made them essentially unsalable.  Each Class member therefore suffered a direct pecuniary loss in the form of the decreased value of their Defective Shifter Vehicle.

62.     Further, the design defect of the ZF Shifter in the Defective Shifter Vehicles has caused numerous accidents nationwide.  These reported accidents have caused higher auto insurance premiums as insurers have adjusted their rates to account for the higher risk of covering the Defective Shifter Vehicle.  The burden has fallen squarely on Class members to pay these higher premiums.

63.     The loss in value is particularly acute and affects Class members because they do not want to own unsafe cars that might roll away and crush them or members of their family.  Safety and quality of design are at the core of FCA's marketing efforts and a driving factor in purchase decisions.  Class members want to sell their Defective Shifter Vehicles but they cannot without incurring substantial losses.

64.     Moreover, many Class members purchased their vehicles with financing in the form of car loans or leases.  The drop in value of the Defective Shifter Vehicles has caused the financing to be underwater, meaning that Class members will have to pay money over and above whatever they can sell their car for.

010616-11  881080V1

65.     In addition, many Class members purchased expensive extended warranties for their Defective Shifter Vehicles, intending to own the vehicles for many years beyond the initial warranty.  However, as a result of the ZF Shifter defect, Class members no longer want to own the Defective Shifter Vehicles and when they sell them, in addition to losses from the cars being worth much less as a result of the defect, they will lose the value of the extended warranties that they purchased.

66.     Further compounding the harm to Class members is that as of the date of this filing, FCA has provided no repair guidance directly to customers or to its dealer network.  Concerned owners of Defective Shifter Vehicles have been told absolutely nothing about what will happen to their cars, what FCA intends to do, or what owners should do.  Instead, FCA has simply sent a letter to registered owners describing the design defect.

67.     As a result of FCA's unfair, deceptive, and/or fraudulent business practices, and its failure to disclose that the ZF Shifter is unsafe and defectively designed, owners and/or lessees of the Defective Shifter Vehicles have suffered losses in money and/or property.  Had Plaintiffs and Class members known of the defect at the time they purchased or leased their Defective Shifter Vehicles, they would not have purchased or leased those vehicles, or would have paid substantially less for the vehicles than they did.

## VI.     TOLLING OF THE STATUTE OF LIMITATIONS

**A.     Discovery Rule Tolling**

68.     Class members had no way of knowing about FCA's defectively designed ZF Shifters in their Defective Shifter Vehicles. As evidenced by its foot-dragging in resolving the issue and implementing a fix, FCA was intent on expressly hiding its behavior from regulators and consumers.  This is the quintessential case for tolling.

69.     Within the period of any applicable statutes of limitation, Plaintiffs and members of the proposed Class could not have discovered through the exercise of reasonable diligence that FCA was concealing the design defect complained of herein

-38-

and misrepresenting the company's true position with respect to the safety qualities of its vehicles.

70.     Within the period of any applicable statutes of limitation, Plaintiffs and the other Class members could not have discovered through the exercise of reasonable diligence that FCA was concealing the ZF Shifter defect.

71.     For these reasons, all applicable statutes of limitation have been tolled by operation of the discovery rule with respect to claims as to all vehicles identified herein.

**B.     Estoppel**

72.     FCA was under a continuous duty to disclose to Plaintiffs and the other Class members the true character, quality, and nature of the ZF Shifter in the vehicles at issue.

73.     FCA knowingly, affirmatively, and actively concealed the true nature, quality, and character of the ZF Shifter in the vehicles at issue.

74.     Based on the foregoing, FCA is estopped from relying on any statutes of limitations in defense of this action.

## VII.   CLASS ALLEGATIONS

75.     Plaintiffs bring this action pursuant to the provisions of Rules 23(a), (b)(2), and (b)(3) of the Federal Rules of Civil Procedure, on behalf of themselves and the following proposed classes:

> **Nationwide Class**
>
> All persons or entities who purchased or leased a 2012-14 Dodge Charger, 2012-14 Chrysler 300, or 2014-15 Jeep Grand Cherokee.
>
> **California Subclass**
>
> All members of the Nationwide Class who are residents of California or purchased their Defective Shifter Vehicle in California.
>
> **Arizona Subclass**

1  All members of the Nationwide Class who are residents of
2  Arizona or purchased their Defective Shifter Vehicle in
   Arizona.

3  **Florida Subclass**

4  All members of the Nationwide Class who are residents of
   Florida or purchased their Defective Shifter Vehicle in
5  Florida.

6  **Illinois Subclass**

7  All members of the Nationwide Class who are residents of
   Illinois or purchased their Defective Shifter Vehicle in
8  Illinois.

9  **Massachusetts Subclass**

10  All members of the Nationwide Class who are residents of
    Massachusetts or purchased their Defective Shifter Vehicle
11  in Masschusetts.

12  **Michigan Subclass**

13  All members of the Nationwide Class who are residents of
    Michigan or purchased their Defective Shifter Vehicle in
14  Michigan.

15  **Nevada Subclass**

16  All members of the Nationwide Class who are residents of
    Nevada or purchased their Defective Shifter Vehicle in
17  Nevada.

18  **North Carolina Subclass**

19  All members of the Nationwide Class who are residents of
    North Carolina or purchased their Defective Shifter Vehicle
20  in North Carolina.

21  **Ohio Subclass**

22  All members of the Nationwide Class who are residents of
    Ohio or purchased their Defective Shifter Vehicle in Ohio.
23

    **Oregon Subclass**
24
    All members of the Nationwide Class who are residents of
25  Oregon or purchased their Defective Shifter Vehicle in
    Oregon.
26

    **Pennsylvania Subclass**
27

28

All members of the Nationwide Class who are residents of Pennsylvania or purchased their Defective Shifter Vehicle in Pennsylvania.

**Texas Subclass**

All members of the Nationwide Class who are residents of Texas or purchased their Defective Shifter Vehicle in Texas.

**Washington Subclass**

All members of the Nationwide Class who are residents of Washington or purchased their Defective Shifter Vehicle in Washington.

76.   Excluded from the Class are FCA, its employees, co-conspirators, officers, directors, legal representatives, heirs, successors, wholly- or partly-owned, and its subsidiaries and affiliates, FCA dealers, Class counsel and their employees, and the judicial officers and their immediate family members and associated court staff assigned to this case, all persons who make a timely election to be excluded from the Class, governmental entities, and the judge to whom this case is assigned and his/her immediate family.

77.   Certification of Plaintiffs' claims for class-wide treatment is appropriate because Plaintiffs can prove the elements of their claims on a class-wide basis using the same evidence as would be used to prove those elements in individual actions alleging the same claim.

78.   This action has been brought and may be properly maintained on behalf of the Class proposed herein under Federal Rule of Civil Procedure 23.

79.   <u>Numerosity</u>.  Federal Rule of Civil Procedure 23(a)(1):  The members of the Class are so numerous and geographically dispersed that individual joinder of all Class members is impracticable.  There are at least 811,000 Defective Shifter Vehicles that have been sold in the United States.  Class members may be notified of the pendency of this action by recognized, Court-approved notice dissemination methods,

which may include U.S. Mail, electronic mail, Internet postings, and/or published notice.

80.    <u>Commonality and Predominance</u>.  Federal Rule of Civil Procedure 23(a)(2) and 23(b)(3):  This action involves common questions of law and fact, which predominate over any questions affecting individual Class members, including, without limitation:

    a.    Whether FCA engaged in the conduct alleged herein;

    b.    Whether FCA designed, advertised, marketed, distributed, leased, sold, or otherwise placed the Defective Shifter Vehicles into the stream of commerce in the United States;

    c.    Whether the ZF Shifter system in the Defective Shifter Vehicles contains a safety defect;

    d.    Whether FCA knew about the defect in the ZF Shifter and, if so, how long FCA has known of it;

    e.    Whether FCA designed, manufactured, marketed, and distributed the Defective Shifter Vehicles with a defective ZF Shifter;

    f.    Whether FCA's conduct violates consumer protection statutes, false advertising laws, sales contracts, warranty laws, and other laws as asserted herein;

    g.    Whether Plaintiffs and the other Class members overpaid for their Defective Shifter Vehicles;

    h.    Whether Plaintiffs and the other Class members are entitled to equitable relief, including, but not limited to, restitution or injunctive relief—including a repair of the defectively designed ZF Shifter; and

    i.    Whether Plaintiffs and the other Class members are entitled to damages and other monetary relief and, if so, in what amount.

81.    <u>Typicality</u>.  Federal Rule of Civil Procedure 23(a)(3):  Plaintiffs' claims are typical of the other Class members' claims because, among other things, all Class

members were comparably injured through FCA's wrongful conduct as described above.

82.     <u>Adequacy</u>.  Federal Rule of Civil Procedure 23(a)(4):  Plaintiffs are adequate Class representatives because their interests do not conflict with the interests of the other members of the Class they seek to represent; Plaintiffs have retained counsel competent and experienced in complex class action litigation; and Plaintiffs intend to prosecute this action vigorously.  The interests of the Class will be fairly and adequately protected by Plaintiffs and their counsel.

83.     <u>Declaratory and Injunctive Relief</u>.  Federal Rule of Civil Procedure 23(b)(2):  FCA has acted or refused to act on grounds generally applicable to Plaintiffs and the other members of the Class, thereby making appropriate final injunctive relief and declaratory relief, as described below, with respect to the Class as a whole.

84.     <u>Superiority</u>.  Federal Rule of Civil Procedure 23(b)(3):  A class action is superior to any other available means for the fair and efficient adjudication of this controversy, and no unusual difficulties are likely to be encountered in the management of this class action.  The damages or other financial detriment suffered by Plaintiffs and the other Class members are relatively small compared to the burden and expense that would be required to individually litigate their claims against FCA, so it would be impracticable for the members of the Class to individually seek redress for FCA's wrongful conduct.  Even if Class members could afford individual litigation, the court system could not.  Individualized litigation creates a potential for inconsistent or contradictory judgments, and increases the delay and expense to all parties and the court system.  By contrast, the class action device presents far fewer management difficulties, and provides the benefits of single adjudication, economy of scale, and comprehensive supervision by a single court.

# VIII.  VIOLATIONS ALLEGED

## A.    Nationwide

### COUNT I

### VIOLATION OF THE MAGNUSON-MOSS WARRANTY ACT
### (15 U.S.C. § 2301, *et seq.*)

85.    Plaintiffs reallege and incorporate by reference all paragraphs as though fully set forth herein.

86.    This claim is brought on behalf of the Nationwide Class.

87.    Plaintiffs are "consumers" within the meaning of the Magnuson-Moss Warranty Act, 15 U.S.C. § 2301(3).

88.    FCA is a "supplier" and "warrantor" within the meaning of the Magnuson-Moss Warranty Act, 15 U.S.C. § 2301(4)-(5).

89.    The Defective Shifter Vehicles are "consumer products" within the meaning of the Magnuson-Moss Warranty Act, 15 U.S.C. § 2301(1).

90.    15 U.S.C. § 2301(d)(1) provides a cause of action for any consumer who is damaged by the failure of a warrantor to comply with a written or implied warranty.

91.    FCA's express warranties are written warranties within the meaning of the Magnuson-Moss Warranty Act, 15 U.S.C. § 2301(6).  The Defective Shifter Vehicles' implied warranties are covered under 15 U.S.C. § 2301(7).

92.    FCA breached these warranties, as described in more detail above. Without limitation, the Defective Shifter Vehicles are equipped with a defective ZF Shifter that puts vehicle occupants' safety in jeopardy.  The Defective Shifter Vehicles share a common design defect in that the ZF Shifter is defectively designed and unsafe, contrary to FCA's representations about its vehicles.

93.    Plaintiffs and the other Class members have had sufficient direct dealings with either FCA or its agents (*e.g.*, dealerships and technical support) to establish privity of contract between FCA on one hand, and Plaintiffs and each of the other Class members on the other hand.  Nonetheless, privity is not required here because

-44-

Plaintiffs and each of the other Class members are intended third-party beneficiaries of contracts between FCA and its dealers, and specifically, of FCA's implied warranties. The dealers were not intended to be the ultimate consumers of the Defective Shifter Vehicles and have no rights under the warranty agreements provided with the Defective Shifter Vehicles; the warranty agreements were designed for and intended to benefit the consumers only.

94.    Affording FCA a reasonable opportunity to cure its breach of written warranties would be unnecessary and futile here. FCA has had over a year to provide a suitable repair for the ZF Shifters and it has done nothing but send a letter to registered owners of Defective Shifter Vehicles.

95.    At the time of sale or lease of each Defective Shifter Vehicle, FCA knew, should have known, or was reckless in not knowing of its misrepresentations and omissions concerning the Defective Shifter Vehicles' inability to perform as warranted, but nonetheless failed to rectify the situation and/or disclose the defective design.  Under the circumstances, the remedies available under any informal settlement procedure would be inadequate and any requirement that Plaintiffs resort to an informal dispute resolution procedure and/or afford FCA a reasonable opportunity to cure its breach of warranties is excused and thereby deemed satisfied.

96.    Plaintiffs and the other Class members would suffer economic hardship if they returned their Defective Shifter Vehicles but did not receive the return of all payments made by them.  Because FCA is refusing to acknowledge any revocation of acceptance and return immediately any payments made, Plaintiffs and the other Class members have not re-accepted their Defective Shifter Vehicles by retaining them.

97.    The amount in controversy of Plaintiffs' individual claims meets or exceeds the sum of $25.  The amount in controversy of this action exceeds the sum of $50,000, exclusive of interest and costs, computed on the basis of all claims to be determined in this lawsuit.

010616-11 881080V1

98.    Plaintiffs, individually and on behalf of the other Class members, seek all damages permitted by law, including diminution in value of the Defective Shifter Vehicles, in an amount to be proven at trial.

**B.    California**

**COUNT I**

**VIOLATION OF CALIFORNIA'S UNFAIR COMPETITION LAW**
**(CAL. BUS. & PROF. CODE § 17200, *et seq*.)**

99.    Plaintiffs reallege and incorporate by reference all paragraphs as though fully set forth herein.

100.    Plaintiffs Deryl Wall, David Goldsmith, Michael Vincent Nathan Jr., and Pascual Pietri bring this Count on behalf of the California Subclass.

101.    California's Unfair Competition Law ("UCL"), CAL. BUS. & PROF. CODE § 17200, *et seq*., proscribes acts of unfair competition, including "any unlawful, unfair or fraudulent business act or practice and unfair, deceptive, untrue or misleading advertising."

102.    FCA's conduct, as described herein, was and is in violation of the UCL. FCA's conduct violates the UCL in at least the following ways:

a.    By knowingly and intentionally concealing from Plaintiffs and the other Class members that the Defective Shifter Vehicles suffer from a design defect while obtaining money from Plaintiffs and the Class;

b.    By marketing the Defective Shifter Vehicles as possessing functional and defect-free transmission systems;

c.    By violating federal laws, including the Motor Vehicle Safety Act and NHTSA regulations, by failing to recall and repair vehicles that contain a safety defect; and

d.    By violating other California laws, including California laws governing false advertising and consumer protection.

-46-

103.    FCA's misrepresentations and omissions alleged herein caused Plaintiffs and the other Class members to make their purchases or leases of their Defective Shifter Vehicles.  Absent those misrepresentations and omissions, Plaintiffs and the other Class members would not have purchased or leased these vehicles, would not have purchased or leased these Defective Shifter Vehicles at the prices they paid, and/or would have purchased or leased less expensive alternative vehicles that did not contain defective ZF Shifters.

104.    Accordingly, Plaintiffs and the other Class members have suffered injury in fact, including lost money or property, as a result of FCA's misrepresentations and omissions.

105.    Plaintiffs seek to enjoin further unlawful, unfair, and/or fraudulent acts or practices by FCA under CAL. BUS. & PROF. CODE § 17200.

106.    Plaintiffs request that this Court enter such orders or judgments as may be necessary to enjoin FCA from continuing its unfair, unlawful, and/or deceptive practices; to restore to Plaintiffs and members of the Class any money it acquired by unfair competition, including restitution and/or restitutionary disgorgement, as provided in CAL. BUS. & PROF. CODE §§ 17203 & 3345; and for such other relief set forth below.

## COUNT II

### VIOLATION OF CALIFORNIA'S CONSUMERS LEGAL REMEDIES ACT
(CAL. BUS. & PROF. CODE § 1750, *et seq.*)

107.    Plaintiffs reallege and incorporate by reference all paragraphs as though fully set forth herein.

108.    Plaintiffs Deryl Wall, David Goldsmith, Michael Vincent Nathan Jr., and Pascual Pietri bring this Count on behalf of the California Subclass.

109.    California's Consumers Legal Remedies Act ("CLRA"), CAL. BUS. & PROF. CODE § 1750, *et seq.*, proscribes "unfair methods of competition and unfair or

deceptive acts or practices undertaken by any person in a transaction intended to result or which results in the sale or lease of goods or services to any consumer."

110.   The Defective Shifter Vehicles are "goods" as defined in CAL. BUS. & PROF. CODE § 1761(a).

111.   Plaintiffs and the other Class members are "consumers" as defined in CAL. BUS. & PROF. CODE § 1761(d), and Plaintiffs, the other Class members, and FCA are "persons" as defined in CAL. BUS. & PROF. CODE § 1761(c).

112.   As alleged above, FCA made numerous representations concerning the benefits, efficiency, performance, and safety features of the Defective Shifter Vehicles that were misleading.

113.   In purchasing or leasing the Defective Shifter Vehicles, Plaintiffs and the other Class members were deceived by FCA's failure to disclose that the Defective Shifter Vehicles were equipped with defective ZF Shifters.

114.   FCA's conduct, as described herein, was and is in violation of the CLRA. FCA's conduct violates at least the following enumerated CLRA provisions:

        a.    CAL. CIV. CODE § 1770(a)(2): Misrepresenting the approval or certification of goods;

        b.    CAL. CIV. CODE § 1770(a)(5): Representing that goods have sponsorship, approval, characteristics, uses, benefits, or quantities which they do not have;

        c.    CAL. CIV. CODE § 1770(a)(7): Representing that goods are of a particular standard, quality, or grade, if they are of another;

        d.    CAL. CIV. CODE § 1770(a)(9): Advertising goods with intent not to sell them as advertised; and

        e.    CAL. CIV. CODE § 1770(a)(16): Representing that goods have been supplied in accordance with a previous representation when they have not.

115.   Plaintiffs and the other Class members have suffered injury in fact and actual damages resulting from FCA's material omissions and misrepresentations

-48-

because they paid an inflated purchase or lease price for the Defective Shifter Vehicles.

116.   FCA knew, should have known, or was reckless in not knowing of the defective design and/or manufacture of the ZF Shifter, and that the Defective Shifter Vehicles were not suitable for their intended use.

117.   The facts concealed and omitted by FCA to Plaintiffs and the other Class members are material in that a reasonable consumer would have considered them to be important in deciding whether to purchase or lease the Defective Shifter Vehicles or pay a lower price.  Had Plaintiffs and the other Class members known about the defective nature of the Defective Shifter Vehicles, they would not have purchased or leased the Defective Shifter Vehicles or would not have paid the prices they paid.

118.   In accordance with Civil Code § 1780 (a), Plaintiffs and the other Class members seek injunctive and equitable relief for FCA's violations of the CLRA, including an injunction to enjoin FCA from continuing its deceptive advertising and sales practices.  In addition, after mailing appropriate notice and demand in accordance with Civil Code § 1782(a) & (d), Plaintiffs and the other Class members will amend this Class Action Complaint to include a request for damages.  Plaintiffs and the other Class members request that this Court enter such orders or judgments as may be necessary to restore to any person in interest any money which may have been acquired by means of such unfair business practices, and for such other relief, including attorneys' fees and costs, as provided in Civil Code § 1780 and the Prayer for Relief.

119.   Plaintiffs Deryl Wall, David Goldsmith, Michael Vincent Nathan, Jr., and Pascual Pietri include affidavits with this Complaint reflecting that venue in this District is proper, to the extent such an affidavit is required by Cal. Civ. Code § 1780(d) in federal court.

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

## COUNT III

## VIOLATION OF CALIFORNIA'S FALSE ADVERTISING LAW
### (CAL. BUS. & PROF. CODE § 17500, *et seq.*)

120.   Plaintiffs reallege and incorporate by reference all paragraphs as though fully set forth herein.

121.   Plaintiffs Deryl Wall, David Goldsmith, Michael Vincent Nathan Jr., and Pascual Pietri bring this Count on behalf of the California Subclass.

122.   CAL. BUS. & PROF. CODE § 17500 states:  "It is unlawful for any . . . corporation . . . with intent directly or indirectly to dispose of real or personal property . . . to induce the public to enter into any obligation relating thereto, to make or disseminate or cause to be made or disseminated . . . from this state before the public in any state, in any newspaper or other publication, or any advertising device, . . . or in any other manner or means whatever, including over the Internet, any statement . . . which is untrue or misleading, and which is known, or which by the exercise of reasonable care should be known, to be untrue or misleading."

123.   FCA caused to be made or disseminated through California and the United States, through advertising, marketing and other publications, statements that were untrue or misleading, and which were known, or which by the exercise of reasonable care should have been known to FCA, to be untrue and misleading to consumers, including Plaintiffs and the other Class members.

124.   FCA has violated CAL. BUS. & PROF. CODE § 17500 because the misrepresentations and omissions regarding the safety, reliability, and functionality of Defective Shifter Vehicles, as set forth in this Complaint, were material and likely to deceive a reasonable consumer.

125.   Plaintiffs and the other Class members have suffered an injury in fact, including the loss of money or property, as a result of FCA's unfair, unlawful, and/or deceptive practices.  In purchasing or leasing their Defective Shifter Vehicles, Plaintiffs and the other Class members relied on the misrepresentations and/or

omissions of FCA with respect to the safety, performance, and reliability of the Defective Shifter Vehicles.  FCA's representations turned out not to be true because the Defective Shifter Vehicles are distributed with defectively designed ZF Shifters, rendering essential vehicle functions inoperative.  Had Plaintiffs and the other Class members known this, they would not have purchased or leased their Defective Shifter Vehicles and/or paid as much for them.  Accordingly, Plaintiffs and the other Class members overpaid for their Defective Shifter Vehicles and did not receive the benefit of their bargain.

126.   All of the wrongful conduct alleged herein occurred, and continues to occur, in the conduct of FCA's business.  FCA's wrongful conduct is part of a pattern or generalized course of conduct that is still perpetuated and repeated, both in the state of California and nationwide.

127.   Plaintiffs, individually and on behalf of the other Class members, request that this Court enter such orders or judgments as may be necessary to enjoin FCA from continuing their unfair, unlawful, and/or deceptive practices, to restore to Plaintiffs and the other Class members any money FCA acquired by unfair competition, including restitution and/or restitutionary disgorgement, and for such other relief set forth below.

## COUNT IV

### BREACH OF IMPLIED WARRANTY OF MERCHANTABILITY
(Cal. Com. Code § 2314)

128.   Plaintiffs reallege and incorporate by reference all paragraphs as though fully set forth herein.

129.   Plaintiffs Deryl Wall, David Goldsmith, Michael Vincent Nathan Jr., and Pascual Pietri bring this Count on behalf of the California Subclass.

130.   FCA is and was at all relevant times a merchant with respect to motor vehicles under Cal. Com. Code § 2314.

-51-

131.   A warranty that the Defective Shifter Vehicles were in merchantable condition is implied by law in the instant transactions, pursuant to CAL. COM. CODE § 2314.  These Defective Shifter Vehicles, when sold and at all times thereafter, were not in merchantable condition and are not fit for the ordinary purpose for which cars are used.  Specifically, the Defective Shifter Vehicles are inherently defective in that the ZF Shifter is unsafe, and was not adequately designed, manufactured, and tested.

132.   FCA was provided notice of these issues by complaints lodged by consumers with NHTSA—which vehicle manufacturers like FCA routinely monitor—before or within a reasonable amount of time after the allegations of the Defective Shifter Vehicle defects became public.

133.   As a direct and proximate result of FCA's breach of the warranties of merchantability, Plaintiffs and the other Class members have been damaged in an amount to be proven at trial.

## COUNT V

**VIOLATION OF THE SONG-BEVERLY CONSUMER WARRANTY ACT FOR BREACH OF IMPLIED WARRANTY OF MERCHANTABILITY (CAL. CIV. CODE §§ 1791.1 & 1792)**

134.   Plaintiffs reallege and incorporate by reference all paragraphs as though fully set forth herein.

135.   Plaintiffs Deryl Wall, David Goldsmith, Michael Vincent Nathan Jr., and Pascual Pietri bring this Count on behalf of the California Subclass.

136.   Plaintiffs and the other Class members who purchased or leased the Defective Shifter Vehicles in California are "buyers" within the meaning of CAL. CIV. CODE § 1791(b).

137.   The Defective Shifter Vehicles are "consumer goods" within the meaning of CAL. CIV. CODE § 1791(a).

138.   FCA is a "manufacturer" of the Defective Shifter Vehicles within the meaning of CAL. CIV. CODE § 1791(j).

139.   FCA impliedly warranted to Plaintiffs and the other Class members that its Defective Shifter Vehicles were "merchantable" within the meaning of CAL. CIV. CODE §§ 1791.1(a) & 1792; however, the Defective Shifter Vehicles do not have the quality that a buyer would reasonably expect.

140.   CAL. CIV. CODE § 1791.1(a) states:

"Implied warranty of merchantability" or "implied warranty that goods are merchantable" means that the consumer goods meet each of the following:

(1)   Pass without objection in the trade under the contract description.

(2)   Are fit for the ordinary purposes for which such goods are used.

(3)   Are adequately contained, packaged, and labeled.

(4)   Conform to the promises or affirmations of fact made on the container or label.

141.   The Defective Shifter Vehicles would not pass without objection in the automotive trade because of the defects in the Defective Shifter Vehicles' ZF Shifter. Specifically, the ZF Shifter is monostable, yet does not have a safety override that automatically puts the car in "park" if the driver's door is opened and the foot brake's released.  In addition, the ZF Shifter was not adequately designed, manufactured, and tested.

142.   Because of the defects in the Defective Shifter Vehicles' ZF Shifter, they are not in merchantable condition and thus not fit for ordinary purposes.

143.   The Defective Shifter Vehicles are not adequately labeled because the labeling fails to disclose the defects in the Defective Shifter Vehicles' ZF Shifter.

144.   FCA breached the implied warranty of merchantability by manufacturing and selling the Defective Shifter Vehicles containing the defectively designed ZF Shifter.  Furthermore, these defects have caused Plaintiffs and the other Class members to not receive the benefit of their bargain and have caused the Defective Shifter Vehicles to depreciate in value.

-53-

145.   As a direct and proximate result of FCA's breach of the implied warranty of merchantability, Plaintiffs and the other Class members received goods whose defective condition substantially impairs their value to Plaintiffs and the other Class members.  Plaintiffs and the other Class members have been damaged as a result of the diminished value of FCA's products, the products' malfunctioning, and the non-use of their Defective Shifter Vehicles.

146.   Pursuant to CAL. CIV. CODE §§ 1791.1(d) & 1794, Plaintiffs and the other Class members are entitled to damages and other legal and equitable relief, including, at their election, the purchase price of their Defective Shifter Vehicles, or the overpayment or diminution in value of their Defective Shifter Vehicles.

147.   Pursuant to CAL. CIV. CODE § 1794, Plaintiffs and the other Class members are entitled to costs and attorneys' fees.

## COUNT VI

### BREACH OF CONTRACT
### (Based on California Law)

148.   Plaintiffs reallege and incorporate by reference all paragraphs as though fully set forth herein.

149.   Plaintiffs Deryl Wall, David Goldsmith, Michael Vincent Nathan Jr., and Pascual Pietri bring this Count on behalf of the California Subclass.

150.   FCA's misrepresentations and omissions alleged herein, including FCA's failure to disclose a defect in the ZF Shifter, caused Plaintiffs and the other Class members to make their purchases or leases of their Defective Shifter Vehicles.  Absent those misrepresentations and omissions, Plaintiffs and the other Class members would not have purchased or leased these Defective Shifter Vehicles, would not have purchased or leased these Defective Shifter Vehicles at the prices they paid, and/or would have purchased or leased less expensive alternative vehicles that did not contain a defective ZF Shifter.  Accordingly, Plaintiffs and the other Class members overpaid for their Defective Shifter Vehicles and did not receive the benefit of their bargain.

151.   Each and every sale or lease of a Defective Shifter Vehicle by an authorized FCA dealer constitutes a contract between FCA and the purchaser or lessee.  FCA breached these contracts by selling or leasing Plaintiffs and the other Class members Defective Shifter Vehicles and by misrepresenting or failing to disclose the existence of the defective design, including information known to FCA, rendering each Defective Shifter Vehicle less safe, and thus less valuable, than vehicles not equipped with a ZF Shifter.

152.   As a direct and proximate result of FCA's breach of contract, Plaintiffs and the Class have been damaged in an amount to be proven at trial, which shall include, but is not limited to, all compensatory damages, incidental and consequential damages, and other damages allowed by law.

## COUNT VII

### EXEMPLARY DAMAGES
#### (CAL. CIV. CODE § 3294)

153.   Plaintiffs reallege and incorporate by reference all paragraphs as though fully set forth herein.

154.   Plaintiffs Deryl Wall, David Goldsmith, Michael Vincent Nathan Jr., and Pascual Pietri bring this Count on behalf of the California Subclass.

155.   FCA's conduct was knowing and malicious and caused significant harm. FCA has been repeatedly warned by NHTSA, and has paid a fine exceeding $105 million for its failure to timely disclose, recall, and repair dangerous defects in its automobiles.  Yet in this case, FCA has again dragged its feet, leading to hundreds of accidents, dozens of injuries, and at least one death.

156.   FCA intentionally designed, manufactured, and sold cars equipped with defective ZF Shifters, and it falsely advertised and represented to California and federal authorities that the Defective Shifter Vehicles were and are safe to operate.

157.   For at least a year, FCA knowingly continued to sell the Defective Shifter Vehicles with the ZF Shifter in order to increase sales.  This deception jeopardized the

safety of drivers of the Defective Shifter Vehicles and other drivers on the roads of California.

158.   FCA's intentional deception, intentional foot-dragging on instituting a repair, and the safety-critical impact of its defective ZF Shifters warrant exemplary damages for the sake of example and by way of punishing the Defendant.

**C.    Arizona**

**COUNT I**

**VIOLATION OF CONSUMER FRAUD ACT**
**(ARIZ. REV. STAT. § 44-1521, *et seq.*)**

159.   Plaintiffs reallege and incorporate by reference all paragraphs as though fully set forth herein.

160.   Plaintiffs Jeffrey Guy and Casey E. Perkins bring this Count on behalf of themselves and the Arizona Subclass.

161.   FCA, Plaintiffs, and the Arizona Subclass are "persons" within the meaning of the Arizona Consumer Fraud Act ("Arizona CFA"), ARIZ. REV. STAT. § 44-1521(6).

162.   The Affected Vehicles are "merchandise" within the meaning of ARIZ. REV. STAT. § 44-1521(5).

163.   The Arizona CFA provides that "[t]he act, use or employment by any person of any deception, deceptive act or practice, fraud, … misrepresentation, or concealment, suppression or omission of any material fact with intent that others rely upon such concealment, suppression or omission, in connection with the sale … of any merchandise whether or not any person has in fact been misled, deceived or damaged thereby, is declared to be an unlawful practice."  ARIZ. REV. STAT. § 44-1522(A).

164.   In the course of its business, FCA willfully failed to disclose and actively concealed the defective ZF Shifter discussed herein and otherwise engaged in activities with a tendency or capacity to deceive.  FCA also engaged in unlawful trade practices by employing deception, deceptive acts or practices, fraud,

-56-

misrepresentations, or concealment, suppression, or omission of any material fact with intent that others rely upon such concealment, suppression, or omission, in connection with the sale of the Defective Shifter Vehicles.

165.   FCA knew it had installed a defectively designed ZF Shifter, knew that the ZF Shifter was not safe, as advertised, and had no override system to prevent roll-away incidents, even though its competitors used such override systems.  FCA knew this for at least two years, but concealed all of that information.

166.   FCA was also aware that it valued profits over safety, and that it was manufacturing, selling, and distributing vehicles throughout the United States that did not perform as advertised and jeopardized the safety of the vehicle's occupants.  FCA concealed this information as well.

167.   By failing to disclose that the defectively designed ZF Shifter was not safe and had no safety override, by marketing its vehicles as safe, reliable, and of high quality, and by presenting itself as a reputable manufacturer that valued safety and stood behind its vehicles after they were sold, FCA engaged in deceptive business practices in violation of the Arizona CFA.

168.   FCA's unfair or deceptive acts or practices were likely to and did in fact deceive reasonable consumers, including Plaintiffs and the other Class members, about the true performance of the Defective Shifter Vehicles, the quality of the FCA brand, the devaluing of safety and performance at FCA, and the true value of the Defective Shifter Vehicles.

169.   FCA intentionally and knowingly misrepresented material facts regarding the Defective Shifter Vehicles with an intent to mislead Plaintiffs and the Arizona Subclass.

170.   FCA knew or should have known that its conduct violated the Arizona CFA.

171.    As alleged above, FCA made material statements about the safety and utility of the Defective Shifter Vehicles and the FCA brand that were either false or misleading.

172.    FCA owed Plaintiffs a duty to disclose the true safety, performance, and reliability of the Defective Shifter Vehicles, and the devaluing of safety and performance at FCA, because FCA:

    a.    Possessed exclusive knowledge that it valued profits and cost-cutting over safety and performance, and that it was manufacturing, selling, and distributing vehicles throughout the United States that included a defectively designed ZF Shifter and did not perform as advertised;

    b.    Intentionally concealed the foregoing from Plaintiffs and the Class; and/or

    c.    Made incomplete representations about the safety and performance of the Defective Shifter Vehicles generally, and the defective ZF Shifter in particular, while purposefully withholding material facts from Plaintiffs and the Class that contradicted these representations.

173.    Because FCA fraudulently concealed the defectively designed ZF Shifter and the true performance of cars equipped with the ZF Shifter, resulting in a raft of negative publicity once the defects finally began to be disclosed, the value of the Defective Shifter Vehicles has greatly diminished.  In light of the stigma attached to those vehicles by FCA's conduct, they are now worth significantly less than they otherwise would be.

174.    FCA's fraudulent use of the defectively designed ZF Shifter and the true performance of the Defective Shifter Vehicles were material to Plaintiffs and the Arizona Subclass.  A vehicle made by a reputable manufacturer of safe, high-performing vehicles is safer and worth more than an otherwise comparable vehicle made by a disreputable manufacturer of unsafe vehicles that conceals defects rather than promptly remedying them.

010616-11 881080V1

175.   Plaintiffs and the Arizona Subclass suffered ascertainable loss caused by FCA's misrepresentations and its concealment of and failure to disclose material information.  Class members who purchased the Defective Shifter Vehicles either would have paid less for their vehicles or would not have purchased or leased them at all but for FCA's violations of the Arizona CFA.

176.   FCA had an ongoing duty to all FCA customers to refrain from unfair and deceptive practices under the Arizona CFA.  All owners of the Defective Shifter Vehicles suffered ascertainable loss in the form of the diminished value of their vehicles as a result of FCA's deceptive and unfair acts and practices made in the course of FCA's business.

177.   FCA's violations present a continuing risk to Plaintiffs as well as to the general public.  FCA's unlawful acts and practices complained of herein affect the public interest.

178.   The recalls and modifications instituted by FCA have not been adequate.

179.   As a direct and proximate result of FCA's violations of the Arizona CFA, Plaintiffs and the Arizona Subclass have suffered injury-in-fact and/or actual damage.

180.   Plaintiffs and the Arizona Subclass seek monetary relief against FCA in an amount to be determined at trial.  Plaintiffs and the Arizona Subclass also seek punitive damages because FCA engaged in aggravated and outrageous conduct with an evil mind.

181.   Plaintiffs also seek an order enjoining FCA's unfair, unlawful, and/or deceptive practices, attorneys' fees, and any other just and proper relief available under the Arizona CFA.

## COUNT II

### VIOLATION OF EXPRESS WARRANTY
### (ARIZ. REV. STAT. § 47-2313, *et seq.*)

182.   Plaintiffs reallege and incorporate by reference all paragraphs as though fully set forth herein.

010616-11 881080V1

183.   Plaintiffs Jeffrey Guy and Casey E. Perkins bring this Count on behalf of themselves and the Arizona Subclass.

184.   FCA is and was at all relevant times a merchant with respect to motor vehicles under ARIZ. REV. STAT. § 47-2104(A).

185.   In connection with the purchase or lease of each one of its new vehicles, FCA provides an express New Vehicle Limited Warranty ("NVLW") for a period of three years or 36,000 miles, whichever occurs first.  This NVLW exists to cover "defect in materials or workmanship." FCA also provides a powertrain limited warranty that covers the engine and transmission, including the shifter assembly, for five years or 100,000 miles, whichever occurs first, for the Defective Shifter Vehicles (FCA has, since the 2016 model year, reduced its powertrain warranty to five years or 60,000 miles).

186.   As a manufacturer of light-duty vehicles, FCA was required to provide these warranties to purchasers of the Defective Shifter Vehicles.

187.   FCA's warranties formed the basis of the bargain that was reached when Plaintiffs and other Class members purchased or leased their Defective Shifter Vehicles equipped with the defectively designed ZF Shifter.

188.   Plaintiffs and the Class members experienced defects within the warranty period.  Despite the existence of warranties, FCA failed to inform Plaintiffs and Class members that the Defective Shifter Vehicles were defectively designed, and failed to fix the defectively designed ZF Shifter free of charge.

189.   FCA breached the express warranty promising to repair and correct a manufacturing defect or materials or workmanship of any part supplied by FCA. FCA has not repaired or adjusted, and has been unable to repair or adjust, the Defective Shifter Vehicles' materials and workmanship defects.

190.   Affording FCA a reasonable opportunity to cure its breach of written warranties would be unnecessary and futile here.

191.   Furthermore, the limited warranty promising to repair and/or correct a manufacturing defect fails in its essential purpose because the contractual remedy is insufficient to make Plaintiffs and Class members whole, and because FCA has failed and/or has refused to adequately provide the promised remedies within a reasonable time.

192.   Accordingly, recovery by Plaintiffs and the other Class members is not limited to the limited warranty promising to repair and/or correct a manufacturing defect, and Plaintiffs, individually and on behalf of the other Class members, seek all remedies as allowed by law.

193.   Also, as alleged in more detail herein, at the time FCA warranted and sold the Defective Shifter Vehicles, it knew that the Defective Shifter Vehicles did not conform to FCA's warranties and were inherently defective, and FCA wrongfully and fraudulently concealed material facts regarding its Defective Shifter Vehicles. Plaintiffs and the other Class members were therefore induced to purchase or lease the Defective Shifter Vehicles under false and/or fraudulent pretenses.

194.   Moreover, many of the injuries flowing from the Defective Shifter Vehicles cannot be resolved through the limited remedy of "replacements or adjustments," as many incidental and consequential damages have already been suffered due to FCA's fraudulent conduct as alleged herein.  Due to FCA's failure and/or continued failure to provide such limited remedy within a reasonable time, any limitation on Plaintiffs' and the other Class members' remedies would be insufficient to make Plaintiffs and the other Class members whole.

195.   Finally, due to FCA's breach of warranty as set forth herein, Plaintiffs and the other Class members assert as an additional and/or alternative remedy, as set forth in ARIZ. REV. STAT. § 47-2711, the revocation of acceptance of the goods, and the return to Plaintiffs and the other Class members of the purchase price of all Affected Vehicles currently owned for such other incidental and consequential damages as allowed under ARIZ. REV. STAT. §§ 47-2711 and 47-2608.

196.   FCA was provided notice of these issues by numerous complaints filed against it, including those submitted to NHTSA and the instant Complaint, within a reasonable amount of time after the defect was discovered.

197.   As a direct and proximate result of FCA's breach of express warranties, Plaintiffs and the other Class members have been damaged in an amount to be determined at trial.

**COUNT III**

**VIOLATION OF IMPLIED WARRANTY OF MERCHANTABILITY**
**(ARIZ. REV. STAT. § 47-2314)**

198.   Plaintiffs reallege and incorporate by reference all paragraphs as though fully set forth herein.

199.   Plaintiffs Jeffrey Guy and Casey E. Perkins bring this Count on behalf of themselves and the Arizona Subclass.

200.   FCA is and was at all relevant times a merchant with respect to motor vehicles under ARIZ. REV. STAT. § 47-2104(A).

201.   A warranty that the Defective Shifter Vehicles were in merchantable condition is implied by law in the instant transactions.  These Defective Shifter Vehicles, when sold and at all times thereafter, were not in merchantable condition and are not fit for the ordinary purpose for which cars are used.  Specifically, the Defective Shifter Vehicles are inherently defective in that the ZF Shifter was not adequately designed, manufactured, and tested.

202.   FCA was provided notice of these issues by complaints lodged by consumers with NHTSA—which vehicle manufacturers like FCA routinely monitor— before or within a reasonable amount of time after the allegations of the Defective Shifter Vehicle defects became public.

203.   As a direct and proximate result of FCA's breach of the warranties of merchantability, Plaintiffs and the other Class members have been damaged in an amount to be proven at trial.

## COUNT IV

## BREACH OF CONTRACT
### (Based on Arizona Law)

204.   Plaintiffs reallege and incorporate by reference all paragraphs as though fully set forth herein.

205.   Plaintiffs Jeffrey Guy and Casey E. Perkins bring this Count on behalf of themselves and the Arizona Subclass.

206.   FCA's misrepresentations and omissions alleged herein, including FCA's failure to disclose a defect in the ZF Shifter, caused Plaintiffs and the other Class members to make their purchases or leases of their Defective Shifter Vehicles.  Absent those misrepresentations and omissions, Plaintiffs and the other Class members would not have purchased or leased these Defective Shifter Vehicles, would not have purchased or leased these Defective Shifter Vehicles at the prices they paid, and/or would have purchased or leased less expensive alternative vehicles that did not contain a defective ZF Shifter.  Accordingly, Plaintiffs and the other Class members overpaid for their Defective Shifter Vehicles and did not receive the benefit of their bargain.

207.   Each and every sale or lease of a Defective Shifter Vehicle by an authorized FCA dealer constitutes a contract between FCA and the purchaser or lessee.  FCA breached these contracts by selling or leasing Plaintiffs and the other Class members Defective Shifter Vehicles, and by misrepresenting or failing to disclose the existence of the defective design, including information known to FCA, rendering each Defective Shifter Vehicle less safe, and thus less valuable, than vehicles not equipped with a monostable ZF Shifter.

208.   As a direct and proximate result of FCA's breach of contract, Plaintiffs and the Class have been damaged in an amount to be proven at trial, which shall include, but is not limited to, all compensatory damages, incidental and consequential damages, and other damages allowed by law.

## COUNT V
## UNJUST ENRICHMENT

209.    Plaintiffs reallege and incorporate by reference all paragraphs as though fully set forth herein.

210.    Plaintiffs Jeffrey Guy and Casey E. Perkins bring this Count on behalf of themselves and the Arizona Subclass.

211.    FCA has received and retained a benefit from Plaintiffs and inequity has resulted.

212.    FCA has benefitted from selling and leasing defective cars whose value was artificially inflated by FCA's concealment of the defective ZF Shifter at a profit, and Plaintiffs and the Class have overpaid for the cars and been forced to pay other costs.

213.    Thus, all Arizona Subclass members conferred a benefit on FCA.

214.    It is inequitable for FCA to retain these benefits.

215.    Plaintiffs and the Class were not aware of the true facts about the Defective Shifter Vehicles, and did not benefit from FCA's conduct.

216.    FCA knowingly accepted the benefits of its unjust conduct.

217.    As a result of FCA's conduct, the amount of its unjust enrichment should be disgorged, in an amount according to proof.

**D.    Florida**

## COUNT I

## VIOLATION OF FLORIDA'S UNFAIR & DECEPTIVE TRADE PRACTICES ACT
### (FLA. STAT. § 501.201, *et seq.*)

218.    Plaintiffs reallege and incorporate by reference all paragraphs as though fully set forth herein.

219.    Plaintiff Justine Andollo brings this Count on behalf of herself and the Florida Subclass.

220.   Plaintiff and Class members are "consumers" within the meaning of the Florida Unfair and Deceptive Trade Practices Act ("FUDTPA"), FLA. STAT. § 501.203(7).

221.   FCA engaged in "trade or commerce" within the meaning of FLA. STAT. § 501.203(8).

222.   The FUDTPA prohibits "[u]nfair methods of competition, unconscionable acts or practices, and unfair or deceptive acts or practices in the conduct of any trade or commerce." FLA. STAT. § 501.204(1).

223.   In the course of its business, FCA willfully failed to disclose and actively concealed the defective ZF Shifter discussed herein and otherwise engaged in activities with a tendency or capacity to deceive.  FCA also engaged in unlawful trade practices by employing deception, deceptive acts or practices, fraud, misrepresentations, or concealment, suppression, or omission of any material fact with intent that others rely upon such concealment, suppression, or omission, in connection with the sale of the Defective Shifter Vehicles.

224.   FCA knew it had installed a defectively designed ZF Shifter, knew that the ZF Shifter was not safe, as advertised, and had no override system to prevent roll-away incidents, even though its competitors used such override systems.  FCA knew this for at least two years, but concealed all of that information.

225.   FCA was also aware that it valued profits over safety, and that it was manufacturing, selling, and distributing vehicles throughout the United States that did not perform as advertised and jeopardized the safety of the vehicle's occupants.  FCA concealed this information as well.

226.   By failing to disclose that the defectively designed ZF Shifter was not safe and had no safety override, by marketing its vehicles as safe, reliable, and of high quality, and by presenting itself as a reputable manufacturer that valued safety and stood behind its vehicles after they were sold, FCA engaged in deceptive business practices in violation of the FUDTPA.

-65-

227.   FCA's unfair or deceptive acts or practices were likely to and did in fact deceive reasonable consumers, including Plaintiff and the other Class members, about the true performance of the Defective Shifter Vehicles, the quality of the FCA brand, the devaluing of safety and performance at FCA, and the true value of the Defective Shifter Vehicles.

228.   FCA intentionally and knowingly misrepresented material facts regarding the Defective Shifter Vehicles with an intent to mislead Plaintiff and the Florida Subclass.

229.   FCA knew or should have known that its conduct violated the FUDTPA.

230.   As alleged above, FCA made material statements about the safety and utility of the Defective Shifter Vehicles and the FCA brand that were either false or misleading.

231.   FCA owed Plaintiff a duty to disclose the true safety, performance, and reliability of the Defective Shifter Vehicles, and the devaluing of safety and performance at FCA, because FCA:

    a.   Possessed exclusive knowledge that it valued profits and cost-cutting over safety and performance, and that it was manufacturing, selling, and distributing vehicles throughout the United States that included a defectively designed ZF Shifter and did not perform as advertised;

    b.   Intentionally concealed the foregoing from Plaintiff and the Class; and/or

    c.   Made incomplete representations about the safety and performance of the Defective Shifter Vehicles generally, and the defective ZF Shifter in particular, while purposefully withholding material facts from Plaintiffs and the Class that contradicted these representations.

232.   Because FCA fraudulently concealed the defectively designed ZF Shifter and the true performance of cars equipped with the ZF Shifter, resulting in a raft of negative publicity once the defects finally began to be disclosed, the value of the Defective Shifter Vehicles has greatly diminished.  In light of the stigma attached to

those vehicles by FCA's conduct, they are now worth significantly less than they otherwise would be.

233.   FCA's fraudulent use of the defectively designed ZF Shifter and the true performance of the Defective Shifter Vehicles were material to Plaintiff and the Florida Subclass.  A vehicle made by a reputable manufacturer of safe, high-performing vehicles is safer and worth more than an otherwise comparable vehicle made by a disreputable manufacturer of unsafe, vehicles that conceals defects rather than promptly remedying them.

234.   Plaintiff and the Florida Subclass suffered ascertainable loss caused by FCA's misrepresentations and its concealment of and failure to disclose material information.  Class members who purchased the Defective Shifter Vehicles either would have paid less for their vehicles or would not have purchased or leased them at all but for FCA's violations of the FUDTPA.

235.   FCA had an ongoing duty to all FCA customers to refrain from unfair and deceptive practices under the FUDTPA.  All owners of the Defective Shifter Vehicles suffered ascertainable loss in the form of the diminished value of their vehicles as a result of FCA's deceptive and unfair acts and practices made in the course of FCA's business.

236.   FCA's violations present a continuing risk to Plaintiffs as well as to the general public.  FCA's unlawful acts and practices complained of herein affect the public interest.

237.   As a direct and proximate result of FCA's violations of the FUDTPA, Plaintiffs and the Florida Subclass have suffered injury-in-fact and/or actual damage.

238.   Plaintiff and the Florida Subclass are entitled to recover their actual damages under FLA. STAT. § 501.211(2) and attorneys' fees under FLA. STAT. § 501.2105(1).

239.    Plaintiffs also seek an order enjoining FCA's unfair and/or deceptive acts or practices, punitive damages, and attorneys' fees, and any other just and proper relief available under the FUDTPA.

## COUNT II

### BREACH OF EXPRESS WARRANTY
#### (FLA. STAT. § 672.313)

240.    Plaintiffs reallege and incorporate by reference all paragraphs as though fully set forth herein.

241.    Plaintiff Justine Andollo brings this Count on behalf of herself and the Florida Subclass.

242.    FCA is and was at all relevant times a merchant with respect to motor vehicles.

243.    In connection with the purchase or lease of each one of its new vehicles, FCA provides an express New Vehicle Limited Warranty ("NVLW") for a period of three years or 36,000 miles, whichever occurs first.  This NVLW exists to cover "defect in materials or workmanship." FCA also provides a powertrain limited warranty that covers the engine and transmission, including the shifter assembly for five years or 100,000 miles, whichever occurs first, for the Defective Shifter Vehicles (FCA has, since the 2016 model year, reduced its powertrain warranty to five years or 60,000 miles).

244.    As a manufacturer of light-duty vehicles, FCA was required to provide these warranties to purchasers of the Defective Shifter Vehicles.

245.    FCA's warranties formed the basis of the bargain that was reached when Plaintiff and other Class members purchased or leased their Defective Shifter Vehicles equipped with the defectively designed ZF Shifter.

246.    Plaintiff and the Class members experienced defects within the warranty period.  Despite the existence of warranties, FCA failed to inform Plaintiff and Class

members that the Defective Shifter Vehicles were defectively designed, and failed to fix the defectively designed ZF Shifter free of charge.

247.   FCA breached the express warranty promising to repair and correct a manufacturing defect or materials or workmanship of any part supplied by FCA. FCA has not repaired or adjusted, and has been unable to repair or adjust, the Defective Shifter Vehicles' materials and workmanship defects.

248.   Affording FCA a reasonable opportunity to cure its breach of written warranties would be unnecessary and futile here.

249.   Furthermore, the limited warranty promising to repair and/or correct a manufacturing defect fails in its essential purpose because the contractual remedy is insufficient to make Plaintiff and Class members whole and because FCA has failed and/or has refused to adequately provide the promised remedies within a reasonable time.

250.   Accordingly, recovery by Plaintiff and the other Class members is not limited to the limited warranty promising to repair and/or correct a manufacturing defect, and Plaintiff, individually and on behalf of the other Class members, seeks all remedies as allowed by law.

251.   Also, as alleged in more detail herein, at the time FCA warranted and sold the Defective Shifter Vehicles, it knew that the Defective Shifter Vehicles did not conform to FCA's warranties and were inherently defective, and FCA wrongfully and fraudulently concealed material facts regarding its Defective Shifter Vehicles. Plaintiff and the other Class members were therefore induced to purchase or lease the Defective Shifter Vehicles under false and/or fraudulent pretenses.

252.   Moreover, many of the injuries flowing from the Defective Shifter Vehicles cannot be resolved through the limited remedy of "replacements or adjustments," as many incidental and consequential damages have already been suffered due to FCA's fraudulent conduct as alleged herein. Due to FCA's failure and/or continued failure to provide such limited remedy within a reasonable time, any

010616-11  881080V1

1     limitation on Plaintiff's and the other Class members' remedies would be insufficient

2     to make Plaintiff and the other Class members whole.

3         253.   FCA was provided notice of these issues by numerous complaints filed

4     against it, including those submitted to NHTSA and the instant Complaint, within a

5     reasonable amount of time after the defect was discovered.

6         254.   As a direct and proximate result of FCA's breach of express warranties,

7     Plaintiff and the other Class members have been damaged in an amount to be

8     determined at trial.

9                        **COUNT III**

10        **BREACH OF IMPLIED WARRANTY OF MERCHANTABILITY**
                           **(FLA. STAT. § 672.314)**

11

12         255.   Plaintiffs reallege and incorporate by reference all paragraphs as though

    fully set forth herein.

13

14         256.   Plaintiff Justine Andollo brings this Count on behalf of herself and the

    Florida Subclass.

15

16         257.   FCA is and was at all relevant times a merchant with respect to motor

17     vehicles.

18         258.   A warranty that the Defective Shifter Vehicles were in merchantable

19     condition is implied by law in the instant transactions.  These Defective Shifter

20     Vehicles, when sold and at all times thereafter, were not in merchantable condition

21     and are not fit for the ordinary purpose for which cars are used.  Specifically, the

22     Defective Shifter Vehicles are inherently defective in that the ZF Shifter was not

23     adequately designed, manufactured, and tested.

24         259.   FCA was provided notice of these issues by complaints lodged by

25     consumers with NHTSA—which vehicle manufacturers like FCA routinely monitor—

26     before or within a reasonable amount of time after the allegations of the Defective

27     Shifter Vehicle defects became public.

28

260.   As a direct and proximate result of FCA's breach of the warranties of merchantability, Plaintiffs and the other Class members have been damaged in an amount to be proven at trial.

## COUNT IV

## BREACH OF CONTRACT
### (Based on Florida Law)

261.   Plaintiffs reallege and incorporate by reference all paragraphs as though fully set forth herein.

262.   Plaintiff Justine Andollo brings this Count on behalf of herself and the Florida Subclass.

263.   FCA's misrepresentations and omissions alleged herein, including FCA's failure to disclose a defect in the ZF Shifter, caused Plaintiff and the other Class members to make their purchases or leases of their Defective Shifter Vehicles.  Absent those misrepresentations and omissions, Plaintiff and the other Class members would not have purchased or leased these Defective Shifter Vehicles, would not have purchased or leased these Defective Shifter Vehicles at the prices they paid, and/or would have purchased or leased less expensive alternative vehicles that did not contain a defective ZF Shifter.  Accordingly, Plaintiff and the other Class members overpaid for their Defective Shifter Vehicles and did not receive the benefit of their bargain.

264.   Each and every sale or lease of a Defective Shifter Vehicle by an authorized FCA dealer constitutes a contract between FCA and the purchaser or lessee.  FCA breached these contracts by selling or leasing Plaintiff and the other Class members Defective Shifter Vehicles, and by misrepresenting or failing to disclose the existence of the defective design, including information known to FCA, rendering each Defective Shifter Vehicle less safe, and thus less valuable, than vehicles not equipped with a monostable ZF Shifter.

265.   As a direct and proximate result of FCA's breach of contract, Plaintiff and the Class have been damaged in an amount to be proven at trial, which shall

010616-11 881080V1

include, but is not limited to, all compensatory damages, incidental and consequential damages, and other damages allowed by law.

## COUNT V

## UNJUST ENRICHMENT

266.   Plaintiffs reallege and incorporate by reference all paragraphs as though fully set forth herein.

267.   Plaintiff Justine Andollo brings this Count on behalf of herself and the Florida Subclass.

268.   FCA has received and retained a benefit from Plaintiff and inequity has resulted.

269.   FCA has benefitted from selling and leasing defective cars whose value was artificially inflated by FCA's concealment of the defective ZF Shifter at a profit, and Plaintiff and the Class have overpaid for the cars and been forced to pay other costs.

270.   Thus, all Florida Subclass members conferred a benefit on FCA.

271.   It is inequitable for FCA to retain these benefits.

272.   Plaintiff and the Class were not aware of the true facts about the Defective Shifter Vehicles, and did not benefit from FCA's conduct.

273.   FCA knowingly accepted the benefits of its unjust conduct.

274.   As a result of FCA's conduct, the amount of its unjust enrichment should be disgorged, in an amount according to proof.

**E.    Illinois**

## COUNT I

**VIOLATIONS OF ILLINOIS CONSUMER FRAUD AND DECEPTIVE BUSINESS PRACTICES ACT**
**(815 ILCS 505/1, *et seq*. AND 720 ILCS 295/1A)**

275.   Plaintiffs reallege and incorporate by reference all paragraphs as though fully set forth herein.

276.    Plaintiffs Kean McDonald and Lindsey Wells bring this Count on behalf of themselves and the Illinois Subclass.

277.    Defendant is a "person" as that term is defined in 815 ILCS 505/1(c).

278.    Plaintiffs and the Illinois Subclass are "consumers" as that term is defined in 815 ILCS 505/1(e).

279.    The Illinois Consumer Fraud and Deceptive Business Practices Act ("Illinois CFA") prohibits "unfair or deceptive acts or practices, including but not limited to the use or employment of any deception, fraud, false pretense, false promise, misrepresentation or the concealment, suppression or omission of any material fact, with intent that others rely upon the concealment, suppression or omission of such material fact … in the conduct of trade or commerce … whether any person has in fact been misled, deceived or damaged thereby."  815 ILCS 505/2.

280.    FCA participated in misleading, false, or deceptive practices that violated the Illinois CFA.  By failing to disclose and actively concealing that the ZF Shifter was not safe, by marketing its Defective Shifter Vehicles as safe and of high quality, and by presenting itself as a reputable manufacturer that valued safety and stood behind its vehicles after they were sold, FCA engaged in deceptive business practices prohibited by the Illinois CFA.

281.    In the course of its business, FCA willfully failed to disclose and actively concealed the defective ZF Shifter discussed herein and otherwise engaged in activities with a tendency or capacity to deceive.  FCA also engaged in unlawful trade practices by employing deception, deceptive acts or practices, fraud, misrepresentations, or concealment, suppression, or omission of any material fact with intent that others rely upon such concealment, suppression, or omission, in connection with the sale of the Defective Shifter Vehicles.

282.    FCA has known that the ZF Shifter was defectively designed and was not safe for at least two years, but concealed all of that information.

010616-11  881080V1

283.   FCA was also aware that it valued profits over safety, and that it was manufacturing, selling, and distributing vehicles throughout the United States that did not perform as advertised and jeopardized the safety of the vehicle's occupants.  FCA concealed this information as well.

284.   By failing to disclose that the defectively designed ZF Shifter was not safe and had no safety override, by marketing its vehicles as safe, reliable, and of high quality, and by presenting itself as a reputable manufacturer that valued safety and stood behind its vehicles after they were sold, FCA engaged in unfair and deceptive business practices in violation of the Illinois CFA.

285.   In the course of FCA's business, it willfully failed to disclose and actively concealed the dangerous risk posed by the many safety issues and serious defects discussed above.  FCA compounded the deception by repeatedly asserting that FCA branded vehicles were safe, reliable, of high quality, and by claiming to be of a reputable manufacturer that valued safety and stood behind its vehicles once they are on the road.

286.   FCA's unfair or deceptive acts or practices were likely to and did in fact deceive reasonable consumers, including Plaintiffs and the other Class members, about the true performance of the Defective Shifter Vehicles, the quality of the FCA brand, the devaluing of safety and performance at FCA, and the true value of the Defective Shifter Vehicles.

287.   FCA intentionally and knowingly misrepresented material facts regarding the Defective Shifter Vehicles with an intent to mislead Plaintiffs and the Illinois Subclass.

288.   FCA knew or should have known that its conduct violated the Illinois CFA.

289.   As alleged above, FCA made material statements about the safety and utility of the Defective Shifter Vehicles and the FCA brand that were either false or misleading.

290.    FCA owed Plaintiffs a duty to disclose the true safety, performance, and reliability of the Defective Shifter Vehicles, and the devaluing of safety and performance at FCA, because FCA:

    a.    Possessed exclusive knowledge that it valued profits and cost-cutting over safety and performance, and that it was manufacturing, selling, and distributing vehicles throughout the United States that included a defectively designed ZF Shifter and did not perform as advertised;

    b.    Intentionally concealed the foregoing from Plaintiffs and the Class; and/or

    c.    Made incomplete representations about the safety and performance of the Defective Shifter Vehicles generally, and the defective ZF Shifter in particular, while purposefully withholding material facts from Plaintiffs and the Class that contradicted these representations.

291.    Because FCA fraudulently concealed the defectively designed ZF Shifter and the true performance of cars equipped with the ZF Shifter, resulting in a raft of negative publicity once the defects finally began to be disclosed, the value of the Defective Shifter Vehicles has greatly diminished.  In light of the stigma attached to those vehicles by FCA's conduct, they are now worth significantly less than they otherwise would be.

292.    FCA's fraudulent use of the defectively designed ZF Shifter and the true performance of the Defective Shifter Vehicles were material to Plaintiffs and the Illinois Subclass.  A vehicle made by a reputable manufacturer of safe, high-performing vehicles is safer and worth more than an otherwise comparable vehicle made by a disreputable manufacturer of unsafe vehicles that conceals defects rather than promptly remedying them.

293.    Plaintiffs and the Illinois Subclass suffered ascertainable loss caused by FCA's misrepresentations and its concealment of and failure to disclose material information.  Class members who purchased the Defective Shifter Vehicles either

would have paid less for their vehicles or would not have purchased or leased them at all but for FCA's violations of the Illinois CFA.

294.   FCA had an ongoing duty to all FCA customers to refrain from unfair and deceptive practices under the Illinois CFA.  All owners of the Defective Shifter Vehicles suffered ascertainable loss in the form of the diminished value of their vehicles as a result of FCA's deceptive and unfair acts and practices made in the course of FCA's business.

295.   FCA's violations present a continuing risk to Plaintiffs as well as to the general public.  FCA's unlawful acts and practices complained of herein affect the public interest.

296.   As a direct and proximate result of FCA's violations of the Illinois CFA, Plaintiffs and the Illinois Subclass have suffered injury-in-fact and/or actual damage.

297.   Pursuant to 815 ILCS 505/10a(a), Plaintiffs and the Illinois Subclass seek monetary relief against FCA in the amount of actual damages, as well as punitive damages because FCA acted with fraud and/or malice and/or was grossly negligent.

298.   Plaintiffs also seek an order enjoining FCA's unfair and/or deceptive acts or practices, punitive damages, and attorneys' fees, and any other just and proper relief available under the 815 ILCS 505/1 *et seq.*

## COUNT II

### BREACH OF EXPRESS WARRANTY
**(810 ILL. COMP. STAT. 5/2-313)**

299.   Plaintiffs reallege and incorporate by reference all paragraphs as though fully set forth herein.

300.   Plaintiffs Kean McDonald and Lindsey Wells bring this Count on behalf of themselves and the Illinois Subclass.

301.   FCA is and was at all relebant times a merchant with respect to motor vehicles.

302.   In connection with the purchase or lease of each one of its new vehicles, FCA provides an express New Vehicle Limited Warranty ("NVLW") for a period of three years or 36,000 miles, whichever occurs first.  This NVLW exists to cover "defect in materials or workmanship." FCA also provides a powertrain limited warranty that covers the engine and transmission, including the shifter assembly for five years or 100,000 miles, whichever occurs first, for the Defective Shifter Vehicles (FCA has, since the 2016 model year, reduced its powertrain warranty to five years or 60,000 miles).

303.   As a manufacturer of light-duty vehicles, FCA was required to provide these warranties to purchasers of the Defective Shifter Vehicles.

304.   FCA's warranties formed the basis of the bargain that was reached when Plaintiffs and other Class members purchased or leased their Defective Shifter Vehicles equipped with the defectively designed ZF Shifter.

305.   Plaintiffs and the Class members experienced defects within the warranty period.  Despite the existence of warranties, FCA failed to inform Plaintiffs and Class members that the Defective Shifter Vehicles were defectively designed, and failed to fix the defectively designed ZF Shifter free of charge.

306.   FCA breached the express warranty promising to repair and correct a manufacturing defect or materials or workmanship of any part supplied by FCA. FCA has not repaired or adjusted, and has been unable to repair or adjust, the Defective Shifter Vehicles' materials and workmanship defects.

307.   Affording FCA a reasonable opportunity to cure its breach of written warranties would be unnecessary and futile here.

308.   Furthermore, the limited warranty promising to repair and/or correct a manufacturing defect fails in its essential purpose because the contractual remedy is insufficient to make Plaintiffs and Class members whole and because FCA has failed and/or has refused to adequately provide the promised remedies within a reasonable time.

309.   Accordingly, recovery by Plaintiffs and the other Class members is not limited to the limited warranty promising to repair and/or correct a manufacturing defect, and Plaintiffs, individually and on behalf of the other Class members, seek all remedies as allowed by law.

310.   Also, as alleged in more detail herein, at the time FCA warranted and sold the Defective Shifter Vehicles, it knew that the Defective Shifter Vehicles did not conform to FCA's warranties and were inherently defective, and FCA wrongfully and fraudulently concealed material facts regarding its Defective Shifter Vehicles. Plaintiffs and the other Class members were therefore induced to purchase or lease the Defective Shifter Vehicles under false and/or fraudulent pretenses.

311.   Moreover, many of the injuries flowing from the Defective Shifter Vehicles cannot be resolved through the limited remedy of "replacements or adjustments," as many incidental and consequential damages have already been suffered due to FCA's fraudulent conduct as alleged herein.  Due to FCA's failure and/or continued failure to provide such limited remedy within a reasonable time, any limitation on Plaintiffs' and the other Class members' remedies would be insufficient to make Plaintiffs and the other Class members whole.

312.   FCA was provided notice of these issues by numerous complaints filed against it, including those submitted to NHTSA and the instant Complaint, within a reasonable amount of time after the defect was discovered.

313.   As a direct and proximate result of FCA's breach of express warranties, Plaintiffs and the other Class members have been damaged in an amount to be determined at trial.

**COUNT III**

**VIOLATION OF IMPLIED WARRANTY OF MERCHANTABILITY**
**(800 ILL. COMP STAT. 5/2-314 AND 5/2A-212)**

314.   Plaintiffs reallege and incorporate by reference all paragraphs as though fully set forth herein.

010616-11 881080V1

315.  Plaintiffs Kean McDonald and Lindsey Wells bring this Count on behalf of themselves and the Illinois Subclass.

316.  FCA is and was at all relevant times a merchant with respect to motor vehicles.

317.  A warranty that the Defective Shifter Vehicles were in merchantable condition is implied by law in the instant transactions.  These Defective Shifter Vehicles, when sold and at all times thereafter, were not in merchantable condition and are not fit for the ordinary purpose for which cars are used.  Specifically, the Defective Shifter Vehicles are inherently defective in that the ZF Shifter system was not adequately designed, manufactured, and tested and does not include a safety override to prevent roll-away incidents.

318.  FCA was provided notice of these issues by complaints lodged by consumers with NHTSA—which vehicle manufacturers like FCA routinely monitor—before or within a reasonable amount of time after the allegations of the Defective Shifter Vehicle defects became public.

319.  As a direct and proximate result of FCA's breach of the warranties of merchantability, Plaintiffs and the other Class members have been damaged in an amount to be proven at trial.

## COUNT IV

### BREACH OF CONTRACT
### (Based on Illinois Law)

320.  Plaintiffs reallege and incorporate by reference all paragraphs as though fully set forth herein.

321.  Plaintiffs Kean McDonald and Lindsey Wells bring this Count on behalf of themselves and the Illinois Subclass.

322.  FCA's misrepresentations and omissions alleged herein, including FCA's failure to disclose a defect in the ZF Shifter, caused Plaintiffs and the other Class members to make their purchases or leases of their Defective Shifter Vehicles.  Absent

-79-

those misrepresentations and omissions, Plaintiffs and the other Class members would not have purchased or leased these Defective Shifter Vehicles, would not have purchased or leased these Defective Shifter Vehicles at the prices they paid, and/or would have purchased or leased less expensive alternative vehicles that did not contain a defective ZF Shifter. Accordingly, Plaintiffs and the other Class members overpaid for their Defective Shifter Vehicles and did not receive the benefit of their bargain.

323. Each and every sale or lease of a Defective Shifter Vehicle by an authorized FCA dealer constitutes a contract between FCA and the purchaser or lessee. FCA breached these contracts by selling or leasing Plaintiffs and the other Class members Defective Shifter Vehicles and by misrepresenting or failing to disclose the existence of the defective design, including information known to FCA, rendering each Defective Shifter Vehicle less safe, and thus less valuable, than vehicles not equipped with a ZF Shifter.

324. As a direct and proximate result of FCA's breach of contract, Plaintiffs and the Class have been damaged in an amount to be proven at trial, which shall include, but is not limited to, all compensatory damages, incidental and consequential damages, and other damages allowed by law.

## COUNT V

## UNJUST ENRICHMENT

325. Plaintiffs reallege and incorporate by reference all paragraphs as though fully set forth herein.

326. Plaintiffs Kean McDonald and Lindsey Wells bring this Count on behalf of themselves and the Illinois Subclass.

327. FCA has received and retained a benefit from Plaintiffs and the Class and inequity has resulted.

328. FCA has benefitted from selling and leasing defective cars whose value was artificially inflated by FCA's concealment of the defective ZF Shifter at a profit,

010616-11 881080V1

and Plaintiffs and the Class have overpaid for the cars and been forced to pay other costs.

329. Thus, all Illinois Subclass members conferred a benefit on FCA.

330. It is inequitable for FCA to retain these benefits.

331. Plaintiffs were not aware of the true facts about the Defective Shifter Vehicles, and did not benefit from FCA's conduct.

332. FCA knowingly accepted the benefits of its unjust conduct.

333. As a result of FCA's conduct, the amount of its unjust enrichment should be disgorged, in an amount according to proof.

**F.    Massachusetts**

**COUNT I**

**DECEPTIVE ACTS OR PRACTICES PROHIBITED BY MASSACHUSETTS LAW**
(MASS. GEN. LAWS CH. 93A, §1, *et seq.*)

334. Plaintiffs reallege and incorporate by reference all paragraphs as though fully set forth herein.

335. Plaintiffs Scott Michael Youngstrom Jr. and Todd Matchley intend to assert a claim under MASS. GEN. Laws ch. 93A, § 2 (the "Massachusetts Act") which prohibits "unfair or deceptive acts or practices in the conduct of any trade or commerce." Plaintiffs will make a demand in satisfaction of MASS. GEN. Laws ch. 93A, § 9, and may amend this Complaint to assert claims under the Massachussets Act once the required 30 days have elapsed. This paragraph is included for purposes of notice only and is not intended to actually assert a claim under the Massachusetts Act.

**COUNT II**

**BREACH OF EXPRESS WARRANTY**
(MASS. GEN. LAWS CH. 106, § 2-313)

336. Plaintiffs reallege and incorporate by reference all paragraphs as though fully set forth herein.

337.   Plaintiffs Scott Michael Youngstrom Jr. and Todd Matchley bring this Count on behalf of themselves and the Massachusetts Subclass.

338.   FCA is and was at all relevant times a "merchant" with respect to motor vehicles under MASS. GEN. Laws ch. 106, § 2-104(1) and a "seller" of motor vehicles under § 2-313(1).

339.   With respect to leases, FCA is and was at all relevant times a "lessor" with respect to motor vehicles under MASS. GEN. Laws ch. 106, § 2A-103(1)(p), and § 2A-210.

340.   The Defective Shifter Vehicles are and were at all relevant times "goods" within the meaning of MASS. GEN. Laws ch. 106, § 2-105(1) and § 2A-103(1)(h).

341.   In connection with the purchase or lease of each one of its new vehicles, FCA provides an express New Vehicle Limited Warranty ("NVLW") for a period of three years or 36,000 miles, whichever occurs first.  This NVLW exists to cover "defect in materials or workmanship." FCA also provides a powertrain limited warranty that covers the engine and transmission, including the shifter assembly for five years or 100,000 miles, whichever occurs first, for the Defective Shifter Vehicles (FCA has, since the 2016 model year, reduced its powertrain warranty to five years or 60,000 miles).

342.   As a manufacturer of light-duty vehicles, FCA was required to provide these warranties to purchasers of the Defective Shifter Vehicles.

343.   FCA's warranties formed the basis of the bargain that was reached when Plaintiffs and other Class members purchased or leased their Defective Shifter Vehicles equipped with the defectively designed ZF Shifter.

344.   Plaintiffs and the Class members experienced defects within the warranty period.  Despite the existence of warranties, FCA failed to inform Plaintiffs and Class members that the Defective Shifter Vehicles were defectively designed, and failed to fix the defectively designed ZF Shifter free of charge.

345.   FCA breached the express warranty promising to repair and correct a manufacturing defect or materials or workmanship of any part supplied by FCA. FCA has not repaired or adjusted, and has been unable to repair or adjust, the Defective Shifter Vehicles' materials and workmanship defects.

346.   Affording FCA a reasonable opportunity to cure its breach of written warranties would be unnecessary and futile here.

347.   Furthermore, the limited warranty promising to repair and/or correct a manufacturing defect fails in its essential purpose because the contractual remedy is insufficient to make Plaintiffs and Class members whole, and because FCA has failed and/or has refused to adequately provide the promised remedies within a reasonable time.

348.   Accordingly, recovery by Plaintiffs and the other Class members is not limited to the limited warranty promising to repair and/or correct a manufacturing defect, and Plaintiffs, individually and on behalf of the other Class members, seek all remedies as allowed by law.

349.   Also, as alleged in more detail herein, at the time FCA warranted and sold the Defective Shifter Vehicles, it knew that the Defective Shifter Vehicles did not conform to FCA's warranties and were inherently defective, and FCA wrongfully and fraudulently concealed material facts regarding its Defective Shifter Vehicles. Plaintiffs and the other Class members were therefore induced to purchase or lease the Defective Shifter Vehicles under false and/or fraudulent pretenses.

350.   Moreover, many of the injuries flowing from the Defective Shifter Vehicles cannot be resolved through the limited remedy of "replacements or adjustments," as many incidental and consequential damages have already been suffered due to FCA's fraudulent conduct as alleged herein.  Due to FCA's failure and/or continued failure to provide such limited remedy within a reasonable time, any limitation on Plaintiffs' and the other Class members' remedies would be insufficient to make Plaintiffs and the other Class members whole.

351.   FCA was provided notice of these issues by numerous complaints filed against it, including those submitted to NHTSA and the instant Complaint, within a reasonable amount of time after the defect was discovered.

352.   As a direct and proximate result of FCA's breach of express warranties, Plaintiffs and the other Class members have been damaged in an amount to be determined at trial.

## COUNT III

### BREACH OF IMPLIED WARRANTY OF MERCHANTABILITY
(MASS. GEN. LAWS CH. 106, § 2-314)

353.   Plaintiffs reallege and incorporate by reference all paragraphs as though fully set forth herein.

354.   Plaintiffs Scott Michael Youngstrom Jr. and Todd Matchley bring this Count on behalf of themselves and the Massachusetts Subclass.

355.   FCA was a merchant with respect to motor vehicles within the meaning of MASS. GEN. Laws ch. 106, § 2-104(1).

356.   Under MASS. GEN. Laws ch. 106, § 2-314, a warranty that the Defective Shifter Vehicles were in merchantable condition was implied by law in the transactions when Plaintiffs purchased or leased their Defective Shifter Vehicles from FCA. These Defective Shifter Vehicles, when sold and at all times thereafter, were not in merchantable condition and are not fit for the ordinary purpose for which cars are used.  Specifically, the Defective Shifter Vehicles are inherently defective in that the ZF Shifter was not adequately designed, manufactured, and tested.

357.   FCA was provided notice of these issues by complaints lodged by consumers with NHTSA—which vehicle manufacturers like FCA routinely monitor— before or within a reasonable amount of time after the allegations of the Defective Shifter Vehicle defects became public.

358.   As a direct and proximate result of FCA's breach of the warranties of merchantability, Plaintiffs and the other Class members have been damaged in an amount to be proven at trial.

## COUNT IV

### BREACH OF CONTRACT
### (Based on Massachusetts Law)

359.   Plaintiffs reallege and incorporate by reference all paragraphs as though fully set forth herein.

360.   Plaintiffs Scott Michael Youngstrom Jr. and Todd Matchley bring this Count on behalf of themselves and the Massachusetts Subclass.

361.   FCA's misrepresentations and omissions alleged herein, including FCA's failure to disclose a defect in the ZF Shifter, caused Plaintiffs and the other Class members to make their purchases or leases of their Defective Shifter Vehicles.  Absent those misrepresentations and omissions, Plaintiffs and the other Class members would not have purchased or leased these Defective Shifter Vehicles, would not have purchased or leased these Defective Shifter Vehicles at the prices they paid, and/or would have purchased or leased less expensive alternative vehicles that did not contain a defective ZF Shifter.  Accordingly, Plaintiffs and the other Class members overpaid for their Defective Shifter Vehicles and did not receive the benefit of their bargain.

362.   Each and every sale or lease of a Defective Shifter Vehicle by an authorized FCA dealer constitutes a contract between FCA and the purchaser or lessee.  FCA breached these contracts by selling or leasing Plaintiffs and the other Class members Defective Shifter Vehicles, and by misrepresenting or failing to disclose the existence of the defective design, including information known to FCA, rendering each Defective Shifter Vehicle less safe, and thus less valuable, than vehicles not equipped with a monostable ZF Shifter.

363.   As a direct and proximate result of FCA's breach of contract, Plaintiffs and the Class have been damaged in an amount to be proven at trial, which shall

-85-

include, but is not limited to, all compensatory damages, incidental and consequential damages, and other damages allowed by law.

## COUNT V

## UNJUST ENRICHMENT

364.   Plaintiffs reallege and incorporate by reference all paragraphs as though fully set forth herein.

365.   Plaintiffs Scott Michael Youngstrom Jr. and Todd Matchley bring this Count on behalf of themselves and the Massachusetts Subclass.

366.   FCA has received and retained a benefit from Plaintiffs and inequity has resulted.

367.   FCA has benefitted from selling and leasing defective cars whose value was artificially inflated by FCA's concealment of the defective ZF Shifter at a profit, and Plaintiffs and the Class have overpaid for the cars and been forced to pay other costs.

368.   Thus, all Massachusetts Subclass members conferred a benefit on FCA.

369.   It is inequitable for FCA to retain these benefits.

370.   Plaintiffs and the Class were not aware of the true facts about the Defective Shifter Vehicles, and did not benefit from FCA's conduct.

371.   FCA knowingly accepted the benefits of its unjust conduct.

372.   As a result of FCA's conduct, the amount of its unjust enrichment should be disgorged, in an amount according to proof.

## G.    Michigan

## COUNT I

## VIOLATIONS OF THE MICHIGAN CONSUMER PROTECTION ACT
### (MICH. COMP. LAWS § 445.903, *et seq.*)

373.   Plaintiffs reallege and incorporate by reference all paragraphs as though fully set forth herein.

374.   Plaintiff Melvin Scott brings this Count on behalf of himself and the Michigan Subclass.

375.   Plaintiff and Class members are "persons" within the meaning of MICH. COMP. LAWS § 445.902(1)(d).

376.   The Michigan Consumer Protection Act ("Michigan CPA") prohibits "[u]nfair, unconscionable, or deceptive methods, acts, or practices in the conduct of trade or commerce …."  MICH. COMP. LAWS § 445.903(1).  FCA engaged in unfair, unconscionable, or deceptive methods, acts or practices prohibited by the Michigan CPA, including:  "(c) Representing that goods or services have … characteristics … that they do not have ….;" "(e) Representing that goods or services are of a particular standard … if they are of another;" "(i) Making false or misleading statements of fact concerning the reasons for, existence of, or amounts of price reductions;" "(s) Failing to reveal a material fact, the omission of which tends to mislead or deceive the consumer, and which fact could not reasonably be known by the consumer;" "(bb) Making a representation of fact or statement of fact material to the transaction such that a person reasonably believes the represented or suggested state of affairs to be other than it actually is;" and "(cc) Failing to reveal facts that are material to the transaction in light of representations of fact made in a positive manner."  MICH. COMP. LAWS § 445.903(1).  By failing to disclose and actively concealing that the ZF Shifter was not safe, by marketing its Defective Shifter Vehicles as safe and of high quality, and by presenting itself as a reputable manufacturer that valued safety and stood behind its vehicles after they were sold, FCA engaged in deceptive business practices prohibited by the Michigan CPA.

377.   In the course of its business, FCA willfully failed to disclose and actively concealed the defective ZF Shifter discussed herein was unsafe, and otherwise engaged in activities with a tendency or capacity to deceive.  FCA also engaged in unlawful trade practices by employing deception, deceptive acts or practices, fraud, misrepresentations, or concealment, suppression, or omission of any material fact with

-87-

intent that others rely upon such concealment, suppression, or omission, in connection with the sale of the Defective Shifter Vehicles.

378.   FCA knew it had installed a defectively designed ZF Shifter, and knew that the ZF Shifter was not safe, as advertised, and had no override system to prevent roll-away incidents, even though its competitors used such override systems.  FCA knew this for at least two years, but concealed all of that information.

379.   FCA was also aware that it valued profits over safety, and that it was manufacturing, selling, and distributing vehicles throughout the United States that did not perform as advertised and jeopardized the safety of the vehicle's occupants.  FCA concealed this information as well.

380.   By failing to disclose that the defectively designed ZF Shifter was not safe and had no safety override, by marketing its vehicles as safe, reliable, and of high quality, and by presenting itself as a reputable manufacturer that valued safety and stood behind its vehicles after they were sold, FCA engaged in deceptive business practices in violation of the Michigan CPA.

381.   In the course of FCA's business, it willfully failed to disclose and actively concealed the dangerous risk posed by the many safety issues and serious defects discussed above.  FCA compounded the deception by repeatedly asserting that FCA branded vehicles were safe, reliable, of high quality, and by claiming to be of a reputable manufacturer that valued safety and stood behind its vehicles once they are on the road.

382.   FCA's unfair or deceptive acts or practices were likely to and did in fact deceive reasonable consumers, including Plaintiff and the other Class members, about the true performance of the Defective Shifter Vehicles, the quality of the FCA brand, the devaluing of safety and performance at FCA, and the true value of the Defective Shifter Vehicles.

383.    FCA intentionally and knowingly misrepresented material facts regarding the Defective Shifter Vehicles with an intent to mislead Plaintiff and the Michigan Subclass.

384.    FCA knew or should have known that its conduct violated the Michigan CPA.

385.    As alleged above, FCA made material statements about the safety and utility of the Defective Shifter Vehicles and the FCA brand that were either false or misleading.

386.    FCA owed Plaintiff a duty to disclose the true safety, performance, and reliability of the Defective Shifter Vehicles, and the devaluing of safety and performance at FCA, because FCA:

a.    Possessed exclusive knowledge that it valued profits and cost-cutting over safety and performance, and that it was manufacturing, selling, and distributing vehicles throughout the United States that included a defectively designed ZF Shifter and did not perform as advertised;

b.    Intentionally concealed the foregoing from Plaintiff and the Class; and/or

c.    Made incomplete representations about the safety and performance of the Defective Shifter Vehicles generally, and the defective ZF Shifter in particular, while purposefully withholding material facts from Plaintiffs and the Class that contradicted these representations.

387.    Because FCA fraudulently concealed the defectively designed ZF Shifter and the true performance of cars equipped with the ZF Shifter, resulting in a raft of negative publicity once the defects finally began to be disclosed, the value of the Defective Shifter Vehicles has greatly diminished.  In light of the stigma attached to those vehicles by FCA's conduct, they are now worth significantly less than they otherwise would be.

388.    FCA's fraudulent use of the defectively designed ZF Shifter and the true performance of the Defective Shifter Vehicles were material to Plaintiff and the

-89-

Michigan Subclass.  A vehicle made by a reputable manufacturer of safe, high-performing vehicles is safer and worth more than an otherwise comparable vehicle made by a disreputable manufacturer of unsafe vehicles that conceals defects rather than promptly remedying them.

389.   Plaintiff and the Michigan Subclass suffered ascertainable loss caused by FCA's misrepresentations and its concealment of and failure to disclose material information.  Class members who purchased the Defective Shifter Vehicles either would have paid less for their vehicles or would not have purchased or leased them at all but for FCA's violations of the Michigan CPA.

390.   FCA had an ongoing duty to all FCA customers to refrain from unfair and deceptive practices under the Michigan CPA.  All owners of the Defective Shifter Vehicles suffered ascertainable loss in the form of the diminished value of their vehicles as a result of FCA's deceptive and unfair acts and practices made in the course of FCA's business.

391.   FCA's violations present a continuing risk to Plaintiff as well as to the general public.  FCA's unlawful acts and practices complained of herein affect the public interest.

392.   As a direct and proximate result of FCA's violations of the Michigan CPA, Plaintiff and the Michigan Subclass have suffered injury-in-fact and/or actual damage.

393.   Plaintiff seeks injunctive relief to enjoin FCA from continuing its unfair and deceptive acts; monetary relief against FCA measured as the greater of (a) actual damages in an amount to be determined at trial and (b) statutory damages in the amount of $250 for Plaintiff and each Michigan Subclass member; reasonable attorneys' fees; and any other just and proper relief available under MICH. COMP. LAWS § 445.911.

394.   Plaintiff also seeks punitive damages against FCA because it carried out despicable conduct with willful and conscious disregard of the rights and safety of

others.  FCA intentionally and willfully misrepresented the safety and reliability of the Defective Shifter Vehicles, concealed material facts that only they knew, and repeatedly promised Plaintiffs and Michigan Subclass Members that all vehicles were safe—all to avoid the expense and public relations nightmare of correcting a noxious flaw in the Defective Shifter Vehicles.  FCA's unlawful conduct constitutes malice, oppression, and fraud warranting punitive damages.

## COUNT II

### BREACH OF EXPRESS WARRANTY
#### (MICH. COMP. LAWS ANN.440.2313 AND 440.2860)

395.   Plaintiffs reallege and incorporate by reference all paragraphs as though fully set forth herein.

396.   Plaintiff Melvin Scott brings this Count on behalf of himself and the Michigan Subclass.

397.   FCA is and was at all relevant times a "merchant" with respect to motor vehicles under MICH. COMP. LAWS ANN. 440.2104(1) and a "seller" of motor vehicles under § 440.2313(1).

398.   With respect to leases, FCA is and was at all relevant times a "lessor" with respect to motor vehicles under MICH. COMP. LAWS ANN. 440.2803(1)(p), and 440.2860.

399.   The Defective Shifter Vehicles are and were at all relevant times "goods" within the meaning of MICH. COMP. LAWS ANN. 440.2105(1) and 440.2803(1)(h).

400.   In connection with the purchase or lease of each one of its new vehicles, FCA provides an express New Vehicle Limited Warranty ("NVLW") for a period of three years or 36,000 miles, whichever occurs first.  This NVLW exists to cover "defect in materials or workmanship." FCA also provides a powertrain limited warranty that covers the engine and transmission, including the shifter assembly for five years or 100,000 miles, whichever occurs first, for the Defective Shifter Vehicles

010616-11 881080V1

(FCA has, since the 2016 model year reduced, its powertrain warranty to five years or 60,000 miles).

401.    As a manufacturer of light-duty vehicles, FCA was required to provide these warranties to purchasers of the Defective Shifter Vehicles.

402.    FCA's warranties formed the basis of the bargain that was reached when Plaintiff and other Class members purchased or leased their Defective Shifter Vehicles equipped with the defectively designed ZF Shifter.

403.    Plaintiff and the Class members experienced defects within the warranty period.  Despite the existence of warranties, FCA failed to inform Plaintiff and Class members that the Defective Shifter Vehicles were defectively designed, and failed to fix the defectively designed ZF Shifter free of charge.

404.    FCA breached the express warranty promising to repair and correct a manufacturing defect or materials or workmanship of any part supplied by FCA. FCA has not repaired or adjusted, and has been unable to repair or adjust, the Defective Shifter Vehicles' materials and workmanship defects.

405.    Affording FCA a reasonable opportunity to cure its breach of written warranties would be unnecessary and futile here.

406.    Furthermore, the limited warranty promising to repair and/or correct a manufacturing defect fails in its essential purpose because the contractual remedy is insufficient to make Plaintiff and Class members whole, and because FCA has failed and/or has refused to adequately provide the promised remedies within a reasonable time.

407.    Accordingly, recovery by Plaintiff and the other Class members is not limited to the limited warranty promising to repair and/or correct a manufacturing defect, and Plaintiff, individually and on behalf of the other Class members, seeks all remedies as allowed by law.

408.    Also, as alleged in more detail herein, at the time FCA warranted and sold the Defective Shifter Vehicles, it knew that the Defective Shifter Vehicles did not

conform to FCA's warranties and were inherently defective and FCA wrongfully and fraudulently concealed material facts regarding its Defective Shifter Vehicles. Plaintiff and the other Class members were therefore induced to purchase or lease the Defective Shifter Vehicles under false and/or fraudulent pretenses.

409.   Moreover, many of the injuries flowing from the Defective Shifter Vehicles cannot be resolved through the limited remedy of "replacements or adjustments," as many incidental and consequential damages have already been suffered due to FCA's fraudulent conduct as alleged herein.  Due to FCA's failure and/or continued failure to provide such limited remedy within a reasonable time, any limitation on Plaintiff's and the other Class members' remedies would be insufficient to make Plaintiff and the other Class members whole.

410.   Finally, due to FCA's breach of warranty as set forth herein, Plaintiff and the other Class members assert as an additional and/or alternative remedy, revocation of acceptance of the goods, and for a return to Plaintiff and the other Class members of the purchase price of all Defective Shifter Vehicles currently owned, and for such other incidental and consequential damages as allowed.

411.   FCA was provided notice of these issues by numerous complaints filed against it, including those submitted to NHTSA and the instant Complaint, within a reasonable amount of time after the defect was discovered.

412.   As a direct and proximate result of FCA's breach of express warranties, Plaintiff and the other Class members have been damaged in an amount to be determined at trial.

## COUNT III

### BREACH OF IMPLIED WARRANTY OF MERCHANTABILITY
(MICH. COMP. LAWS § 440.314)

413.   Plaintiffs reallege and incorporate by reference all paragraphs as though fully set forth herein.

414.   Plaintiff Melvin Scott brings this Count on behalf of himself and the Michigan Subclass.

415.   FCA was a merchant with respect to motor vehicles within the meaning of MICH. COMP. LAWS § 440.2314(1).

416.   Under MICH. COMP. LAWS § 440.2314, a warranty that the Defective Shifter Vehicles were in merchantable condition was implied by law in the transactions when Plaintiff purchased or leased the Defective Shifter Vehicles.

417.   A warranty that the Defective Shifter Vehicles were in merchantable condition is implied by law in the instant transactions.  These Defective Shifter Vehicles, when sold and at all times thereafter, were not in merchantable condition and are not fit for the ordinary purpose for which cars are used.  Specifically, the Defective Shifter Vehicles are inherently defective in that the ZF Shifter was not adequately designed, manufactured, and tested.

418.   FCA was provided notice of these issues by complaints lodged by consumers with NHTSA—which vehicle manufacturers like FCA routinely monitor—before or within a reasonable amount of time after the allegations of the Defective Shifter Vehicle defects became public.

419.   As a direct and proximate result of FCA's breach of the warranties of merchantability, Plaintiff and the other Class members have been damaged in an amount to be proven at trial.

## COUNT IV

### BREACH OF CONTRACT
#### (Based on Michigan Law)

420.   Plaintiffs reallege and incorporate by reference all paragraphs as though fully set forth herein.

421.   Plaintiff Melvin Scott brings this Count on behalf of himself and the Michigan Subclass.

010616-11 881080V1

422.   FCA's misrepresentations and omissions alleged herein, including FCA's failure to disclose a defect in the ZF Shifter, caused Plaintiff and the other Class members to make their purchases or leases of their Defective Shifter Vehicles.  Absent those misrepresentations and omissions, Plaintiff and the other Class members would not have purchased or leased these Defective Shifter Vehicles, would not have purchased or leased these Defective Shifter Vehicles at the prices they paid, and/or would have purchased or leased less expensive alternative vehicles that did not contain a defective ZF Shifter.  Accordingly, Plaintiff and the other Class members overpaid for their Defective Shifter Vehicles and did not receive the benefit of their bargain.

423.   Each and every sale or lease of a Defective Shifter Vehicle by an authorized FCA dealer constitutes a contract between FCA and the purchaser or lessee.  FCA breached these contracts by selling or leasing Plaintiff and the other Class members Defective Shifter Vehicles and by misrepresenting or failing to disclose the existence of the defective design, including information known to FCA, rendering each Defective Shifter Vehicle less safe, and thus less valuable, than vehicles not equipped with a monostable ZF Shifter.

424.   As a direct and proximate result of FCA's breach of contract, Plaintiff and the Class have been damaged in an amount to be proven at trial, which shall include, but is not limited to, all compensatory damages, incidental and consequential damages, and other damages allowed by law.

**COUNT V**

**UNJUST ENRICHMENT**

425.   Plaintiffs reallege and incorporate by reference all paragraphs as though fully set forth herein.

426.   Plaintiff Melvin Scott brings this Count on behalf of himself and the Michigan Subclass.

427.   FCA has received and retained a benefit from Plaintiff and inequity has resulted.

-95-

428.   FCA has benefitted from selling and leasing defective cars whose value was artificially inflated by FCA's concealment of the defective ZF Shifter at a profit, and Plaintiff and the Class have overpaid for the cars and been forced to pay other costs.

429.   Thus, all Michigan Subclass members conferred a benefit on FCA.

430.   It is inequitable for FCA to retain these benefits.

431.   Plaintiff and the Class were not aware of the true facts about the Defective Shifter Vehicles, and did not benefit from FCA's conduct.

432.   FCA knowingly accepted the benefits of its unjust conduct.

433.   As a result of FCA's conduct, the amount of its unjust enrichment should be disgorged, in an amount according to proof.

**H.    Nevada**

### COUNT I

### VIOLATIONS OF THE NEVADA DECEPTIVE TRADE PRACTICES ACT
(NEV. REV. STAT. § 598.0903, *et seq.*)

434.   Plaintiffs reallege and incorporate by reference all paragraphs as though fully set forth herein.

435.   Plaintiff Eliam Marrero Bernal brings this Count on behalf of himself and the Nevada Subclass.

436.   The Nevada Deceptive Trade Practices Act ("Nevada DTPA"), NEV. REV. STAT. § 598.0903, *et seq.*, prohibits deceptive trade practices.  NEV. REV. STAT. § 598.0915 provides that a person engages in a "deceptive trade practice" if, in the course of business or occupation, the person:  "5.  Knowingly makes a false representation as to the characteristics, ingredients, uses, benefits, alterations or quantities of goods or services for sale or lease or a false representation as to the sponsorship, approval, status, affiliation or connection of a person therewith"; "7. Represents that goods or services for sale or lease are of a particular standard, quality or grade, or that such goods are of a particular style or model, if he or she knows or

-96-

should know that they are of another standard, quality, grade, style or model"; "9. Advertises goods or services with intent not to sell or lease them as advertised"; or "15. Knowingly makes any other false representation in a transaction."

437.   FCA engaged in deceptive trade practices that violated the Nevada DTPA, including: knowingly representing that Defective Shifter Vehicles have uses and benefits which they do not have; representing that Defective Shifter Vehicles are of a particular standard, quality, and grade when they are not; advertising Defective Shifter Vehicles with the intent not to sell or lease them as advertised; representing that the subject of a transaction involving Defective Shifter Vehicles has been supplied in accordance with a previous representation when it has not; and knowingly making other false representations in a transaction.

438.   FCA's actions as set forth above occurred in the conduct of trade or commerce.

439.   In the course of its business, FCA willfully failed to disclose and actively concealed the defective ZF Shifter discussed herein, and otherwise engaged in activities with a tendency or capacity to deceive.  FCA also engaged in unlawful trade practices by employing deception, deceptive acts or practices, fraud, misrepresentations, or concealment, suppression, or omission of any material fact with intent that others rely upon such concealment, suppression, or omission, in connection with the sale of the Defective Shifter Vehicles.

440.   FCA knew it had installed a defectively designed ZF Shifter, knew that the ZF Shifter was not safe, as advertised, and had no override system to prevent roll-away incidents, even though its competitors used such override systems.  FCA knew this for at least two years, but concealed all of that information.

441.   FCA was also aware that it valued profits over safety, and that it was manufacturing, selling, and distributing vehicles throughout the United States that did not perform as advertised and jeopardized the safety of the vehicle's occupants.  FCA concealed this information as well.

442.   By failing to disclose that the defectively designed ZF Shifter was not safe and had no safety override, by marketing its vehicles as safe, reliable, and of high quality, and by presenting itself as a reputable manufacturer that valued safety and stood behind its vehicles after they were sold, FCA engaged in deceptive business practices in violation of the Nevada DTPA.

443.   In the course of FCA's business, it willfully failed to disclose and actively concealed the dangerous risk posed by the many safety issues and serious defects discussed above.  FCA compounded the deception by repeatedly asserting that FCA branded vehicles were safe, reliable, of high quality, and by claiming to be of a reputable manufacturer that valued safety and stood behind its vehicles once they are on the road.

444.   FCA's unfair or deceptive acts or practices were likely to and did in fact deceive reasonable consumers, including Plaintiff and the other Class members, about the true performance of the Defective Shifter Vehicles, the quality of the FCA brand, the devaluing of safety and performance at FCA, and the true value of the Defective Shifter Vehicles.

445.   FCA intentionally and knowingly misrepresented material facts regarding the Defective Shifter Vehicles with an intent to mislead Plaintiff and the Nevada Subclass.

446.   FCA knew or should have known that its conduct violated the Nevada DTPA.

447.   As alleged above, FCA made material statements about the safety and utility of the Defective Shifter Vehicles and the FCA brand that were either false or misleading.

448.   FCA owed Plaintiff a duty to disclose the true safety, performance, and reliability of the Defective Shifter Vehicles, and the devaluing of safety and performance at FCA, because FCA:

-98-

a.  Possessed exclusive knowledge that it valued profits and cost-cutting over safety and performance, and that it was manufacturing, selling, and distributing vehicles throughout the United States that included a defectively designed ZF Shifter and did not perform as advertised;

b.  Intentionally concealed the foregoing from Plaintiff and the Class; and/or

c.  Made incomplete representations about the safety and performance of the Defective Shifter Vehicles generally, and the defective ZF Shifter in particular, while purposefully withholding material facts from Plaintiff and the Class that contradicted these representations.

449.    Because FCA fraudulently concealed the defectively designed ZF Shifter and the true performance of cars equipped with the ZF Shifter, resulting in a raft of negative publicity once the defects finally began to be disclosed, the value of the Defective Shifter Vehicles has greatly diminished.  In light of the stigma attached to those vehicles by FCA's conduct, they are now worth significantly less than they otherwise would be.

450.    FCA's fraudulent use of the defectively designed ZF Shifter and the true performance of the Defective Shifter Vehicles were material to Plaintiff and the Nevada Subclass.  A vehicle made by a reputable manufacturer of safe, high-performing vehicles is safer and worth more than an otherwise comparable vehicle made by a disreputable manufacturer of unsafe vehicles that conceals defects rather than promptly remedying them.

451.    Plaintiff and the Nevada Subclass suffered ascertainable loss caused by FCA's misrepresentations and its concealment of and failure to disclose material information.  Class members who purchased the Defective Shifter Vehicles either would have paid less for their vehicles or would not have purchased or leased them at all but for FCA's violations of the Nevada DTPA.

452.    FCA had an ongoing duty to all FCA customers to refrain from unfair and deceptive practices under the Nevada DTPA.  All owners of the Defective Shifter

Vehicles suffered ascertainable loss in the form of the diminished value of their vehicles as a result of FCA's deceptive and unfair acts and practices made in the course of FCA's business.

453.   FCA's violations present a continuing risk to Plaintiff as well as to the general public.  FCA's unlawful acts and practices complained of herein affect the public interest.

454.   As a direct and proximate result of FCA's violations of the Nevada DTPA, Plaintiff and the Nevada Subclass have suffered injury-in-fact and/or actual damage.

455.   Accordingly, Plaintiff and the Nevada Subclass seek their actual damages, punitive damages, an order enjoining FCA's deceptive acts or practices, costs of Court, attorney's fees, and all other appropriate and available remedies under the Nevada Deceptive Trade Practices Act.  NEV. REV. STAT. § 41.600.

**COUNT II**

**BREACH OF EXPRESS WARRANTY**
**(NEV. REV. STAT. § 104.2313 AND 104A.2210)**

456.   Plaintiffs reallege and incorporate by reference all paragraphs as though fully set forth herein.

457.   Plaintiff Eliam Marrero Bernal brings this Count on behalf of himself and the Nevada  Subclass.

458.   FCA is and was at all relevant times a "merchant" with respect to motor vehicles under NEV. REV. STAT. § 104.2104(1) and a "seller" of motor vehicles under § 104.2313(1).

459.   With respect to leases, FCA is and was at all relevant times a "lessor" with respect to motor vehicles under NEV. REV. STAT. § 104A.2103(1)(p), and § 104A.2210.

460.   The Affected Vehicles are and were at all relevant times "goods" within the meaning of NEV. REV. STAT. § 104.2105(1) and NEV. REV. STAT. § 104A.2103(1)(h).

461.   In connection with the purchase or lease of each one of its new vehicles, FCA provides an express New Vehicle Limited Warranty ("NVLW") for a period of three years or 36,000 miles, whichever occurs first.  This NVLW exists to cover "defect in materials or workmanship." FCA also provides a powertrain limited warranty that covers the engine and transmission, including the shifter assembly for five years or 100,000 miles, whichever occurs first, for the Defective Shifter Vehicles (FCA has, since the 2016 model year, reduced its powertrain warranty to five years or 60,000 miles).

462.   As a manufacturer of light-duty vehicles, FCA was required to provide these warranties to purchasers of the Defective Shifter Vehicles.

463.   FCA's warranties formed the basis of the bargain that was reached when Plaintiff and other Class members purchased or leased their Defective Shifter Vehicles equipped with the defectively designed ZF Shifter.

464.   Plaintiff and the Class members experienced defects within the warranty period.  Despite the existence of warranties, FCA failed to inform Plaintiffs and Class members that the Defective Shifter Vehicles were defectively designed, and failed to fix the defectively designed ZF Shifter free of charge.

465.   FCA breached the express warranty promising to repair and correct a manufacturing defect or materials or workmanship of any part supplied by FCA. FCA has not repaired or adjusted, and has been unable to repair or adjust, the Defective Shifter Vehicles' materials and workmanship defects.

466.   Affording FCA a reasonable opportunity to cure its breach of written warranties would be unnecessary and futile here.

467.   Furthermore, the limited warranty promising to repair and/or correct a manufacturing defect fails in its essential purpose because the contractual remedy is

insufficient to make Plaintiff and Class members whole and because FCA has failed and/or has refused to adequately provide the promised remedies within a reasonable time.

468.    Accordingly, recovery by Plaintiff and the other Class members is not limited to the limited warranty promising to repair and/or correct a manufacturing defect, and Plaintiff, individually and on behalf of the other Class members, seeks all remedies as allowed by law.

469.    Also, as alleged in more detail herein, at the time FCA warranted and sold the Defective Shifter Vehicles, it knew that the Defective Shifter Vehicles did not conform to FCA's warranties and were inherently defective and FCA wrongfully and fraudulently concealed material facts regarding its Defective Shifter Vehicles. Plaintiff and the other Class members were therefore induced to purchase or lease the Defective Shifter Vehicles under false and/or fraudulent pretenses.

470.    Moreover, many of the injuries flowing from the Defective Shifter Vehicles cannot be resolved through the limited remedy of "replacements or adjustments," as many incidental and consequential damages have already been suffered due to FCA's fraudulent conduct as alleged herein.  Due to FCA's failure and/or continued failure to provide such limited remedy within a reasonable time, any limitation on Plaintiff and the other Class members' remedies would be insufficient to make Plaintiff and the other Class members whole.

471.    Finally, due to FCA's breach of warranty as set forth herein, Plaintiffs and the other Class members assert as an additional and/or alternative remedy, revocation of acceptance of the goods, and the return to Plaintiff and the other Class members of the purchase price of all Defective Shifter Vehicles currently owned, and for such other incidental and consequential damages as allowed.

472.    FCA was provided notice of these issues by numerous complaints filed against it, including those submitted to NHTSA and the instant Complaint, within a reasonable amount of time after the defect was discovered.

010616-11  881080V1

473.   As a direct and proximate result of FCA's breach of express warranties, Plaintiff and the other Class members have been damaged in an amount to be determined at trial.

## COUNT III

### BREACH OF IMPLIED WARRANTY OF MERCHANTABILITY
#### (NEV. REV. STAT. § 104.2314)

474.   Plaintiffs reallege and incorporate by reference all paragraphs as though fully set forth herein.

475.   Plaintiff Eliam Marrero Bernal brings this Count on behalf of himself and the Nevada Subclass.

476.   A warranty that the Defective Shifter Vehicles were in merchantable condition is implied by law in the instant transactions.  These Defective Shifter Vehicles, when sold and at all times thereafter, were not in merchantable condition and are not fit for the ordinary purpose for which cars are used.  Specifically, the Defective Shifter Vehicles are inherently defective in that the ZF Shifter was not adequately designed, manufactured, and tested.

477.   FCA was provided notice of these issues by complaints lodged by consumers with NHTSA—which vehicle manufacturers like FCA routinely monitor—before or within a reasonable amount of time after the allegations of the Defective Shifter Vehicle defects became public.

478.   As a direct and proximate result of FCA's breach of the warranties of merchantability, Plaintiff and the other Class members have been damaged in an amount to be proven at trial.

### COUNT IV

### BREACH OF CONTRACT
#### (Based on Nevada Law)

479.   Plaintiffs reallege and incorporate by reference all paragraphs as though fully set forth herein.

480.   Plaintiff Eliam Marrero Bernal brings this Count on behalf of himself and the Nevada Subclass.

481.   FCA's misrepresentations and omissions alleged herein, including FCA's failure to disclose a defect in the ZF Shifter, caused Plaintiff and the other Class members to make their purchases or leases of their Defective Shifter Vehicles.  Absent those misrepresentations and omissions, Plaintiff and the other Class members would not have purchased or leased these Defective Shifter Vehicles, would not have purchased or leased these Defective Shifter Vehicles at the prices they paid, and/or would have purchased or leased less expensive alternative vehicles that did not contain a defective ZF Shifter.  Accordingly, Plaintiff and the other Class members overpaid for their Defective Shifter Vehicles and did not receive the benefit of their bargain.

482.   Each and every sale or lease of a Defective Shifter Vehicle by an authorized FCA dealer constitutes a contract between FCA and the purchaser or lessee.  FCA breached these contracts by selling or leasing Plaintiff and the other Class members Defective Shifter Vehicles, and by misrepresenting or failing to disclose the existence of the defective design, including information known to FCA, rendering each Defective Shifter Vehicle less safe, and thus less valuable, than vehicles not equipped with a monostable ZF Shifter.

483.   Additionally, FCA breached its implied covenant of good faith and fair dealing under Nevada law.  By delivering vehicles containing the defectively designed ZF Shifter, which was not safe, and by marketing its vehicles as safe, reliable, and of high quality, FCA blatantly violated Plaintiff and Class members' fair and reasonable expectations under their respective contracts.

484.   As a direct and proximate result of FCA's breach of contract, Plaintiff and the Class have been damaged in an amount to be proven at trial, which shall include, but is not limited to, all compensatory damages, incidental and consequential damages, and other damages allowed by law.

**COUNT V**

**UNJUST ENRICHMENT**

485.   Plaintiffs reallege and incorporate by reference all paragraphs as though fully set forth herein.

486.   Plaintiff Eliam Marrero Bernal brings this Count on behalf of himself and the Nevada Subclass.

487.   FCA has received and retained a benefit from Plaintiff and inequity has resulted.

488.   FCA has benefitted from selling and leasing defective cars whose value was artificially inflated by FCA's concealment of the defective ZF Shifter at a profit, and Plaintiff and the Class have overpaid for the cars and been forced to pay other costs.

489.   Thus, all Nevada Subclass members conferred a benefit on FCA.

490.   It is inequitable for FCA to retain these benefits.

491.   Plaintiff and the Class were not aware of the true facts about the Defective Shifter Vehicles, and did not benefit from FCA's conduct.

492.   FCA knowingly accepted the benefits of its unjust conduct.

493.   As a result of FCA's conduct, the amount of its unjust enrichment should be disgorged, in an amount according to proof.

**I.    New Jersey**

**COUNT I**

**VIOLATIONS OF THE NEW JERSEY CONSUMER FRAUD ACT**
(N.J. STAT. ANN. §§ 56:8-1, *et seq.*)

494.   Plaintiffs reallege and incorporate by reference all paragraphs as though fully set forth herein.

495.   Plaintiff Clare Colrick brings this Count on behalf of herself and the New Jersey Subclass.

496.   The New Jersey Consumer Fraud Act, N.J. STAT. ANN. §§ 56:8-1, *et seq*. ("NJ CFA"), prohibits unfair or deceptive acts or practices in the conduct of any trade or commerce.

497.   In the course of its business, FCA willfully failed to disclose and actively concealed that the defective ZF Shifter discussed herein was unsafe and otherwise engaged in activities with a tendency or capacity to deceive.  Accordingly, FCA engaged in unfair and deceptive trade practices, including representing that Defective Shifter Vehicles have characteristics, uses, benefits, and qualities which they do not have; representing that Defective Shifter Vehicles are of a particular standard and quality when they are not; advertising Defective Shifter Vehicles with the intent not to sell them as advertised; and otherwise engaging in conduct likely to deceive.  Further, FCA's acts and practices described herein offend established public policy because the harm they cause to consumers, motorists, and pedestrians outweighs any benefit associated with such practices, and because FCA fraudulently concealed the defective nature of the Defective Shifter Vehicles from consumers.

498.   FCA's actions as set forth above occurred in the conduct of trade or commerce.

499.   FCA's conduct proximately caused injuries to Plaintiff and the other Class members.

500.   Plaintiff and the other Class members were injured as a result of FCA's conduct in that Plaintiff and the other Class members overpaid for their Defective Shifter Vehicles and did not receive the benefit of their bargain, and their Defective Shifter Vehicles have suffered a diminution in value.  These injuries are the direct and natural consequence of FCA's misrepresentations and omissions.

501.   Pursuant TO N.J. STAT. ANN. § 56:8-20, Plaintiff will serve the New Jersey Attorney General with a copy of this Complaint.

010616-11  881080V1

## COUNT II

### BREACH OF EXPRESS WARRANTY
### (N.J. STAT. ANN. § 12A:2-313 AND 12A:2A-210)

502.   Plaintiffs reallege and incorporate by reference all paragraphs as though fully set forth herein.

503.   Plaintiff Clare Colrick brings this Count on behalf of herself and the New Jersey Subclass.

504.   FCA is and was at all relevant times a "merchant" with respect to motor vehicles under N.J. Stat. Ann. § 12A:2-104  and a "seller" of motor vehicles under § 12A:2-313.

505.   With respect to leases, FCA is and was at all relevant times a "lessor" with respect to motor vehicles under NJ. Stat. Ann. § 12A:2A-103(1)(p), and § 12A:2A-210.

506.   The Defective Shifter Vehicles are and were at all relevant times "goods" within the meaning of N.J. Stat. Ann. § 12A:2-104(1) and § 12A:2A-103(1)(h).

507.   In connection with the purchase or lease of each one of its new vehicles, FCA provides an express New Vehicle Limited Warranty ("NVLW") for a period of three years or 36,000 miles, whichever occurs first.  This NVLW exists to cover "defect in materials or workmanship." FCA also provides a powertrain limited warranty that covers the engine and transmission, including the shifter assembly for five years or 100,000 miles, whichever occurs first, for the Defective Shifter Vehicles (FCA has, since the 2016 model year, reduced its powertrain warranty to five years or 60,000 miles).

508.   As a manufacturer of light-duty vehicles, FCA was required to provide these warranties to purchasers of the Defective Shifter Vehicles.

509.   FCA's warranties formed the basis of the bargain that was reached when Plaintiff and other Class members purchased or leased their Defective Shifter Vehicles equipped with the defectively designed ZF Shifter.

-107-

510.   Plaintiff and the Class members experienced defects within the warranty period.  Despite the existence of warranties, FCA failed to inform Plaintiff and Class members that the Defective Shifter Vehicles were defectively designed, and failed to fix the defectively designed ZF Shifter free of charge.

511.   FCA breached the express warranty promising to repair and correct a manufacturing defect or materials or workmanship of any part supplied by FCA. FCA has not repaired or adjusted, and has been unable to repair or adjust, the Defective Shifter Vehicles' materials and workmanship defects.

512.   Affording FCA a reasonable opportunity to cure its breach of written warranties would be unnecessary and futile here.

513.   Furthermore, the limited warranty promising to repair and/or correct a manufacturing defect fails in its essential purpose because the contractual remedy is insufficient to make Plaintiff and Class members whole and because FCA has failed and/or has refused to adequately provide the promised remedies within a reasonable time.

514.   Accordingly, recovery by Plaintiff and the other Class members is not limited to the limited warranty promising to repair and/or correct a manufacturing defect, and Plaintiff, individually and on behalf of the other Class members, seeks all remedies as allowed by law.

515.   Also, as alleged in more detail herein, at the time FCA warranted and sold the Defective Shifter Vehicles, it knew that the Defective Shifter Vehicles did not conform to FCA's warranties and were inherently defective, and FCA wrongfully and fraudulently concealed material facts regarding its Defective Shifter Vehicles. Plaintiff and the other Class members were therefore induced to purchase or lease the Defective Shifter Vehicles under false and/or fraudulent pretenses.

516.   Moreover, many of the injuries flowing from the Defective Shifter Vehicles cannot be resolved through the limited remedy of "replacements or adjustments," as many incidental and consequential damages have already been

010616-11 881080V1

suffered due to FCA's fraudulent conduct as alleged herein.  Due to FCA's failure and/or continued failure to provide such limited remedy within a reasonable time, any limitation on Plaintiff's and the other Class members' remedies would be insufficient to make Plaintiff and the other Class members whole.

517.   Finally, due to FCA's breach of warranty as set forth herein, Plaintiff and the other Class members assert as an additional and/or alternative remedy, revocation of acceptance of the goods, and for the return to Plaintiffs and the other Class members of the purchase price of all Defective Shifter Vehicles currently owned, and for such other incidental and consequential damages as allowed.

518.   FCA was provided notice of these issues by numerous complaints filed against it, including those submitted to NHTSA and the instant Complaint, within a reasonable amount of time after the defect was discovered.

519.   As a direct and proximate result of FCA's breach of express warranties, Plaintiff and the other Class members have been damaged in an amount to be determined at trial.

## COUNT III

## BREACH OF IMPLIED WARRANTY OF MERCHANTABILITY
### (N.J. STAT. ANN. § 12-A:2-314)

520.   Plaintiffs reallege and incorporate by reference all paragraphs as though fully set forth herein.

521.   Plaintiff Clare Colrick brings this Count on behalf of herself and the New Jersey Subclass.

522.   FCA is and was at all relevant times a merchant with respect to motor vehicles.

523.   A warranty that the Defective Shifter Vehicles were in merchantable condition is implied by law in the instant transactions.  These Defective Shifter Vehicles, when sold and at all times thereafter, were not in merchantable condition

and are not fit for the ordinary purpose for which cars are used. Specifically, the Defective Shifter Vehicles are inherently defective in that the ZF Shifter was not adequately designed, manufactured, and tested.

524. FCA was provided notice of these issues by complaints lodged by consumers with NHTSA—which vehicle manufacturers like FCA routinely monitor—before or within a reasonable amount of time after the allegations of the Defective Shifter Vehicle defects became public.

525. As a direct and proximate result of FCA's breach of the warranties of merchantability, Plaintiff and the other Class members have been damaged in an amount to be proven at trial.

### COUNT IV

### BREACH OF CONTRACT
(Based on New Jersey Law)

526. Plaintiffs reallege and incorporate by reference all paragraphs as though fully set forth herein.

527. Plaintiff Clare Colrick brings this Count on behalf of herself and the New Jersey Subclass.

528. FCA's misrepresentations and omissions alleged herein, including FCA's failure to disclose a defect in the ZF Shifter, caused Plaintiff and the other Class members to make their purchases or leases of their Defective Shifter Vehicles. Absent those misrepresentations and omissions, Plaintiff and the other Class members would not have purchased or leased these Defective Shifter Vehicles, would not have purchased or leased these Defective Shifter Vehicles at the prices they paid, and/or would have purchased or leased less expensive alternative vehicles that did not contain a defective ZF Shifter. Accordingly, Plaintiff and the other Class members overpaid for their Defective Shifter Vehicles and did not receive the benefit of their bargain.

529. Each and every sale or lease of a Defective Shifter Vehicle by an authorized FCA dealer constitutes a contract between FCA and the purchaser or

-110-

lessee.  FCA breached these contracts by selling or leasing Plaintiff and the other Class members Defective Shifter Vehicles, and by misrepresenting or failing to disclose the existence of the defective design, including information known to FCA, rendering each Defective Shifter Vehicle less safe, and thus less valuable, than vehicles not equipped with a monostable ZF Shifter.

530.    Additionally, FCA breached its implied covenant of good faith and fair dealing under New Jersey law.  By delivering vehicles containing the defectively designed ZF Shifter, which was not safe, and by marketing its vehicles as safe, reliable, and of high quality, FCA blatantly violated Plaintiff's and Class members' fair and reasonable expectations under their respective contracts.

531.    As a direct and proximate result of FCA's breach of contract, Plaintiff and the Class have been damaged in an amount to be proven at trial, which shall include, but is not limited to, all compensatory damages, incidental and consequential damages, and other damages allowed by law.

## COUNT V

## UNJUST ENRICHMENT

532.    Plaintiffs reallege and incorporate by reference all paragraphs as though fully set forth herein.

533.    Plaintiff Clare Colrick brings this Count on behalf of herself and the New Jersey Subclass.

534.    FCA has received and retained a benefit from Plaintiff and inequity has resulted.

535.    FCA has benefitted from selling and leasing defective cars whose value was artificially inflated by FCA's concealment of the defective ZF Shifter at a profit, and Plaintiff and the Class have overpaid for the cars and been forced to pay other costs.

536.    Thus, all New Jersey Subclass members conferred a benefit on FCA.

537.    It is inequitable for FCA to retain these benefits.

538.   Plaintiff and the Class were not aware of the true facts about the Defective Shifter Vehicles, and did not benefit from FCA's conduct.

539.   FCA knowingly accepted the benefits of its unjust conduct.

540.   As a result of FCA's conduct, the amount of its unjust enrichment should be disgorged, in an amount according to proof.

## J.    North Carolina

### COUNT I

### VIOLATIONS OF THE NORTH CAROLINA UNFAIR AND DECEPTIVE TRADE PRACTICES ACT
### (N.C. GEN. STAT. §§ 75-1.1, *et seq.*)

541.   Plaintiffs reallege and incorporate by reference all paragraphs as though fully set forth herein.

542.   Plaintiff Jacob Gunnells brings this Count on behalf of himself and the North Carolina Subclass.

543.   North Carolina's Unfair and Deceptive Trade Practices Act, N.C. GEN. STAT. §§ 75-1.1, et seq. ("NCUDTPA"), prohibits a person from engaging in "[u]nfair methods of competition in or affecting commerce, and unfair or deceptive acts or practices in or affecting commerce[.]"  The NCUDTPA provides a private right of action for any person injured "by reason of any act or thing done by any other person, firm or corporation in violation of" the NCUDTPA.  N.C. GEN. STAT. § 75-16.

544.   FCA's acts and practices complained of herein were performed in the course of FCA's trade or business and thus occurred in or affected "commerce," as defined in N.C. GEN. STAT. § 75-1.1(b).

545.   In the course of its business, FCA willfully failed to disclose and actively concealed that the defective ZF Shifter discussed herein was unsafe and otherwise engaged in activities with a tendency or capacity to deceive.  Accordingly, FCA engaged in unfair and deceptive trade practices, including representing that Defective Shifter Vehicles have characteristics, uses, benefits, and qualities which they do not have; representing that Defective Shifter Vehicles are of a particular standard and

quality when they are not; advertising Defective Shifter Vehicles with the intent not to sell them as advertised; and otherwise engaging in conduct likely to deceive.

546.   FCA's conduct proximately caused injuries to Plaintiff and the other Class members.

547.   FCA acted with willful and conscious disregard of the rights and safety of others, subjecting Plaintiff and the other Class members to cruel and unjust hardship as a result, such that an award of punitive damages is appropriate.

548.   Plaintiff and the other Class members were injured as a result of FCA's conduct in that Plaintiff and the other Class members overpaid for their Defective Shifter Vehicles and did not receive the benefit of their bargain, and their Defective Shifter Vehicles have suffered a diminution in value.  These injuries are the direct and natural consequence of FCA's misrepresentations and omissions.

549.   Plaintiff, individually and on behalf of the other Class members, seeks treble damages pursuant to N.C. GEN. STAT. § 75-16, and an award of attorneys' fees pursuant to N.C. GEN. STAT. § 75-16.1.

## COUNT II

### BREACH OF EXPRESS WARRANTY
### (N.C. GEN. STAT. § 25-2-313 AND § 25-2A-210)

550.   Plaintiffs reallege and incorporate by reference all paragraphs as though fully set forth herein.

551.   Plaintiff Jacob Gunnells brings this Count on behalf of himself and the North Carolina Subclass.

552.   FCA is and was at all relevant times a "merchant" with respect to motor vehicles under N.C. GEN. STAT. § 25-2-104(1) and a "seller" of motor vehicles under § 25-2-313(1).

553.   With respect to leases, FCA is and was at all relevant times a "lessor" with respect to motor vehicles under N.C. GEN. STAT. § 25-2A-103(1)(p) and § 25-2A-210.

554.   The Defective Shifter Vehicles are and were at all relevant times "goods" within the meaning of N.C. GEN. STAT. § 25-2-105(1) and N.C. GEN. STAT. § 25-2A-103(1)(h).

555.   In connection with the purchase or lease of each one of its new vehicles, FCA provides an express New Vehicle Limited Warranty ("NVLW") for a period of three years or 36,000 miles, whichever occurs first.  This NVLW exists to cover "defect in materials or workmanship." FCA also provides a powertrain limited warranty that covers the engine and transmission, including the shifter assembly for five years or 100,000 miles, whichever occurs first, for the Defective Shifter Vehicles (FCA has, since the 2016 model year, reduced its powertrain warranty to five years or 60,000 miles).

556.   As a manufacturer of light-duty vehicles, FCA was required to provide these warranties to purchasers of the Defective Shifter Vehicles.

557.   FCA's warranties formed the basis of the bargain that was reached when Plaintiff and other Class members purchased or leased their Defective Shifter Vehicles equipped with the defectively designed ZF Shifter.

558.   Plaintiff and the Class members experienced defects within the warranty period.  Despite the existence of warranties, FCA failed to inform Plaintiff and Class members that the Defective Shifter Vehicles were defectively designed, and failed to fix the defectively designed ZF Shifter free of charge.

559.   FCA breached the express warranty promising to repair and correct a manufacturing defect or materials or workmanship of any part supplied by FCA. FCA has not repaired or adjusted, and has been unable to repair or adjust, the Defective Shifter Vehicles' materials and workmanship defects.

560.   Affording FCA a reasonable opportunity to cure its breach of written warranties would be unnecessary and futile here.

561.   Furthermore, the limited warranty promising to repair and/or correct a manufacturing defect fails in its essential purpose because the contractual remedy is

insufficient to make Plaintiff and Class members whole and because FCA has failed and/or has refused to adequately provide the promised remedies within a reasonable time.

562.    Accordingly, recovery by Plaintiff and the other Class members is not limited to the limited warranty promising to repair and/or correct a manufacturing defect, and Plaintiff, individually and on behalf of the other Class members, seeks all remedies as allowed by law.

563.    Also, as alleged in more detail herein, at the time FCA warranted and sold the Defective Shifter Vehicles, it knew that the Defective Shifter Vehicles did not conform to FCA's warranties and were inherently defective, and FCA wrongfully and fraudulently concealed material facts regarding its Defective Shifter Vehicles. Plaintiff and the other Class members were therefore induced to purchase or lease the Defective Shifter Vehicles under false and/or fraudulent pretenses.

564.    Moreover, many of the injuries flowing from the Defective Shifter Vehicles cannot be resolved through the limited remedy of "replacements or adjustments," as many incidental and consequential damages have already been suffered due to FCA's fraudulent conduct as alleged herein.  Due to FCA's failure and/or continued failure to provide such limited remedy within a reasonable time, any limitation on Plaintiff and the other Class members' remedies would be insufficient to make Plaintiff and the other Class members whole.

565.    Finally, due to FCA's breach of warranty as set forth herein, Plaintiff and the other Class members assert as an additional and/or alternative remedy, revocation of acceptance of the goods, the return to Plaintiffs and the other Class members of the purchase price of all Defective Shifter Vehicles currently owned, and such other incidental and consequential damages as allowed.

566.    FCA was provided notice of these issues by numerous complaints filed against it, including those submitted to NHTSA and the instant Complaint, within a reasonable amount of time after the defect was discovered.

567.   As a direct and proximate result of FCA's breach of express warranties, Plaintiff and the other Class members have been damaged in an amount to be determined at trial.

## COUNT III

## BREACH OF IMPLIED WARRANTY OF MERCHANTABILITY
### (N.C. GEN. STAT. § 25-2-314)

568.   Plaintiffs reallege and incorporate by reference all paragraphs as though fully set forth herein.

569.   Plaintiff Jacob Gunnells brings this Count on behalf of himself and the North Carolina Subclass.

570.   FCA is and was at all relevant times a merchant with respect to motor vehicles.

571.   A warranty that the Defective Shifter Vehicles were in merchantable condition is implied by law in the instant transactions.  These Defective Shifter Vehicles, when sold and at all times thereafter, were not in merchantable condition and are not fit for the ordinary purpose for which cars are used.  Specifically, the Defective Shifter Vehicles are inherently defective in that the ZF Shifter was not adequately designed, manufactured, and tested.

572.   FCA was provided notice of these issues by complaints lodged by consumers with NHTSA—which vehicle manufacturers like FCA routinely monitor—before or within a reasonable amount of time after the allegations of the Defective Shifter Vehicle defects became public.

573.   As a direct and proximate result of FCA's breach of the warranties of merchantability, Plaintiff and the other Class members have been damaged in an amount to be proven at trial.

# COUNT IV

## BREACH OF CONTRACT
### (Based on North Carolina Law)

574.    Plaintiffs reallege and incorporate by reference all paragraphs as though fully set forth herein.

575.    Plaintiff Jacob Gunnells brings this Count on behalf of himself and the North Carolina Subclass.

576.    FCA's misrepresentations and omissions alleged herein, including FCA's failure to disclose a defect in the ZF Shifter, caused Plaintiff and the other Class members to make their purchases or leases of their Defective Shifter Vehicles.  Absent those misrepresentations and omissions, Plaintiff and the other Class members would not have purchased or leased these Defective Shifter Vehicles, would not have purchased or leased these Defective Shifter Vehicles at the prices they paid, and/or would have purchased or leased less expensive alternative vehicles that did not contain a defective ZF Shifter.  Accordingly, Plaintiff and the other Class members overpaid for their Defective Shifter Vehicles and did not receive the benefit of their bargain.

577.    Each and every sale or lease of a Defective Shifter Vehicle by an authorized FCA dealer constitutes a contract between FCA and the purchaser or lessee.  FCA breached these contracts by selling or leasing Plaintiff and the other Class members Defective Shifter Vehicles and by misrepresenting or failing to disclose the existence of the defective design, including information known to FCA, rendering each Defective Shifter Vehicle less safe, and thus less valuable, than vehicles not equipped with a monostable ZF Shifter.

578.    Additionally, FCA breached its implied covenant of good faith and fair dealing under North Carolina law.  By delivering vehicles containing the defectively designed ZF Shifter, which was not safe, and by marketing its vehicles as safe, reliable, and of high quality, FCA blatantly violated Plaintiff's and Class members' fair and reasonable expectations under their respective contracts.

579.   As a direct and proximate result of FCA's breach of contract, Plaintiff and the Class have been damaged in an amount to be proven at trial, which shall include, but is not limited to, all compensatory damages, incidental and consequential damages, and other damages allowed by law.

## COUNT V

## UNJUST ENRICHMENT

580.   Plaintiffs reallege and incorporate by reference all paragraphs as though fully set forth herein.

581.   Plaintiff Jacob Gunnells brings this Count on behalf of himself and the North Carolina Subclass.

582.   FCA has received and retained a benefit from Plaintiff and inequity has resulted.

583.   FCA has benefitted from selling and leasing defective cars whose value was artificially inflated by FCA's concealment of the defective ZF Shifter at a profit, and Plaintiff and the Class have overpaid for the cars and been forced to pay other costs.

584.   Thus, all North Carolina Subclass members conferred a benefit on FCA.

585.   It is inequitable for FCA to retain these benefits.

586.   Plaintiff and the Class were not aware of the true facts about the Defective Shifter Vehicles, and did not benefit from FCA's conduct.

587.   FCA knowingly accepted the benefits of its unjust conduct.

588.   As a result of FCA's conduct, the amount of its unjust enrichment should be disgorged, in an amount according to proof.

**K.      Ohio**

## COUNT I

### VIOLATIONS OF THE CONSUMER SALES PRACTICES ACT
(OHIO REV. CODE § 1345.01, *et seq.*)

589.    Plaintiffs reallege and incorporate by reference all paragraphs as though fully set forth herein.

590.    Plaintiffs Danielle and Joby Hackett bring this Count on behalf of themselves and the Ohio Subclass.

591.    Plaintiffs and the other Ohio Subclass members are "consumers" as defined by the Ohio Consumer Sales Practices Act, OHIO REV. CODE § 1345.01 ("OCSPA").  FCA is a "supplier" as defined by the OCSPA.  Plaintiffs' and the other Ohio Subclass members' purchases or leases of the Defective Shifter Vehicles were "consumer transactions" as defined by the OCSPA.

592.    By willfully failing to disclose and actively concealing the defective ZF Shifter, FCA engaged in deceptive business practices prohibited by the OCSPA, including (1) representing that the Defective Shifter Vehicles have characteristics, uses, benefits, and qualities which they do not have, (2) representing that the Defective Shifter Vehicles are of a particular standard, quality, and grade when they are not, (3) advertising the Defective Shifter Vehicles with the intent not to sell them as advertised, and (4) engaging in acts or practices which are otherwise unfair, misleading, false, or deceptive to the consumer.

593.    In the course of its business, FCA willfully failed to disclose and actively concealed the defective ZF Shifter discussed herein, and otherwise engaged in activities with a tendency or capacity to deceive.  FCA also engaged in unlawful trade practices by employing deception, deceptive acts or practices, fraud, misrepresentations, or concealment, suppression, or omission of any material fact with intent that others rely upon such concealment, suppression, or omission, in connection with the sale of the Defective Shifter Vehicles.

594.    FCA knew it had installed a defective ZF Shifter and knew that the ZF Shifter did not operate safely, as advertised.  FCA knew this for at least two years, but concealed all of that information.

595.    FCA was also aware that it valued profits over safety, and that it was manufacturing, selling, and distributing vehicles throughout the United States that did not perform as advertised and jeopardized the safety of the vehicle's occupants.  FCA concealed this information as well.

596.    By failing to disclose that the defective ZF Shifter did not operate safely and did not include a safety override to prevent roll-away incidents, by marketing its vehicles as safe, reliable, and of high quality, and by presenting itself as a reputable manufacturer that valued safety and stood behind its vehicles after they were sold, FCA engaged in deceptive business practices in violation of the OCSPA.

597.    FCA's unfair or deceptive acts or practices were likely to and did in fact deceive reasonable consumers, including Plaintiffs and the other Class members, about the true performance of the Defective Shifter Vehicle with ZF Shifter, the quality of the FCA brand, the devaluing of safety and performance at FCA, and the true value of the Defective Shifter Vehicles.

598.    FCA intentionally and knowingly misrepresented material facts regarding the Defective Shifter Vehicles with an intent to mislead Plaintiffs and the Ohio Subclass.

599.    FCA knew or should have known that its conduct violated the OCSPA.

600.    As alleged above, FCA made material statements about the safety and utility of the Defective Shifter Vehicles and the FCA brand that were either false or misleading.

601.    FCA owed Plaintiffs a duty to disclose the true safety, performance, and reliability of the Defective Shifter Vehicles, and the devaluing of safety and performance at FCA, because FCA:

010616-11 881080V1

a.   Possessed exclusive knowledge that it valued profits and cost-cutting over safety and performance, and that it was manufacturing, selling, and distributing vehicles throughout the United States that did not perform as advertised;

b.   Intentionally concealed the foregoing from Plaintiffs and the Class; and/or

c.   Made incomplete representations about the safety and performance of the Defective Shifter Vehicles generally, and the defective ZF Shifter in particular, while purposefully withholding material facts from Plaintiffs and the Class that contradicted these representations.

602.   Because FCA fraudulently concealed the defective ZF Shifter and the true performance of the Defective Shifter Vehicle with ZF Shifter, resulting in a raft of negative publicity once the defects finally began to be disclosed, the value of the Defective Shifter Vehicles has greatly diminished.  In light of the stigma attached to those vehicles by FCA's conduct, they are now worth significantly less than they otherwise would be.

603.   The Ohio Attorney General has made available for public inspection prior state court decisions which have held that the acts and omissions of FCA in this Complaint, including, but not limited to, the failure to honor both implied warranties and express warranties, the making and distribution of false, deceptive, and/or misleading representations, and the concealment and/or non-disclosure of a dangerous defect, constitute deceptive sales practices in violation of the OCSPA.  These cases include, but are not limited to, the following:

a.   *Mason v. Mercedes Benz USA, LLC* (OPIF #10002382);

b.   *State ex rel. Betty D. Montgomery v. Volkswagen Motor Co.* (OPIF #10002123);

c.   *State ex rel. Betty D. Montgomery v. Bridgestone/Firestone, Inc.* (OPIF #10002025);

d.   *Bellinger v. Hewlett-Packard Co.*, No. 20744, 2002 Ohio App. LEXIS 1573 (Ohio Ct. App. Apr. 10, 2002) (OPIF #10002077);

e.   *Borror v. MarineMax of Ohio*, No. OT-06-010, 2007 Ohio App. LEXIS 525 (Ohio Ct. App. Feb. 9, 2007) (OPIF #10002388);

f.   *State ex rel. Jim Petro v. Craftmatic Organization, Inc.* (OPIF #10002347);

g.   *Mark J. Craw Volkswagen, et al. v. Joseph Airport Toyota, Inc.* (OPIF #10001586);

h.   *State ex rel. William J. Brown v. Harold Lyons, et al.* (OPIF #10000304);

i.   *Brinkman v. Mazda Motor of America, Inc.* (OPIF #10001427);

j.   *Khouri v. Don Lewis* (OPIF #100001995);

k.   *Mosley v. Performance Mitsubishi aka Automanage* (OPIF #10001326);

l.   *Walls v. Harry Williams dba Butch's Auto Sales* (OPIF #10001524); and

m.   *Brown v. Spears* (OPIF #10000403).

604.   As a result of its violations of the OCSPA, as detailed above, FCA caused actual damage to Plaintiffs and, if not stopped, will continue to harm Plaintiffs. Plaintiffs currently own or lease, or within the class period have owned or leased, a Defective Shifter Vehicle that is defective.  Defects associated with the ZF Shifter have caused the value of the Defective Shifter Vehicles to decrease.

605.   Plaintiffs and the Class sustained damages as a result of FCA's unlawful acts and are therefore entitled to damages and other relief as provided under the OCSPA.

606.   Plaintiffs also seek court costs and attorneys' fees as a result of FCA's violations of the OCSPA, as provided in OHIO REV. CODE § 1345.09.

## COUNT II

### BREACH OF EXPRESS WARRANTY
(OHIO REV. CODE § 1302.26, *et seq.*) (U.C.C. § 2-313)

607.   Plaintiffs reallege and incorporate by reference all paragraphs as though fully set forth herein.

608.   Plaintiffs Danielle and Joby Hackett bring this Count on behalf of themselves and the Ohio Subclass.

609.   FCA is and was at all relevant times a merchant with respect to motor vehicles.

610.   In connection with the purchase or lease of each one of its new vehicles, FCA provides an express New Vehicle Limited Warranty ("NVLW") for a period of three years or 36,000 miles, whichever occurs first.  This NVLW exists to cover "defect in materials or workmanship." FCA also provides a powertrain limited warranty that covers the engine and transmission, including the shifter assembly for five years or 100,000 miles, whichever occurs first, for the Defective Shifter Vehicles (FCA has, since the 2016 model year, reduced its powertrain warranty to five years or 60,000 miles).

611.   As a manufacturer of light-duty vehicles, FCA was required to provide these warranties to purchasers of its Defective Shifter Vehicles.

612.   FCA's warranties formed the basis of the bargain that was reached when Plaintiffs and other Class members purchased or leased their Defective Shifter Vehicles equipped with the defective ZF Shifter system from FCA.

613.   Plaintiffs and the Class members experienced defects within the warranty period.  Despite the existence of warranties, FCA failed to inform Plaintiffs and Class members that the Defective Shifter Vehicles were defectively designed, and failed to fix the defective ZF Shifter free of charge.

614.   FCA breached the express warranty promising to repair and correct a manufacturing defect or materials or workmanship of any part supplied by FCA.  FCA has not repaired or adjusted, and has been unable to repair or adjust, the Defective Shifter Vehicles' materials and workmanship defects.

615.   Affording FCA a reasonable opportunity to cure its breach of written warranties would be unnecessary and futile here.

616.   Furthermore, the limited warranty promising to repair and/or correct a manufacturing defect fails in its essential purpose because the contractual remedy is insufficient to make Plaintiffs and the other Class members whole, and because FCA

has failed and/or has refused to adequately provide the promised remedies within a reasonable time.

617.    Accordingly, recovery by Plaintiffs and the other Class members is not limited to the limited warranty promising to repair and/or correct a manufacturing defect, and Plaintiffs, individually and on behalf of the other Class members, seek all remedies as allowed by law.

618.    Also, as alleged in more detail herein, at the time FCA warranted and sold the Defective Shifter Vehicles, it knew that the Defective Shifter Vehicles did not conform to FCA's warranties and were inherently defective, and FCA wrongfully and fraudulently concealed material facts regarding its Defective Shifter Vehicles. Plaintiffs and the other Class members were therefore induced to purchase or lease the Defective Shifter Vehicles under false and/or fraudulent pretenses.

619.    Moreover, many of the injuries flowing from the Defective Shifter Vehicles cannot be resolved through the limited remedy of "replacements or adjustments," as many incidental and consequential damages have already been suffered due to FCA's fraudulent conduct as alleged herein.  Due to FCA's failure and/or continued failure to provide such limited remedy within a reasonable time, any limitation on Plaintiffs' and the other Class members' remedies would be insufficient to make Plaintiffs and the other Class members whole.

620.    FCA was provided notice of these issues by numerous complaints filed against it, including complaints to NHTSA and the instant Complaint, within a reasonable amount of time after the defect was discovered.

621.    As a direct and proximate result of FCA's breach of express warranties, Plaintiffs and the other Class members have been damaged in an amount to be determined at trial.

## COUNT III

### BREACH OF IMPLIED WARRANTY OF MERCHANTABILITY
(Ohio Rev. Code § 1302.27)(U.C.C. § 2-314))

622.   Plaintiffs reallege and incorporate by reference all paragraphs as though fully set forth herein.

623.   Plaintiffs Danielle and Joby Hackett bring this Count on behalf of themselves and the Ohio Subclass.

624.   FCA is and was at all relevant times a merchant with respect to motor vehicles.

625.   A warranty that the Defective Shifter Vehicles were in merchantable condition is implied by law in the instant transactions.  These Defective Shifter Vehicles, when sold and at all times thereafter, were not in merchantable condition and are not fit for the ordinary purpose for which cars are used.  Specifically, the Defective Shifter Vehicles are inherently defective in that the ZF Shifter system was not adequately designed, manufactured, and tested and does not include a safety override to prevent roll-away incidents.

626.   FCA was provided notice of these issues by complaints lodged by consumers with NHTSA—which vehicle manufacturers like FCA routinely monitor—before or within a reasonable amount of time after the allegations of the Defective Shifter Vehicle defects became public.

627.   As a direct and proximate result of FCA's breach of the warranties of merchantability, Plaintiffs and the other Class members have been damaged in an amount to be proven at trial.

## COUNT IV

### BREACH OF CONTRACT
(Based on Ohio Law)

628.   Plaintiffs reallege and incorporate by reference all paragraphs as though fully set forth herein.

629.   Plaintiffs Danielle and Joby Hackett bring this Count on behalf of themselves and the Ohio Subclass.

630.   FCA's misrepresentations and omissions alleged herein, including FCA's failure to disclose a defect in the ZF Shifter, caused Plaintiffs and the other Class members to make their purchases or leases of their Defective Shifter Vehicles.  Absent those misrepresentations and omissions, Plaintiffs and the other Class members would not have purchased or leased these Defective Shifter Vehicles, would not have purchased or leased these Defective Shifter Vehicles at the prices they paid, and/or would have purchased or leased less expensive alternative vehicles that did not contain a defective ZF Shifter.  Accordingly, Plaintiffs and the other Class members overpaid for their Defective Shifter Vehicles and did not receive the benefit of their bargain.

631.   Each and every sale or lease of a Defective Shifter Vehicle by an authorized FCA dealer constitutes a contract between FCA and the purchaser or lessee.  FCA breached these contracts by selling or leasing Plaintiffs and the other Class members Defective Shifter Vehicles, and by misrepresenting or failing to disclose the existence of the defective design, including information known to FCA, rendering each Defective Shifter Vehicle less safe, and thus less valuable, than vehicles not equipped with a ZF Shifter.

632.   As a direct and proximate result of FCA's breach of contract, Plaintiffs and the Class have been damaged in an amount to be proven at trial, which shall include, but is not limited to, all compensatory damages, incidental and consequential damages, and other damages allowed by law.

## COUNT V

## UNJUST ENRICHMENT

633.   Plaintiffs reallege and incorporate by reference all paragraphs as though fully set forth herein.

634.   Plaintiffs Danielle and Joby Hackett bring this Count on behalf of themselves and the Ohio Subclass.

010616-11 881080V1

635.   FCA has received and retained a benefit from Plaintiffs and the Class and inequity has resulted.

636.   FCA has benefitted from selling and leasing defective cars whose value was artificially inflated by FCA's concealment of the defective ZF Shifter at a profit, and Plaintiffs and the Class have overpaid for the cars and been forced to pay other costs.

637.   Thus, all Ohio Subclass members conferred a benefit on FCA.

638.   It is inequitable for FCA to retain these benefits.

639.   Plaintiffs were not aware of the true facts about the Defective Shifter Vehicles, and did not benefit from FCA's conduct.

640.   FCA knowingly accepted the benefits of its unjust conduct.

641.   As a result of FCA's conduct, the amount of its unjust enrichment should be disgorged, in an amount according to proof.

**L.    Oregon**

## COUNT I

**VIOLATIONS OF THE OREGON UNLAWFUL TRADE PRACTICES ACT
(OR. REV. STAT. §§ 646.605, *et seq.*)**

642.   Plaintiffs reallege and incorporate by reference all paragraphs as though fully set forth herein.

643.   Plaintiff Todd Fisher brings this Count on behalf of himself and the Oregon Subclass.

644.   FCA is a person within the meaning of OR. REV. STAT. § 646.605(4)

645.   The Defective Shifter Vehicles at issue are "goods" obtained primarily for personal family or household purposes within the meaning of OR. REV. STAT. § 646.605(6).

646.   The Oregon Unfair Trade Practices Act ("Oregon UTPA") prohibits a person from, in the course of the person's business, doing any of the following:  "(e) Represent[ing] that … goods … have … characteristics … uses, benefits, … or

qualities that they do not have; (g) Represent[ing] that … goods … are of a particular standard [or] quality … if they are of another; (i) Advertis[ing] … goods or services with intent not to provide them as advertised;" and "(u) engag[ing] in any other unfair or deceptive conduct in trade or commerce." OR. REV. STAT. § 646.608(1).

647.   FCA engaged in unlawful trade practices, including representing that Defective Shifter Vehicles have characteristics, uses, benefits, and qualities which they do not have; representing that Defective Shifter Vehicles are of a particular standard and quality when they are not; advertising Defective Shifter Vehicles with the intent not to sell them as advertised; and engaging in other unfair or deceptive acts.

648.   FCA also engaged in unlawful trade practices by employing deception, deceptive acts or practices, fraud, misrepresentations, or concealment, suppression or omission of any material fact with intent that others rely upon such concealment, suppression or omission, in connection with the sale of Affected Vehicles.

649.   FCA's actions as set forth above occurred in the conduct of trade or commerce.

650.   FCA knew it had installed a defectively designed ZF Shifter and knew that the ZF Shifter was not safe, as advertised, and had no override system to prevent roll-away incidents, even though its competitors used such override systems.  FCA knew this for at least two years, but concealed all of that information.

651.   FCA was also aware that it valued profits over safety, and that it was manufacturing, selling, and distributing vehicles throughout the United States that did not perform as advertised and jeopardized the safety of the vehicle's occupants.  FCA concealed this information as well.

652.   By failing to disclose that the defectively designed ZF Shifter was not safe and had no safety override, by marketing its vehicles as safe, reliable, and of high quality, and by presenting itself as a reputable manufacturer that valued safety and stood behind its vehicles after they were sold, FCA engaged in deceptive business practices in violation of the Oregon UTPA.

-128-

653.   In the course of FCA's business, it willfully failed to disclose and actively concealed the dangerous risk posed by the many safety issues and serious defects discussed above.  FCA compounded the deception by repeatedly asserting that FCA branded vehicles were safe, reliable, of high quality, and by claiming to be of a reputable manufacturer that valued safety and stood behind its vehicles once they are on the road.

654.   FCA's unfair or deceptive acts or practices were likely to and did in fact deceive reasonable consumers, including Plaintiff and the other Class members, about the true performance of the Defective Shifter Vehicles, the quality of the FCA brand, the devaluing of safety and performance at FCA, and the true value of the Defective Shifter Vehicles.

655.   FCA intentionally and knowingly misrepresented material facts regarding the Defective Shifter Vehicles with an intent to mislead Plaintiff and the Oregon Subclass.

656.   FCA knew or should have known that its conduct violated the Oregon UTPA.

657.   As alleged above, FCA made material statements about the safety and utility of the Defective Shifter Vehicles and the FCA brand that were either false or misleading.

658.   FCA owed Plaintiff a duty to disclose the true safety, performance, and reliability of the Defective Shifter Vehicles, and the devaluing of safety and performance at FCA, because FCA:

    a.    Possessed exclusive knowledge that it valued profits and cost-cutting over safety and performance, and that it was manufacturing, selling, and distributing vehicles throughout the United States that included a defectively designed ZF Shifter and did not perform as advertised;

    b.    Intentionally concealed the foregoing from Plaintiff and the Class; and/or

-129-

c.    Made incomplete representations about the safety and performance of the Defective Shifter Vehicles generally, and the defective ZF Shifter in particular, while purposefully withholding material facts from Plaintiff and the Class that contradicted these representations.

659.    Because FCA fraudulently concealed the defectively designed ZF Shifter and the true performance of cars equipped with the ZF Shifter, resulting in a raft of negative publicity once the defects finally began to be disclosed, the value of the Defective Shifter Vehicles has greatly diminished.  In light of the stigma attached to those vehicles by FCA's conduct, they are now worth significantly less than they otherwise would be.

660.    FCA's fraudulent use of the defectively designed ZF Shifter and the true performance of the Defective Shifter Vehicles were material to Plaintiff and the Oregon Subclass.  A vehicle made by a reputable manufacturer of safe, high-performing vehicles is safer and worth more than an otherwise comparable vehicle made by a disreputable manufacturer of unsafe vehicles that conceals defects rather than promptly remedying them.

661.    Plaintiff and the Oregon Subclass suffered ascertainable loss caused by FCA's misrepresentations and its concealment of and failure to disclose material information.  Class members who purchased the Defective Shifter Vehicles either would have paid less for their vehicles or would not have purchased or leased them at all but for FCA's violations of the Oregon UTPA.

662.    FCA had an ongoing duty to all FCA customers to refrain from unfair and deceptive practices under the Oregon UTPA.  All owners of the Defective Shifter Vehicles suffered ascertainable loss in the form of the diminished value of their vehicles as a result of FCA's deceptive and unfair acts and practices made in the course of FCA's business.

663.   FCA's violations present a continuing risk to Plaintiff as well as to the general public.  FCA's unlawful acts and practices complained of herein affect the public interest.

664.   As a direct and proximate result of FCA's violations of the Oregon UTPA, Plaintiff and the Oregon Subclass have suffered injury-in-fact and/or actual damage.

665.   Plaintiff and the Oregon Subclass are entitled to recover the greater of actual damages or $200 pursuant to OR. REV. STAT.  § 646.638(1).  Plaintiff and the Oregon Subclass are also entitled to punitive damages because FCA engaged in conduct amounting to a particularly aggravated, deliberate disregard of the rights of others.

## COUNT II

### BREACH OF EXPRESS WARRANTY
### (OR. REV. STAT. §§ 72.3130 AND § 72A.2100)

666.   Plaintiffs reallege and incorporate by reference all paragraphs as though fully set forth herein.

667.   Plaintiff Todd Fisher brings this Count on behalf of himself and the Oregon Subclass.

668.   With respect to leases, FCA is and was at all relevant times a "lessor" with respect to motor vehicles under OR. REV. STAT. § 72A.1030(1)(p) and § 72A.2100.

669.   The Defective Shifter Vehicles are and were at all relevant times "goods" within the meaning of OR. REV. STAT. § 72.1050(1) and OR. REV. STAT. § 72A.1030(1)(h).

670.   In connection with the purchase or lease of each one of its new vehicles, FCA provides an express New Vehicle Limited Warranty ("NVLW") for a period of three years or 36,000 miles, whichever occurs first.  This NVLW exists to cover "defect in materials or workmanship." FCA also provides a powertrain limited

warranty that covers the engine and transmission, including the shifter assembly for five years or 100,000 miles, whichever occurs first, for the Defective Shifter Vehicles (FCA has, since the 2016 model year, reduced its powertrain warranty to five years or 60,000 miles).

671.    As a manufacturer of light-duty vehicles, FCA was required to provide these warranties to purchasers of its Defective Shifter Vehicles.

672.    FCA's warranties formed the basis of the bargain that was reached when Plaintiff and other Class members purchased or leased their Defective Shifter Vehicles equipped with the defective ZF Shifter system from FCA.

673.    Plaintiffs and the Class members experienced defects within the warranty period.  Despite the existence of warranties, FCA failed to inform Plaintiff and Class members that the Defective Shifter Vehicles were defectively designed, and failed to fix the defective ZF Shifter free of charge.

674.    FCA breached the express warranty promising to repair and correct a manufacturing defect or materials or workmanship of any part supplied by FCA.  FCA has not repaired or adjusted, and has been unable to repair or adjust, the Defective Shifter Vehicles' materials and workmanship defects.

675.    Affording FCA a reasonable opportunity to cure its breach of written warranties would be unnecessary and futile here.

676.    Furthermore, the limited warranty promising to repair and/or correct a manufacturing defect fails in its essential purpose because the contractual remedy is insufficient to make Plaintiff and the other Class members whole and because FCA has failed and/or has refused to adequately provide the promised remedies within a reasonable time.

677.    Accordingly, recovery by Plaintiff and the other Class members is not limited to the limited warranty promising to repair and/or correct a manufacturing defect, and Plaintiff, individually and on behalf of the other Class members, seeks all remedies as allowed by law.

678.   Also, as alleged in more detail herein, at the time FCA warranted and sold the Defective Shifter Vehicles, it knew that the Defective Shifter Vehicles did not conform to FCA's warranties and were inherently defective and FCA wrongfully and fraudulently concealed material facts regarding its Defective Shifter Vehicles. Plaintiff and the other Class members were therefore induced to purchase or lease the Defective Shifter Vehicles under false and/or fraudulent pretenses.

679.   Moreover, many of the injuries flowing from the Defective Shifter Vehicles cannot be resolved through the limited remedy of "replacements or adjustments," as many incidental and consequential damages have already been suffered due to FCA's fraudulent conduct as alleged herein.  Due to FCA's failure and/or continued failure to provide such limited remedy within a reasonable time, any limitation on Plaintiff and the other Class members' remedies would be insufficient to make Plaintiff and the other Class members whole.

680.   FCA was provided notice of these issues by numerous complaints filed against it, including complaints to NHTSA and the instant Complaint, within a reasonable amount of time after the defect was discovered.

681.   As a direct and proximate result of FCA's breach of express warranties, Plaintiff and the other Class members have been damaged in an amount to be determined at trial.

**COUNT III**

**BREACH OF IMPLIED WARRANTY OF MERCHANTABILITY**
**(OR. REV. STAT. § 72.3140)**

682.   Plaintiffs reallege and incorporate by reference all paragraphs as though fully set forth herein.

683.   Plaintiff Todd Fisher brings this Count on behalf of himself and the Oregon Subclass.

684.   FCA is and was at all relevant times a merchant with respect to motor vehicles.

685.   A warranty that the Defective Shifter Vehicles were in merchantable condition is implied by law in the instant transactions.  These Defective Shifter Vehicles, when sold and at all times thereafter, were not in merchantable condition and are not fit for the ordinary purpose for which cars are used.  Specifically, the Defective Shifter Vehicles are inherently defective in that the ZF Shifter was not adequately designed, manufactured, and tested.

686.   FCA was provided notice of these issues by complaints lodged by consumers with NHTSA—which vehicle manufacturers like FCA routinely monitor—before or within a reasonable amount of time after the allegations of the Defective Shifter Vehicle defects became public.

687.   As a direct and proximate result of FCA's breach of the warranties of merchantability, Plaintiff and the other Class members have been damaged in an amount to be proven at trial.

### COUNT IV

### BREACH OF CONTRACT
#### (Based on Oregon Law)

688.   Plaintiffs reallege and incorporate by reference all paragraphs as though fully set forth herein.

689.   Plaintiff Todd Fisher brings this Count on behalf of himself and the Oregon Subclass.

690.   FCA's misrepresentations and omissions alleged herein, including FCA's failure to disclose a defect in the ZF Shifter, caused Plaintiffs and the other Class members to make their purchases or leases of their Defective Shifter Vehicles.  Absent those misrepresentations and omissions, Plaintiff and the other Class members would not have purchased or leased these Defective Shifter Vehicles, would not have purchased or leased these Defective Shifter Vehicles at the prices they paid, and/or would have purchased or leased less expensive alternative vehicles that did not contain

1  a defective ZF Shifter.  Accordingly, Plaintiff and the other Class members overpaid

2  for their Defective Shifter Vehicles and did not receive the benefit of their bargain.

3      691.   Each and every sale or lease of a Defective Shifter Vehicle by an

4  authorized FCA dealer constitutes a contract between FCA and the purchaser or

5  lessee.  FCA breached these contracts by selling or leasing Plaintiff and the other

6  Class members Defective Shifter Vehicles and by misrepresenting or failing to

7  disclose the existence of the defective design, including information known to FCA,

8  rendering each Defective Shifter Vehicle less safe, and thus less valuable, than

9  vehicles not equipped with a monostable ZF Shifter.

10     692.   Additionally, FCA breached its implied covenant of good faith and fair

11  dealing under Oregon law.  By delivering vehicles containing the defectively designed

12  ZF Shifter, which was not safe, and by marketing its vehicles as safe, reliable, and of

13  high quality, FCA blatantly violated Plaintiff's and Class members' fair and

14  reasonable expectations under their respective contracts.

15     693.   As a direct and proximate result of FCA's breach of contract, Plaintiff

16  and the Class have been damaged in an amount to be proven at trial, which shall

17  include, but is not limited to, all compensatory damages, incidental and consequential

18  damages, and other damages allowed by law.

19                                **COUNT V**

20                          **UNJUST ENRICHMENT**

21     694.   Plaintiffs reallege and incorporate by reference all paragraphs as though

22  fully set forth herein.

23     695.   Plaintiff Todd Fisher brings this Count on behalf of himself and the

24  Oregon Subclass.

25     696.   FCA has received and retained a benefit from Plaintiff and the Class and

26  inequity has resulted.

27     697.   FCA has benefitted from selling and leasing defective cars whose value

28  was artificially inflated by FCA's concealment of the defective ZF Shifter at a profit,

                                    -135-

and Plaintiffs and the Class have overpaid for the cars and been forced to pay other costs.

698.    Thus, all Oregon Subclass members conferred a benefit on FCA.

699.    It is inequitable for FCA to retain these benefits.

700.    Plaintiff and the Class were not aware of the true facts about the Defective Shifter Vehicles, and did not benefit from FCA's conduct.

701.    FCA knowingly accepted the benefits of its unjust conduct.

702.    As a result of FCA's conduct, the amount of its unjust enrichment should be disgorged, in an amount according to proof.

**M.    Pennsylvania**

## COUNT I

**VIOLATIONS OF THE PENNSYLVANIA UNFAIR TRADE PRACTICES AND CONSUMER PROTECTION LAW**
**(73 PA. CONS. STAT. § 201-1, *et seq.*)**

703.    Plaintiffs reallege and incorporate by reference all paragraphs as though fully set forth herein.

704.    Plaintiffs John and Mary Metzger bring this Count on behalf of themselves and the Pennsylvania Subclass.

705.    Plaintiffs purchased or leased their Defective Shifter Vehicles primarily for personal, family or household purposes within the meaning of 73 PA. CONS. STAT. § 201-9.2.

706.    All of the acts complained of herein were perpetrated by FCA in the course of trade or commerce within the meaning of 73 PA. CONS. STAT. § 201-2(3).

707.    The Pennsylvania Unfair Trade Practices and Consumer Protection Law ("Pennsylvania CPL") prohibits unfair or deceptive acts or practices, including: (i) "Representing that goods or services have … characteristics, …. Benefits or qualities that they do not have;" (ii) "Representing that goods or services are of a particular standard, quality or grade … if they are of another;:" (iii) "Advertising goods or services with intent not to sell them as advertised;" and (iv) "Engaging in any other

-136-

fraudulent or deceptive conduct which creates a likelihood of confusion or misunderstanding." 73 PA. CONS. STAT. § 201-2(4).

708.   FCA engaged in unlawful trade practices including representing that Defective Shifter Vehicles have characteristics, uses, benefits, and qualities which they do not have; representing that Defective Shifter Vehicles are of a particular standard and quality when they are not; advertising Defective Shifter Vehicles with the intent not to sell them as advertised; and engaging in any other fraudulent or deceptive conduct which creates a likelihood of confusion or of misunderstanding.

709.   In the course of its business, FCA willfully failed to disclose and actively concealed the defective ZF Shifter discussed herein and otherwise engaged in activities with a tendency or capacity to deceive.  FCA also engaged in unlawful trade practices by employing deception, deceptive acts or practices, fraud, misrepresentations, or concealment, suppression, or omission of any material fact with intent that others rely upon such concealment, suppression, or omission, in connection with the sale of the Defective Shifter Vehicles.

710.   FCA knew it had installed a defectively designed ZF Shifter, knew that the ZF Shifter was not safe, as advertised, and had no override system to prevent roll-away incidents, even though its competitors used such override systems.  FCA knew this for at least two years, but concealed all of that information.

711.   FCA was also aware that it valued profits over safety, and that it was manufacturing, selling, and distributing vehicles throughout the United States that did not perform as advertised and jeopardized the safety of the vehicle's occupants.  FCA concealed this information as well.

712.   By failing to disclose that the defectively designed ZF Shifter was not safe and had no safety override, by marketing its vehicles as safe, reliable, and of high quality, and by presenting itself as a reputable manufacturer that valued safety and stood behind its vehicles after they were sold, FCA engaged in deceptive business practices in violation of the Pennsylvania CPL.

-137-

713.   In the course of FCA's business, it willfully failed to disclose and actively concealed the dangerous risk posed by the many safety issues and serious defects discussed above.  FCA compounded the deception by repeatedly asserting that FCA branded vehicles were safe, reliable, of high quality, and by claiming to be of a reputable manufacturer that valued safety and stood behind its vehicles once they are on the road.

714.   FCA's unfair or deceptive acts or practices were likely to and did in fact deceive reasonable consumers, including Plaintiffs and the other Class members, about the true performance of the Defective Shifter Vehicles, the quality of the FCA brand, the devaluing of safety and performance at FCA, and the true value of the Defective Shifter Vehicles.

715.   FCA intentionally and knowingly misrepresented material facts regarding the Defective Shifter Vehicles with an intent to mislead Plaintiffs and the Pennsylvania Subclass.

716.   FCA knew or should have known that its conduct violated the Pennsylvania CPL.

717.   As alleged above, FCA made material statements about the safety and utility of the Defective Shifter Vehicles and the FCA brand that were either false or misleading.

718.   FCA owed Plaintiffs a duty to disclose the true safety, performance, and reliability of the Defective Shifter Vehicles, and the devaluing of safety and performance at FCA, because FCA:

    a.   Possessed exclusive knowledge that it valued profits and cost-cutting over safety and performance, and that it was manufacturing, selling, and distributing vehicles throughout the United States that included a defectively designed ZF Shifter and did not perform as advertised;

    b.   Intentionally concealed the foregoing from Plaintiffs and the Class; and/or

c.  Made incomplete representations about the safety and performance of the Defective Shifter Vehicles generally, and the defective ZF Shifter in particular, while purposefully withholding material facts from Plaintiffs and the Class that contradicted these representations.

719.  Because FCA fraudulently concealed the defectively designed ZF Shifter and the true performance of cars equipped with the ZF Shifter, resulting in a raft of negative publicity once the defects finally began to be disclosed, the value of the Defective Shifter Vehicles has greatly diminished.  In light of the stigma attached to those vehicles by FCA's conduct, they are now worth significantly less than they otherwise would be.

720.  FCA's fraudulent use of the defectively designed ZF Shifter and the true performance of the Defective Shifter Vehicles were material to Plaintiffs and the Pennsylvania Subclass.  A vehicle made by a reputable manufacturer of safe, high-performing vehicles is safer and worth more than an otherwise comparable vehicle made by a disreputable manufacturer of unsafe vehicles that conceals defects rather than promptly remedying them.

721.  Plaintiffs and the Pennsylvania Subclass suffered ascertainable loss caused by FCA's misrepresentations and its concealment of and failure to disclose material information.  Class members who purchased the Defective Shifter Vehicles either would have paid less for their vehicles or would not have purchased or leased them at all but for FCA's violations of the Pennsylvania CPL.

722.  FCA had an ongoing duty to all FCA customers to refrain from unfair and deceptive practices under the Pennsylvania CPL.  All owners of the Defective Shifter Vehicles suffered ascertainable loss in the form of the diminished value of their vehicles as a result of FCA's deceptive and unfair acts and practices made in the course of FCA's business.

723.   FCA's violations present a continuing risk to Plaintiffs as well as to the general public.  FCA's unlawful acts and practices complained of herein affect the public interest.

724.   As a direct and proximate result of FCA's violations of the Pennsylvania CPL, Plaintiffs and the Pennsylvania Subclass have suffered injury-in-fact and/or actual damage.

725.   FCA is liable to Plaintiffs and the Pennsylvania Subclass for treble their actual damages or $100, whichever is greater, and attorneys' fees and costs.  73 PA. CONS. STAT. § 201-9.2(a).  Plaintiffs and the Pennsylvania Class are also entitled to an award of punitive damages given that Volkswagen's conduct was malicious, wanton, willful, oppressive, or exhibited a reckless indifference to the rights of others.

## COUNT II

### BREACH OF EXPRESS WARRANTY
#### (13 PA. CONS. STAT. ANN. § 2313)

726.   Plaintiffs reallege and incorporate by reference all paragraphs as though fully set forth herein.

727.   Plaintiffs John and Mary Metzger bring this Count on behalf of themselves and the Pennsylvania Subclass.

728.   FCA is and was at all relevant times a "merchant" with respect to motor vehicles under 13 PA. CONS. STAT. ANN. § 2104 and a "seller" of motor vehicles under 13 PA. CONS. STAT. ANN. § 2313.

729.   With respect to leases, FCA is and was at all relevant times a "lessor" with respect to motor vehicles under 13 PA. CONS. STAT. ANN. § 2A103 and 2A210.

730.   The Defective Shifter Vehicles are and were at all relevant times "goods" within the meaning of 13 PA. CONS. STAT. ANN. § 2105 and § 2A103.

731.   In connection with the purchase or lease of each one of its new vehicles, FCA provides an express New Vehicle Limited Warranty ("NVLW") for a period of three years or 36,000 miles, whichever occurs first.  This NVLW exists to cover

"defect in materials or workmanship." FCA also provides a powertrain limited warranty that covers the engine and transmission, including the shifter assembly for five years or 100,000 miles, whichever occurs first, for the Defective Shifter Vehicles (FCA has, since the 2016 model year, reduced its powertrain warranty to five years or 60,000 miles).

732. As a manufacturer of light-duty vehicles, FCA was required to provide these warranties to purchasers of its Defective Shifter Vehicles.

733. FCA's warranties formed the basis of the bargain that was reached when Plaintiffs and other Class members purchased or leased their Defective Shifter Vehicles equipped with the defective ZF Shifter system from FCA.

734. Plaintiffs and the Class members experienced defects within the warranty period. Despite the existence of warranties, FCA failed to inform Plaintiffs and Class members that the Defective Shifter Vehicles were defectively designed, and failed to fix the defective ZF Shifter free of charge.

735. FCA breached the express warranty promising to repair and correct a manufacturing defect or materials or workmanship of any part supplied by FCA. FCA has not repaired or adjusted, and has been unable to repair or adjust, the Defective Shifter Vehicles' materials and workmanship defects.

736. Affording FCA a reasonable opportunity to cure its breach of written warranties would be unnecessary and futile here.

737. Furthermore, the limited warranty promising to repair and/or correct a manufacturing defect fails in its essential purpose because the contractual remedy is insufficient to make Plaintiffs and the other Class members whole, and because FCA has failed and/or has refused to adequately provide the promised remedies within a reasonable time.

738. Accordingly, recovery by Plaintiffs and the other Class members is not limited to the limited warranty promising to repair and/or correct a manufacturing

defect, and Plaintiffs, individually and on behalf of the other Class members, seek all remedies as allowed by law.

739.    Also, as alleged in more detail herein, at the time FCA warranted and sold the Defective Shifter Vehicles, it knew that the Defective Shifter Vehicles did not conform to FCA's warranties and were inherently defective, and FCA wrongfully and fraudulently concealed material facts regarding its Defective Shifter Vehicles. Plaintiffs and the other Class members were therefore induced to purchase or lease the Defective Shifter Vehicles under false and/or fraudulent pretenses.

740.    Moreover, many of the injuries flowing from the Defective Shifter Vehicles cannot be resolved through the limited remedy of "replacements or adjustments," as many incidental and consequential damages have already been suffered due to FCA's fraudulent conduct as alleged herein.  Due to FCA's failure and/or continued failure to provide such limited remedy within a reasonable time, any limitation on Plaintiffs' and the other Class members' remedies would be insufficient to make Plaintiffs and the other Class members whole.

741.    FCA was provided notice of these issues by numerous complaints filed against it, including complaints to NHTSA and the instant Complaint, within a reasonable amount of time after the defect was discovered.

742.    As a direct and proximate result of FCA's breach of express warranties, Plaintiffs and the other Class members have been damaged in an amount to be determined at trial.

## COUNT III

### BREACH OF IMPLIED WARRANTY OF MERCHANTABILITY
(13 PA. CONS. STAT. ANN. § 2314)

743.    Plaintiffs reallege and incorporate by reference all paragraphs as though fully set forth herein.

744.    Plaintiffs John and Mary Metzger bring this Count on behalf of themselves and the Pennsylvania Subclass.

010616-11  881080V1

745.   FCA is and was at all relevant times a merchant with respect to motor vehicles.

746.   A warranty that the Defective Shifter Vehicles were in merchantable condition is implied by law in the instant transactions.  These Defective Shifter Vehicles, when sold and at all times thereafter, were not in merchantable condition and are not fit for the ordinary purpose for which cars are used.  Specifically, the Defective Shifter Vehicles are inherently defective in that the ZF Shifter was not adequately designed, manufactured, and tested.

747.   FCA was provided notice of these issues by complaints lodged by consumers with NHTSA—which vehicle manufacturers like FCA routinely monitor— before or within a reasonable amount of time after the allegations of the Defective Shifter Vehicle defects became public.

748.   As a direct and proximate result of FCA's breach of the warranties of merchantability, Plaintiffs and the other Class members have been damaged in an amount to be proven at trial.

## COUNT IV

### BREACH OF CONTRACT
### (Based on Pennsylvania Law)

749.   Plaintiffs reallege and incorporate by reference all paragraphs as though fully set forth herein.

750.   Plaintiffs John and Mary Metzger bring this Count on behalf of themselves and the Pennsylvania Subclass.

751.   FCA's misrepresentations and omissions alleged herein, including FCA's failure to disclose a defect in the ZF Shifter, caused Plaintiffs and the other Class members to make their purchases or leases of their Defective Shifter Vehicles.  Absent those misrepresentations and omissions, Plaintiffs and the other Class members would not have purchased or leased these Defective Shifter Vehicles, would not have purchased or leased these Defective Shifter Vehicles at the prices they paid, and/or

-143-

would have purchased or leased less expensive alternative vehicles that did not contain a defective ZF Shifter.  Accordingly, Plaintiffs and the other Class members overpaid for their Defective Shifter Vehicles and did not receive the benefit of their bargain.

752.   Each and every sale or lease of a Defective Shifter Vehicle by an authorized FCA dealer constitutes a contract between FCA and the purchaser or lessee.  FCA breached these contracts by selling or leasing Plaintiffs and the other Class members Defective Shifter Vehicles and by misrepresenting or failing to disclose the existence of the defective design, including information known to FCA, rendering each Defective Shifter Vehicle less safe, and thus less valuable, than vehicles not equipped with a monostable ZF Shifter.

753.   As a direct and proximate result of FCA's breach of contract, Plaintiffs and the Class have been damaged in an amount to be proven at trial, which shall include, but is not limited to, all compensatory damages, incidental and consequential damages, and other damages allowed by law.

## COUNT V

## UNJUST ENRICHMENT

754.   Plaintiffs reallege and incorporate by reference all paragraphs as though fully set forth herein.

755.   Plaintiffs John and Mary Metzger bring this Count on behalf of themselves and the Pennsylvania Subclass.

756.   FCA has received and retained a benefit from Plaintiffs and the Class and inequity has resulted.

757.   FCA has benefitted from selling and leasing defective cars whose value was artificially inflated by FCA's concealment of the defective ZF Shifter at a profit, and Plaintiffs and the Class have overpaid for the cars and been forced to pay other costs.

758.   Thus, all Pennsylvania Subclass members conferred a benefit on FCA.

759.   It is inequitable for FCA to retain these benefits.

-144-

760.    Plaintiffs were not aware of the true facts about the Defective Shifter Vehicles, and did not benefit from FCA's conduct.

761.    FCA knowingly accepted the benefits of its unjust conduct.

762.    As a result of FCA's conduct, the amount of its unjust enrichment should be disgorged, in an amount according to proof.

**N.    Texas**

**COUNT I**

**VIOLATIONS OF THE DECEPTIVE TRADE PRACTICES ACT**
**(TEX. BUS. & COM. CODE §§ 17.41, *et seq.*)**

763.    Plaintiffs (for purposes of all Texas Subclass counts) reallege and incorporate by reference all paragraphs as though fully set forth herein.

764.    Plaintiffs Cameron Phelps and Robert F. Hyatt IV intend to assert a claim under the Texas Deceptive Trade Practices Act ("TDTPA"), which makes it unlawful to commit "[f]alse, misleading, or deceptive acts or practices in the conduct of any trade or commerce." TEX. BUS. & COM. CODE § 17.46.  Plaintiffs will make a demand in satisfaction of TEX. BUS. & COM. CODE § 17.45(2), and may amend this Complaint to assert claims under the TDTPA once the required 60 days have elapsed.  This paragraph is included for purposes of notice only and is not intended to actually assert a claim under the TDTPA.

**COUNT II**

**BREACH OF EXPRESS WARRANTY**
**(TEX. BUS. & COM. CODE § 2.313)**

765.    Plaintiffs reallege and incorporate by reference all paragraphs as though fully set forth herein.

766.    Plaintiffs Cameron Phelps and Robert F. Hyatt IV bring this Count on behalf of themselves and the Texas Subclass.

767.    FCA is and was at all relevant times a "merchant" with respect to motor vehicles under TEX. BUS. & COM. CODE § 2.104(a) and a "seller" of motor vehicles under § 2.313(a).

768.   The Defective Shifter Vehicles are and were at all relevant times "goods" within the meaning of TEX. BUS. & COM. CODE § 2.105(a) and § 2.313.

769.   In connection with the purchase or lease of each one of its new vehicles, FCA provides an express New Vehicle Limited Warranty ("NVLW") for a period of three years or 36,000 miles, whichever occurs first.  This NVLW exists to cover "defect in materials or workmanship." FCA also provides a powertrain limited warranty that covers the engine and transmission, including the shifter assembly for five years or 100,000 miles, whichever occurs first, for the Defective Shifter Vehicles (FCA has, since the 2016 model year, reduced its powertrain warranty to five years or 60,000 miles).

770.   As a manufacturer of light-duty vehicles, FCA was required to provide these warranties to purchasers of its Defective Shifter Vehicles.

771.   FCA's warranties formed the basis of the bargain that was reached when Plaintiffs and other Class members purchased or leased their Defective Shifter Vehicles equipped with the defective ZF Shifter system from FCA.

772.   Plaintiffs and the Class members experienced defects within the warranty period.  Despite the existence of warranties, FCA failed to inform Plaintiffs and Class members that the Defective Shifter Vehicles were defectively designed, and failed to fix the defective ZF Shifter free of charge.

773.   FCA breached the express warranty promising to repair and correct a manufacturing defect or materials or workmanship of any part supplied by FCA.  FCA has not repaired or adjusted, and has been unable to repair or adjust, the Defective Shifter Vehicles' materials and workmanship defects.

774.   Affording FCA a reasonable opportunity to cure its breach of written warranties would be unnecessary and futile here.

775.   Furthermore, the limited warranty promising to repair and/or correct a manufacturing defect fails in its essential purpose because the contractual remedy is insufficient to make Plaintiffs and the other Class members whole, and because FCA

has failed and/or has refused to adequately provide the promised remedies within a reasonable time.

776.  Accordingly, recovery by Plaintiffs and the other Class members is not limited to the limited warranty promising to repair and/or correct a manufacturing defect, and Plaintiffs, individually and on behalf of the other Class members, seek all remedies as allowed by law.

777.  Also, as alleged in more detail herein, at the time FCA warranted and sold the Defective Shifter Vehicles, it knew that the Defective Shifter Vehicles did not conform to FCA's warranties and were inherently defective, and FCA wrongfully and fraudulently concealed material facts regarding its Defective Shifter Vehicles. Plaintiffs and the other Class members were therefore induced to purchase or lease the Defective Shifter Vehicles under false and/or fraudulent pretenses.

778.  Moreover, many of the injuries flowing from the Defective Shifter Vehicles cannot be resolved through the limited remedy of "replacements or adjustments," as many incidental and consequential damages have already been suffered due to FCA's fraudulent conduct as alleged herein.  Due to FCA's failure and/or continued failure to provide such limited remedy within a reasonable time, and any limitation on Plaintiffs' and the other Class members' remedies would be insufficient to make Plaintiffs and the other Class members whole.

779.  FCA was provided notice of these issues by numerous complaints filed against it, including complaints to NHTSA and the instant Complaint, within a reasonable amount of time after the defect was discovered.

780.  As a direct and proximate result of FCA's breach of express warranties, Plaintiffs and the other Class members have been damaged in an amount to be determined at trial.

# COUNT III

## BREACH OF IMPLIED WARRANTY OF MERCHANTABILITY
### (Tex. Bus. & Com. Code § 2.314)

781.   Plaintiffs reallege and incorporate by reference all paragraphs as though fully set forth herein.

782.   Plaintiffs Cameron Phelps and Robert F. Hyatt IV bring this Count on behalf of themselves and the Texas Subclass.

783.   FCA is and was at all relevant times a merchant with respect to motor vehicles.

784.   A warranty that the Defective Shifter Vehicles were in merchantable condition is implied by law in the instant transactions.  These Defective Shifter Vehicles, when sold and at all times thereafter, were not in merchantable condition and are not fit for the ordinary purpose for which cars are used.  Specifically, the Defective Shifter Vehicles are inherently defective in that the ZF Shifter was not adequately designed, manufactured, and tested.

785.   FCA was provided notice of these issues by complaints lodged by consumers with NHTSA—which vehicle manufacturers like FCA routinely monitor— before or within a reasonable amount of time after the allegations of the Defective Shifter Vehicle defects became public.

786.   As a direct and proximate result of FCA's breach of the warranties of merchantability, Plaintiffs and the other Class members have been damaged in an amount to be proven at trial.

# COUNT IV

## BREACH OF CONTRACT
### (Based on Texas Law)

787.   Plaintiffs reallege and incorporate by reference all paragraphs as though fully set forth herein.

788.   Plaintiffs Cameron Phelps and Robert F. Hyatt IV bring this Count on behalf of themselves and the Texas Subclass.

-148-

789.   FCA's misrepresentations and omissions alleged herein, including FCA's failure to disclose a defect in the ZF Shifter, caused Plaintiffs and the other Class members to make their purchases or leases of their Defective Shifter Vehicles.  Absent those misrepresentations and omissions, Plaintiffs and the other Class members would not have purchased or leased these Defective Shifter Vehicles, would not have purchased or leased these Defective Shifter Vehicles at the prices they paid, and/or would have purchased or leased less expensive alternative vehicles that did not contain a defective ZF Shifter.  Accordingly, Plaintiffs and the other Class members overpaid for their Defective Shifter Vehicles and did not receive the benefit of their bargain.

790.   Each and every sale or lease of a Defective Shifter Vehicle by an authorized FCA dealer constitutes a contract between FCA and the purchaser or lessee.  FCA breached these contracts by selling or leasing Plaintiffs and the other Class members Defective Shifter Vehicles and by misrepresenting or failing to disclose the existence of the defective design, including information known to FCA, rendering each Defective Shifter Vehicle less safe, and thus less valuable, than vehicles not equipped with a monostable ZF Shifter.

791.   Additionally, FCA breached its implied covenant of good faith and fair dealing under Texas law.  By delivering vehicles containing the defectively designed ZF Shifter, which was not safe, and by marketing its vehicles as safe, reliable, and of high quality, FCA blatantly violated Plaintiff's and Class members' fair and reasonable expectations under their respective contracts.

792.   As a direct and proximate result of FCA's breach of contract, Plaintiffs and the Class have been damaged in an amount to be proven at trial, which shall include, but is not limited to, all compensatory damages, incidental and consequential damages, and other damages allowed by law.

**COUNT V**

**UNJUST ENRICHMENT**

793.    Plaintiffs reallege and incorporate by reference all paragraphs as though fully set forth herein.

794.    Plaintiffs Cameron Phelps and Robert F. Hyatt IV bring this Count on behalf of themselves and the Texas Subclass.

795.    FCA has received and retained a benefit from Plaintiffs and the Class and inequity has resulted.

796.    FCA has benefitted from selling and leasing defective cars whose value was artificially inflated by FCA's concealment of the defective ZF Shifter at a profit, and Plaintiffs and the Class have overpaid for the cars and been forced to pay other costs.

797.    Thus, all Texas Subclass members conferred a benefit on FCA.

798.    It is inequitable for FCA to retain these benefits.

799.    Plaintiffs were not aware of the true facts about the Defective Shifter Vehicles, and did not benefit from FCA's conduct.

800.    FCA knowingly accepted the benefits of its unjust conduct.

801.    As a result of FCA's conduct, the amount of its unjust enrichment should be disgorged, in an amount according to proof.

**O.    Washington**

**COUNT I**

**VIOLATIONS OF THE WASHINGTON CONSUMER PROTECTION ACT**
**(WASH. REV. CODE ANN. § 19.86.010, *et seq*.)**

802.    Plaintiffs reallege and incorporate by reference all paragraphs as though fully set forth herein.

803.    Plaintiffs Karen Stedman and Cameron Webster bring this Count on behalf of themselves and the Washington Subclass.

804.   FCA, Plaintiff, and the Washington Subclass members are each a "person" under WASH. REV. CODE ANN. § 19.86.010(1) ("Washington CPA").

805.   FCA engaged in "trade" or "commerce" under WASH. REV. CODE ANN. § 19.86.010(2).

806.   In the course of its business, FCA willfully failed to disclose and actively concealed the defective ZF Shifter discussed herein was unsafe, and otherwise engaged in activities with a tendency or capacity to deceive.  FCA also engaged in unlawful trade practices by employing deception, deceptive acts or practices, fraud, misrepresentations, or concealment, suppression, or omission of any material fact with intent that others rely upon such concealment, suppression, or omission, in connection with the sale of the Defective Shifter Vehicles.

807.   FCA knew it had installed a defectively designed ZF Shifter and knew that the ZF Shifter was not safe, as advertised, and had no override system to prevent roll-away incidents, even though its competitors used such override systems.  FCA knew this for at least two years, but concealed all of that information.

808.   FCA was also aware that it valued profits over safety, and that it was manufacturing, selling, and distributing vehicles throughout the United States that did not perform as advertised and jeopardized the safety of the vehicle's occupants.  FCA concealed this information as well.

809.   By failing to disclose that the defectively designed ZF Shifter was not safe and had no safety override, by marketing its vehicles as safe, reliable, and of high quality, and by presenting itself as a reputable manufacturer that valued safety and stood behind its vehicles after they were sold, FCA engaged in deceptive business practices in violation of the Washington CPA.

810.   In the course of FCA's business, it willfully failed to disclose and actively concealed the dangerous risk posed by the many safety issues and serious defects discussed above.  FCA compounded the deception by repeatedly asserting that FCA branded vehicles were safe, reliable, of high quality, and by claiming to be of a

-151-

reputable manufacturer that valued safety and stood behind its vehicles once they are on the road.

811.   FCA's unfair or deceptive acts or practices were likely to and did in fact deceive reasonable consumers, including Plaintiffs and the other Class members, about the true performance of the Defective Shifter Vehicles, the quality of the FCA brand, the devaluing of safety and performance at FCA, and the true value of the Defective Shifter Vehicles.

812.   FCA intentionally and knowingly misrepresented material facts regarding the Defective Shifter Vehicles with an intent to mislead Plaintiffs and the Washington Subclass.

813.   FCA knew or should have known that its conduct violated the Washington CPA.

814.   As alleged above, FCA made material statements about the safety and utility of the Defective Shifter Vehicles and the FCA brand that were either false or misleading.

815.   FCA owed Plaintiffs a duty to disclose the true safety, performance, and reliability of the Defective Shifter Vehicles, and the devaluing of safety and performance at FCA, because FCA:

    a.    Possessed exclusive knowledge that it valued profits and cost-cutting over safety and performance, and that it was manufacturing, selling, and distributing vehicles throughout the United States that included a defectively designed ZF Shifter and did not perform as advertised;

    b.    Intentionally concealed the foregoing from Plaintiffs and the Class; and/or

    c.    Made incomplete representations about the safety and performance of the Defective Shifter Vehicles generally, and the defective ZF Shifter in particular, while purposefully withholding material facts from Plaintiffs and the Class that contradicted these representations.

-152-

816.   Because FCA fraudulently concealed the defectively designed ZF Shifter and the true performance of cars equipped with the ZF Shifter, resulting in a raft of negative publicity once the defects finally began to be disclosed, the value of the Defective Shifter Vehicles has greatly diminished.  In light of the stigma attached to those vehicles by FCA's conduct, they are now worth significantly less than they otherwise would be.

817.   FCA's fraudulent use of the defectively designed ZF Shifter and the true performance of the Defective Shifter Vehicles were material to Plaintiffs and the Washington Subclass.  A vehicle made by a reputable manufacturer of safe, high-performing vehicles is safer and worth more than an otherwise comparable vehicle made by a disreputable manufacturer of unsafe vehicles that conceals defects rather than promptly remedying them.

818.   Plaintiffs and the Washington Subclass suffered ascertainable loss caused by FCA's misrepresentations and its concealment of and failure to disclose material information.  Class members who purchased the Defective Shifter Vehicles either would have paid less for their vehicles or would not have purchased or leased them at all but for FCA's violations of the Washington CPA.

819.   FCA's actions constituted a generalized course of deception that impacts the public interest because Plaintiffs and the Washington Subclass were injured in exactly the same way as millions of others purchasing and/or leasing FCA vehicles, and the failure to follow the practices pertaining to motor vehicle warranties in WASH. REV. CODE ANN. § 19.118 is recognized by statute as matters vitally affecting the public interest.  All of the wrongful conduct alleged herein occurred, and continues to occur, in the conduct of FCA's business and has the potential for repetition.

820.   As a direct and proximate result of FCA's violations of the Washington CPA, Plaintiffs and the Washington Subclass have suffered injury-in-fact and/or actual damage.

821.   FCA's actions as set forth above induced Plaintiffs and the Washington Subclass members to purchase their Defective Shifter Vehicles from FCA and/or pay a higher price for their Defective Shifter Vehicles than they otherwise would have.

822.   Plaintiffs and the Washington Subclass were injured as a result of FCA's conduct.  Due to FCA's deceptive or unfair conduct, Plaintiffs and the Washington Subclass overpaid for their Defective Shifter Vehicles and did not receive the benefit of their bargain.  Their vehicles have also suffered a diminution in value.

823.   Pursuant to WASH. REV. CODE ANN. § 19.86.095, Plaintiffs will serve the Washington Attorney General with a copy of this complaint as Plaintiffs and the Washington Subclass members seek injunctive relief.

824.   As a direct and proximate result of FCA's breach of contract, Plaintiffs and the Washington Subclass have been damaged in an amount to be proven at trial, which shall include, but is not limited to, all compensatory damages, incidental and consequential damages, attorneys' fees, costs, treble damages, and other damages allowed by law.

### COUNT II

### BREACH OF EXPRESS WARRANTY
(WASH. REV. CODE § 62A.2-313)

825.   Plaintiffs reallege and incorporate by reference all paragraphs as though fully set forth herein.

826.   Plaintiffs Karen Stedman and Cameron Webster bring this Count on behalf of themselves and the Washington Subclass.

827.   FCA is and was at all relevant times a "merchant" with respect to motor vehicles under WASH. REV. CODE  § 62A.2-104(1) and a "seller" of motor vehicles under §§ 62A.2-103(1)(d) and 62A.2-313.

828.   The Defective Shifter Vehicles are and were at all relevant times "goods" within the meaning of WASH. REV. CODE §§ 62A.2-105(1) and 62A.2-313.

829.   In connection with the purchase or lease of each one of its new vehicles, FCA provides an express New Vehicle Limited Warranty ("NVLW") for a period of three years or 36,000 miles, whichever occurs first.  This NVLW exists to cover "defect in materials or workmanship." FCA also provides a powertrain limited warranty that covers the engine and transmission, including the shifter assembly for five years or 100,000 miles, whichever occurs first, for the Defective Shifter Vehicles (FCA has, since the 2016 model year, reduced its powertrain warranty to five years or 60,000 miles).

830.   As a manufacturer of light-duty vehicles, FCA was required to provide these warranties to purchasers of its Defective Shifter Vehicles.

831.   FCA's warranties formed the basis of the bargain that was reached when Plaintiffs and other Class members purchased or leased their Defective Shifter Vehicles equipped with the defective ZF Shifter system from FCA.

832.   Plaintiffs and the Class members experienced defects within the warranty period.  Despite the existence of warranties, FCA failed to inform Plaintiffs and Class members that the Defective Shifter Vehicles were defectively designed, and failed to fix the defective ZF Shifter free of charge.

833.   FCA breached the express warranty promising to repair and correct a manufacturing defect or materials or workmanship of any part supplied by FCA.  FCA has not repaired or adjusted, and has been unable to repair or adjust, the Defective Shifter Vehicles' materials and workmanship defects.

834.   Affording FCA a reasonable opportunity to cure its breach of written warranties would be unnecessary and futile here.

835.   Furthermore, the limited warranty promising to repair and/or correct a manufacturing defect fails in its essential purpose because the contractual remedy is insufficient to make Plaintiffs and the other Class members whole, and because FCA has failed and/or has refused to adequately provide the promised remedies within a reasonable time.

010616-11  881080V1

836.   Accordingly, recovery by Plaintiffs and the other Class members is not limited to the limited warranty promising to repair and/or correct a manufacturing defect, and Plaintiffs, individually and on behalf of the other Class members, seek all remedies as allowed by law.

837.   Also, as alleged in more detail herein, at the time FCA warranted and sold the Defective Shifter Vehicles, it knew that the Defective Shifter Vehicles did not conform to FCA's warranties and were inherently defective, and FCA wrongfully and fraudulently concealed material facts regarding its Defective Shifter Vehicles. Plaintiffs and the other Class members were therefore induced to purchase or lease the Defective Shifter Vehicles under false and/or fraudulent pretenses.

838.   Moreover, many of the injuries flowing from the Defective Shifter Vehicles cannot be resolved through the limited remedy of "replacements or adjustments," as many incidental and consequential damages have already been suffered due to FCA's fraudulent conduct as alleged herein.  Due to FCA's failure and/or continued failure to provide such limited remedy within a reasonable time, any limitation on Plaintiffs' and the other Class members' remedies would be insufficient to make Plaintiffs and the other Class members whole.

839.   FCA was provided notice of these issues by numerous complaints filed against it, including complaints to NHTSA and the instant Complaint, within a reasonable amount of time after the defect was discovered.

840.   As a direct and proximate result of FCA's breach of express warranties, Plaintiffs and the other Class members have been damaged in an amount to be determined at trial.

## COUNT III

### BREACH OF IMPLIED WARRANTY OF MERCHANTABILITY
#### (WASH. REV. CODE § 62A.2-314)

841.   Plaintiffs reallege and incorporate by reference all paragraphs as though fully set forth herein.

842.   Plaintiffs Karen Stedman and Cameron Webster bring this Count on behalf of themselves and the Washington Subclass.

843.   FCA is and was at all relevant times a merchant with respect to motor vehicles.

844.   A warranty that the Defective Shifter Vehicles were in merchantable condition is implied by law in the instant transactions.  These Defective Shifter Vehicles, when sold and at all times thereafter, were not in merchantable condition and are not fit for the ordinary purpose for which cars are used.  Specifically, the Defective Shifter Vehicles are inherently defective in that the ZF Shifter was not adequately designed, manufactured, and tested.

845.   FCA was provided notice of these issues by complaints lodged by consumers with NHTSA—which vehicle manufacturers like FCA routinely monitor— before or within a reasonable amount of time after the allegations of the Defective Shifter Vehicle defects became public.

846.   As a direct and proximate result of FCA's breach of the warranties of merchantability, Plaintiffs and the other Class members have been damaged in an amount to be proven at trial.

## COUNT IV

### BREACH OF CONTRACT
### (Based on Washington Law)

847.   Plaintiffs reallege and incorporate by reference all paragraphs as though fully set forth herein.

848.   Plaintiffs Karen Stedman and Cameron Webster bring this Count on behalf of themselves and the Washington Subclass.

849.   FCA's misrepresentations and omissions alleged herein, including FCA's failure to disclose a defect in the ZF Shifter, caused Plaintiffs and the other Class members to make their purchases or leases of their Defective Shifter Vehicles.  Absent those misrepresentations and omissions, Plaintiffs and the other Class members would

not have purchased or leased these Defective Shifter Vehicles, would not have purchased or leased these Defective Shifter Vehicles at the prices they paid, and/or would have purchased or leased less expensive alternative vehicles that did not contain a defective ZF Shifter. Accordingly, Plaintiffs and the other Class members overpaid for their Defective Shifter Vehicles and did not receive the benefit of their bargain.

850.   Each and every sale or lease of a Defective Shifter Vehicle by an authorized FCA dealer constitutes a contract between FCA and the purchaser or lessee. FCA breached these contracts by selling or leasing Plaintiffs and the other Class members Defective Shifter Vehicles and by misrepresenting or failing to disclose the existence of the defective design, including information known to FCA, rendering each Defective Shifter Vehicle less safe, and thus less valuable, than vehicles not equipped with a monostable ZF Shifter.

851.   Additionally, FCA breached its implied covenant of good faith and fair dealing under Washington law. By delivering vehicles containing the defectively designed ZF Shifter, which was not safe, and by marketing its vehicles as safe, reliable, and of high quality, FCA blatantly violated Plaintiff's and Class members' fair and reasonable expectations under their respective contracts.

852.   As a direct and proximate result of FCA's breach of contract, Plaintiffs and the Class have been damaged in an amount to be proven at trial, which shall include, but is not limited to, all compensatory damages, incidental and consequential damages, and other damages allowed by law.

## COUNT V

## UNJUST ENRICHMENT

853.   Plaintiffs reallege and incorporate by reference all paragraphs as though fully set forth herein.

854.   Plaintiffs Karen Stedman and Cameron Webster bring this Count on behalf of themselves and the Washington Subclass.

855.    FCA has received and retained a benefit from Plaintiffs and the Class and inequity has resulted.

856.    FCA has benefitted from selling and leasing defective cars whose value was artificially inflated by FCA's concealment of the defective ZF Shifter at a profit, and Plaintiffs and the Class have overpaid for the cars and been forced to pay other costs.

857.    Thus, all Washington Subclass members conferred a benefit on FCA.

858.    It is inequitable for FCA to retain these benefits.

859.    Plaintiffs were not aware of the true facts about the Defective Shifter Vehicles, and did not benefit from FCA's conduct.

860.    FCA knowingly accepted the benefits of its unjust conduct.

861.    As a result of FCA's conduct, the amount of its unjust enrichment should be disgorged, in an amount according to proof.

## REQUEST FOR RELIEF

WHEREFORE, Plaintiffs, individually and on behalf of members of the Class, respectfully request that the Court enter judgment in their favor and against Defendant, as follows:

A.    Certification of the proposed Class, including appointment of Plaintiffs' counsel as Class Counsel;

B.    An order temporarily and permanently enjoining FCA from continuing the unlawful, deceptive, fraudulent, and unfair business practices alleged in this Complaint;

C.    Injunctive relief in the form of a recall or free replacement program including that FCA:

    i.    Notify owners not to drive the Defective Shifter Vehicles until the ZF Shifter defect has been repaired;

    ii.    Provide replacement cars of comparable value to all owners until the Defective Shifter Vehicles are repaired;

-159-

iii.    For buyers who request it, buy the Defective Shifter Vehicles back at original purchase or lease cost with no deduction for use;

iv.    Fully disclose FCA's plans and intention with respect to the ZF Shifter defect, including the engineering details of the repair and a timeline for implementation;

D.    Equitable relief in the form of buyback of the Defective Shifter Vehicles;

E.    Costs, restitution, damages, including punitive damages, penalties, and disgorgement in an amount to be determined at trial;

F.    An order requiring FCA to pay both pre- and post-judgment interest on any amounts awarded;

G.    An award of costs and attorneys' fees; and

H.    Such other or further relief as may be appropriate.

## DEMAND FOR JURY TRIAL

Plaintiffs hereby demand a jury trial for all claims so triable.

DATED:  July 7, 2016        HAGENS BERMAN SOBOL SHAPIRO LLP

By  */s/ Lee M. Gordon*
   Lee M. Gordon (SBN 174168)
HAGENS BERMAN SOBOL SHAPIRO LLP
301 North Lake Avenue, Suite 203
Pasadena, CA 91101
Telephone: (213) 330-7150
Facsimile: (213) 330-7152
Email: lee@hbsslaw.com

010616-11 881080V1

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

Steve W. Berman (*pro hac vice pending*)
Thomas E. Loeser (SBN 202724)
Jessica Thompson (*pro hac vice pending*)
HAGENS BERMAN SOBOL SHAPIRO LLP
1918 Eighth Avenue, Suite 3300
Seattle, WA 98101
Telephone: (206) 623-7292
Facsimile: (206) 623-0594
Email: steve@hbsslaw.com
Email: toml@hbsslaw.com
Email: jessicat@hbsslaw.com

*Attorneys for Plaintiffs and the Proposed Class*

010616-11 881080V1